# EXHIBIT "1"

## International Centre for Settlement of Investment Disputes

1818 H  Street, N.W., Washington, D.C.  20433, U.S.A.
Telephone: (202) 458-1534    Faxes: (202) 522-2615 / (202) 522-2027
Website: http://www.worldbank.org/icsid

SISTEM MÜHENDISLIK INSAAT SANAYI VE TICARET A.S.

v.

KYRGYZ REPUBLIC

(ICSID Case No. ARB/(AF)/06/1)

## C E R T I F I C A T E

I hereby certify that the attached document is a true copy of the Decision on Jurisdiction of the Arbitral Tribunal.

Ucheora Onwuamaegbu
Secretary of the Tribunal

Washington, D.C., September 13, 2007.

INTERNATIONAL CENTRE FOR SETTLEMENT
OF INVESTMENT DISPUTES
WASHINGTON, D.C.

---

In the Proceeding Between

SISTEM MÜHENDISLIK INSAAT SANAYI VE TICARET A.S.

(Claimant)

**and**

KYRGYZ REPUBLIC

(Respondent)

(ICSID Case No. ARB/(AF)/06/1)

---

## DECISION ON JURISDICTION

---

*Members of the Tribunal*

Professor Vaughan Lowe (President)
Judge Nabil Elaraby
Dr. Paolo Michele Patocchi

*Secretary of the Tribunal*

Ucheora Onwuamaegbu

*Representing the Claimant*

Dr. Ziya Akinci
Dr. Cemile Gokyayla
Mrs. Karen D. Akinci
AKINCI LAW OFFICE

*Representing the Respondent*

Ms. Indira Satarkulova

## TABLE OF CONTENTS

**THE BACKGROUND TO THE CLAIM**                                                                  1

  Sistem's Account of the Background to the Claim                                      2

  The Kyrgyz Republic's Account of the Background to the Claim                          8

**THE PROCEDURAL HISTORY**                                                                      10

**JURISDICTION**                                                                                11

  The Requirements of Nationality                                                      12

  The Requirement That There be a Dispute Arising Out of an Investment                 12

    Is There an Investment?                                                   12

      The Positions of the Parties                                  12

      The Tribunal's Analysis                                       13

    Does the Claim Arise Directly Out of the Investment?                      20

  Jurisdiction Under the ICSID Additional Facility                                     20

    (a) Jurisdiction Under the BIT                                            20

      Article VII ("Settlement of Disputes Between One Party and Investors of the Other Party")   20

        "Disputes between one of the Parties and one investor of the other Party"   21

        "in connection with his investment"                 22

        "shall be notified in writing, including a detailed information, by the investor to the recipient Party of the investment"   22

        "If these disputes cannot be settled in this way within six months following the date of the written notification mentioned in paragraph 1"   22

        "provided that, if the investor concerned has brought the dispute before the courts of justice of the Party that is a party to the dispute and a final award has not been rendered within one year"   22

        Jurisdiction *Ratione Temporis*                     23

        The effect of the contractual dispute settlement clause   23

      Claims are based on the BIT                                    23

        "[in case both Parties become signatories of this Convention.]"   23

      Article II ("Promotion and Protection of Investments" / MFN)   24

    (b) Jurisdiction Under the Kyrgyz Investment Law                          25

    (c) Jurisdiction Under the Main Agreement                                 27

**EFFECT OF THE DECISION ON JURISDICTION**                                                      28

**COSTS**                                                                                       28

**DECISION**                                                                                    28

i

## THE BACKGROUND TO THE CLAIM

1.      This case was initiated by the Request for Arbitration dated September 30, 2005, made by Sistem Mühendislik Insaat Sanayi ve Ticaret A.S. ("**Sistem**"), a company incorporated under the laws of the Republic of Turkey ("**Turkey**") and located at 1703 Sokak 67/2 Karsiyaka, Izmir, Turkey. The Claimant says that Sistem and all of its shareholders have Turkish nationality, and this has not been contested by the Respondent. The claims are brought against the Kyrgyz Republic. The claims arise from a dispute between Sistem and the Kyrgyz Republic concerning the building and operation of a hotel in Bishkek in the Kyrgyz Republic.

2.      Turkey ratified the ICSID Convention on March 3, 1989, and the Convention entered into force for Turkey on April 2, 1989. The Kyrgyz Republic signed the ICSID Convention on June 9, 1995, but has not yet ratified the Convention.

3.      There is in force a bilateral investment treaty between Turkey and the Kyrgyz Republic (the "**BIT**"). The BIT states, in one of the texts submitted by the Claimant, that it was "Done at Bishkek on the day of 28/4/1992 in two authentic copies in English."[1]  That is the date also given on the UNCTAD website, which records that the BIT entered into force on October 31, 1996.[2] The copy submitted by the Respondent gives the date of the treaty as "29.04.92."[3]

4.      In essence, the claim arises from a joint venture formed in 1992 by the Claimant, Sistem, and a Kyrgyz company, the Ak-Keme Joint-Stock Company ("**Ak-Keme**"). Sistem says that it fulfilled its obligations under the various agreements that underpinned the project, that it bought Ak-Keme's share in the project in 1999 after Ak-Keme went into bankruptcy in 1998, and that it is entitled now to operate the hotel, but was dispossessed in March 2005 by Ak-Keme (now acting with a Malaysian partner). Sistem claims that the Kyrgyz Republic failed in its duty to protect Sistem's investment. The Respondent says that Sistem was simply a contractor hired to build the hotel, that it did not fulfil its obligations, that the 1998 bankruptcy procedure and 1998 purchase by Sistem of Ak-Keme's interest were legally invalid, and that Sistem unlawfully occupied the hotel until it was recovered by Ak-Keme and its Malaysian partner in March 2005. The Kyrgyz Republic does not accept Sistem's claim.

5.      It is necessary to explain the background in more detail.

---

[1]      Agreement Between The Republic of Turkey and The Republic of Kyrgyzstan Concerning the Reciprocal Promotion and Protection of Investments, April 28, 1992, RESMI GAZETE, 12 Şubat 1995 – Sayı: 22200, at 20, submitted as Claimant's Exhibit C-54. The other text of the Agreement, submitted as Claimant's Exhibit C-1, is undated.

[2]      Total Number of Bilateral Investment Agreements Concluded, 1 June 2006, United Nations Conference on Trade and Development, *available at* http://www.unctad.org/sections/dite_pcbb/docs/Kyrgyzstan.pdf.  The date of entry into force of the BIT is not contested.

[3]      BIT at 8, (as submitted in the Respondent's Exhibit LA-10).

**Sistem's Account of the Background to the Claim**

6.      According to Sistem, the background to the claim is as follows.  (This account refers only to those matters necessary for an understanding of this decision on jurisdiction and does not set out all of the allegations made by Sistem or all the responses made by the Kyrgyz Republic.)

7.      In 1992 Sistem decided to make a hotel investment in the Kyrgyz Republic in collaboration with Ak-Keme.  An Agreement between Sistem and Ak-Keme was signed on May 27, 1992.[4]  In Special Agreement No 1 of May 27, 1992, they agreed to "jointly construct as a 'key delivery project' a 4 star 400 beds world class hotel in Bishkek city."[5]  The Charter of the Joint Kyrgyz-Turkish Venture "**Ak-Keme-Pınara**" was signed on October 16, 1992.[6]  "**Pınara**" or "**Ak-Keme Pınara**" was the name of the hotel.

8.      In 1993 Turkey provided, via **Turkish Eximbank**, a loan to the Kyrgyz Republic of USD75 million, of which USD6 million was provided for the building of the hotel.

9.      The contract for the construction of the hotel ("**Contract No. 1**") was signed by Mr. **F. Yenice** for Sistem and by Mr. **R. Sarymsakov** for Ak-Keme on February 1, 1993.[7]  A letter dated February 3, 1993, from the National Bank of Kyrgyzstan to Sistem refers to the opening of a credit line in respect of the sum of USD6 million provided by Eximbank for the hotel project, and notes that

> This project is included in the list of the projects approved by the government of the Republic of Kirghizstan and has got a positive expert conclusion of the Ministry of Economics and Finances, State Committee on Foreign Economical Affairs and National Bank of Kirgizstan [sic] and is to be financed [according] to expences culculations [sic] made by your firm and given in feasibility studies.[8]

10.     The hotel was opened on August 28, 1995.  On December 19, 1995, according to Sistem, "Ak-Keme's armed men invaded the Hotel" and Ak-Keme informed Sistem that it would no longer take responsibility for the safety of the lives of Sistem's Turkish employees.[9]

---

[4]      Agreement Concerning Establishment and Activity of the Kyrgyz-Turkish Joint Venture, May 27, 1992 (Respondent's Exhibit E-2).

[5]      Special Agreement No. 1 for Construction of the "Ak-Keme-Pinara" Hotel in Bishkek city, May 27, 1992 (Respondent's Exhibit E-1).

[6]      Charter, Joint Kyrghyz-Turkish Venture "Ak-Keme-Pinara", Bishkek, Oct. 16, 1992 (Respondent's Exhibit E-3).

[7]      Contract for Construction and Management of a 4 Star 400 Bed Hotel in Bishkek, Kyrghyzstan, Feb. 1, 1993 (Claimant's Exhibit C-10 and Respondent's Exhibit E-4) [hereinafter Contract for Construction and Management].

[8]      Letter from S. Sulaimanbekov, Deputy Chairman of the National Bank of Kirghizstan, and R. Jumakanov, Chief of the Department on Foreign Affairs, Hard Currency Transactions, to Sistem Mühendislik Insaat (Feb. 3, 1993) (Claimant's Exhibit C-11).

[9]      Request for Arbitration, Sept. 30, 2005, para. 21;  Letter from R.A. Sarymsakov, President of Ak-Keme Joint-Stock Company, to Sistem Mühendislik Company (Dec. 19, 1995) (Claimant's Exhibit C-12).

11.     The dispute was addressed by the inter-governmental **Turkish-Kyrgyz Joint Technical Permanent Committee** in 1996, which confirmed on September 13, 1996, *inter alia* that Sistem and Ak-Keme each owned "50% [of the] shares over the hotel and the Turkish firm [Sistem] holds the operating rights for 5 years."[10]

12.     The Respondent says that in 1996 Sistem's investment licence was revoked, and that Ak-Keme began to negotiate with other investors, and in particular with a Malaysian company.  The Respondent further says that a joint venture was created by Ak-Keme and the Malaysian company, and that from 1998 onwards it was this joint venture that was continuing to construct the hotel.[11]

13.     A Decision of the Legislative Assembly of the Kyrgyz Republic dated October 7, 2002, records that in 1996 Sistem's investment licence was taken back because it "failed to prove [its] contributions," and that "[a]s a result of this, 'Ak-Keme' Joint [sc., Venture] Company has stopped performance."[12]   The notice of revocation, dated April 10, 1996, states that Sistem's licence was revoked "based on non-presentation of documents certifying the facts of investment by Turkish Founder, and informs on liquidation of Ak-Keme Pınara Joint Kyrgyz-Turkish Enterprise on the basis of documents and statement presented by Kyrgyz Founder – Ak-Keme Closed Joint-Stock Company."[13]   The 2002 Decision continued: "Construction of the Hotel had been completed from the accounts of Kyrgyz and **Malaysian investor 'Biznes Fokas Sdn. Bhd.**' Company.  2.000.000 USD had been spent for the completion of the construction."[14]

14.     On December 10, 1998, the Supreme Court of Arbitration of the Kyrgyz Republic declared Ak-Keme bankrupt, on the application of the "**Liquidation and Re-Establishment of the Companies Organization**" (the "**URLP**") of the Kyrgyz Republic.[15]   This decision followed earlier bankruptcy proceedings and reversed an earlier decision of the Bishkek City Court of Arbitration, dated November 16, 1998.

15.     The bankruptcy arose from Ak-Keme's failure to pay its debts, including debts to the Government of the Kyrgyz Republic, which had guaranteed payment by Ak-Keme of loans to Ak-Keme from the Turkish Eximbank.  The loans were used for purchasing construction materials from Turkey.[16]

---

[10]     Protocol, Turkey-Kyrgyzstan Joint Technical Committee Meeting (Claimant's Exhibit C-14).

[11]     Hearing transcripts, May 31, 2007, at 63–64;  Hearing transcripts, June 1, 2007, at 29–30.

[12]     Decision of the Legislative Assembly of the Republic of Kyrgyzstan, No. 874-II, at 1 (Oct. 7, 2002) (Claimant's Exhibit C-23).

[13]     Letter from A. Sarygulov, Director General of the General Directorate of the State Commission of the Kyrgyz Republic on Foreign Investments and Economic Assistance, to Ak-Keme Pinara Joint Kyrgyz-Turkish Enterprise (April 10, 1996) (Respondent's Exhibit LA 11).

[14]     Decision of the Legislative Assembly of the Republic of Kyrgyzstan, No. 874-II, at 1 (Oct. 7, 2002) (Claimant's Exhibit C-23) (emphasis added).

[15]     Case No. B-400/4, Judgement (Sup. Ct. Arb. Kyrg. Rep. Dec. 10, 1998) (Claimant's Exhibit C-15) (emphasis added).

[16]     *Id.*

16.     The decision of the Supreme Court of Arbitration records that

> Through the hearing, representatives of the Government of the Republic of
> Kyrgyz and the Ministry of Finance of the Republic of Kyrgyz completely
> supported the demands of the FGI of the URLP of the Republic of Kyrgyz;
> and, requested the bankruptcy of the 'Ak-Keme' company because payment
> regarding Türk Eximbank credit is a heavy burden on the state budget.[17]

It also records that "[t]he representative of the defendant appeared at the court disrespectfully
and left the room alone. He did not come to the following hearings."[18]

17.     Sistem, already the owner of a 50% share of the interest in the hotel,  subsequently
purchased the remaining 50% that had belonged to Ak-Keme in accordance with the terms of the
July 1, 1999 "**Main Agreement**," to which Turkey, the Kyrgyz Republic, the liquidator of Ak-
Keme, and Sistem were parties.[19]  Sistem did so by purchasing 100% of the shares in a new
company ("**Hotel Ak-Keme de Luks**"),[20] established by the liquidator of Ak-Keme, to which
company Ak-Keme's interest in the hotel had been transferred in accordance with the Main
Agreement.[21]

18.     The **Share Purchase Agreement** was concluded on the same day, July 1, 1999.[22]  It
provided, in Articles 2 and 3, for payment to be made by the transfer by Sistem of half of its net
profit gained from the management of the hotel.  On the following day, July 2, 1999, Sistem and
the Kyrgyz Republic agreed that Sistem would pay off Ak-Keme's debt to the Kyrgyz
Republic.[23]

19.     On April 13, 2001, representatives of the Republic of Turkey and of the Kyrgyz Republic
agreed a Protocol at a meeting of the Turkish-Kyrgyz Intergovernmental Mixed Economic
Commission.  The agreed Protocol, signed by Abdulhak Mehmet Cay, Turkish Minister of State,
and Temirbek Akmataliev, Kyrgyz Minister of Finance, included the following statement:

> The parties have affirmed their determination to fulfil the main agreement
> signed on July 1, 1999, in Ankara, under the guarantee of the Governments of
> the Turkish and Kyrgyz Republics, concerning Pınara Bishkek Hotel located
> in Bishkek.[24]

---

[17]     *Id.* at 5.
[18]     *Id.*
[19]     Main Agreement, July 1, 1999 (Claimant's Exhibit C-16;  Respondent's Exhibit E-7).
[20]     *See* Case No. B-400/4, Award (Bishkek Ct. Arb. Aug. 2, 2002) (Claimant's Exhibit C-27).
[21]     *See* Articles 1, 2 and 3 of the Main Agreement (Claimant's Exhibit C-16;  Respondent's Exhibit E-7);  *see
also* Share Purchase Agreement, July 1, 1999 (Claimant's Exhibit C-17;  Respondent's Exhibit E-8).
[22]     *Id.*
[23]     Agreement, July 2, 1999 (Claimant's Exhibit C-18).
[24]     *Turkish-Kyrgyz Intergovernmental Mixed Economic 2nd Term Meeting Commission Protocol,* ELECTRONIK
RESMI GAZETE, July 23, 2001 (Claimant's Exhibit C-19).  References in this document to "the parties" are
clearly references to the two States.

20.     Sistem alleges that the Kyrgyz authorities subsequently created difficulties for the hotel's operation, for example by alleging that the hotel's construction was defective and that the hotel lacked the necessary licence.[25]

21.     The hotel was subsequently approved for operation in an order of the Kyrgyz State Approval Committee dated January 15, 2002.[26]   The hotel was being operated by **Pınara Bishkek Ltd**, whose chairman was Mr. F. Yenice.[27]   The sole founder and member of Pınara Bishkek Co. Ltd. is Sistem.[28]   According to the Supreme Court of the Kyrgyz Republic, all rights and obligations relating to the hotel were assigned to Pınara Bishkek Ltd.[29]   The Respondent has taken no point on the distinction between Pınara Bishkek Ltd and Sistem.

22.     According to the decision of Judge B. Karasartov, dated August 2, 2002,[30]

> On July 24, 2002 an agreement was signed between ZAO 'Ak-Keme' and 'Sistem Muhendislik Insaat Sanayi ve Ticaret AS' (the sole creditor of ZAO 'Ak-Keme' considering the agreement mentioned above).[31] According to this agreement, in order to pay its debts, ZAO 'Ak-Keme''s liquidator transfers all the assets that are not brought through the auction, to the Company. The total amount of the assets is 11,256,286.56 USD and 27,182,686 soms. The transfer of the foresaid assets was made considering the last auction values of them, which is 11,002,148.94 USD and 175,850 soms. This agreement was approved by ZAO 'Ak-Keme''s creditors' meeting on July 25, 2002 and since then, the debt of 12,220,276.23 USD from the company to its liquidator (debt remaining from the Hotel), the debt of 27,187,686 soms and 11,256,286.56 USD from the liquidator to the company are accepted as having been paid.

23.     In the decision dated August 2, 2002, the liquidation of Ak-Keme was declared complete by Judge B Karasartov.[32]   The decision records the establishment of Hotel Ak-Keme de Luks and its sale to Sistem. It notes that the hotel was valued at USD10,570,000, and that 100% of the

[25]   Request for Arbitration, Sept. 30, 2005, para. 38;  Letter from K. Bezkorovayniy, Assistant Manager of State Architecture and Construction Inspectorship to the Public Prosecutor of Bishkek (Jan. 4, 2000) (Claimant's Exhibit C-20);  *see also* Prof. Melike Altan's and Engineer Nejat Bayulke's Report on Pinara Hotel, (Claimant's Exhibit C-21).
[26]   Request for Arbitration, para. 40;  Agreement of the State's Approval Committee to the Commission of the Completed 1st Degree (step, line) Construction of "Pinara-Bishkek" Hotel in International Standards, Domiciled in Bishkek (Jan. 15, 2002) (Claimant's Exhibit C-22) [hereinafter Agreement of the State's Approval Committee].
[27]   *See id.;  see also* Letter from Gürsel Yenice, Vice President of "Pınara Bishkek" LTD, to the Government of the Kyrgyz Republic, Kyrgyz General Public Prosecutor, Ministry of Internal Affairs, and the National Security Service (March 28, 2005) (Claimant's Exhibit C-29) [hereinafter Yenice's March 28, 2005 letter].
[28]   Letter from Bekmamat uuly T., Division Head, Bishkek Office of Public Prosecutor, to the Authorities of Internal Affairs Departments of the Kyrgyz Republic and the Republic of Kazakhstan (May 31, 2006) (Respondent's Exhibit LA-37).
[29]   Case No. 6-904, Decision (Sup. Ct. Kyrg. Rep. Nov. 2, 2005) (Respondent's Exhibit LA-9).
[30]   Case No. B-400/4, Award, at 3 (Bishkek Ct. Arb. Aug. 2, 2002) (Claimant's Exhibit C-27).
[31]   This appears to be referring to the agreement that Sistem take over the claims of Ak-Keme's creditors.
[32]   Case No. B-400/4, Award.

shares in Hotel Ak-Keme de Luks were sold to Sistem for USD12,700,000.  It further notes that unpaid creditors of Ak-Keme had transferred their rights to Sistem and that

> As August 1, 2002,[33] 'Sistem Muhendislik' paid the following amounts to the mentioned legal entities: AGB Bishkek 19,039.64 USD (remaining: 6000 USD), Oktyabr Region Tax Office 1,703,986 soms[34] (remaining: 4,800,000 soms), Insurance 840,000 soms (remaining 316,700 soms). The debt to the Economic Development Fund shall be paid depending on the annual business results of the 'Pınara Bishkek' Hotel.[35]

24.    Sistem says that following a change in the political climate in the Kyrgyz Republic the attitude towards foreign investors changed.[36]  Decision 874-II of the Legislative Assembly of the Republic of Kyrgyzstan, dated October 7, 2002, determined that Sistem had not fulfilled its commitments relating to the hotel project and had violated Kyrgyz laws and procedures.  It recommended that the Government cancel the Main Agreement and other agreements made on July 1, 1999, and transfer the hotel from Sistem to a new company, formed by Ak-Keme and the Malaysian investor, within ten days.[37]  It also recommended collection of taxes and other sums said to be owed by Sistem to the Kyrgyz Republic, among other matters.

25.    In a letter dated October 15, 2002, Sistem said that the account given by the Legislative Assembly was inaccurate.[38]  A criminal investigation into the hotel was nevertheless started on the basis of the decision 874-II of the Legislative Assembly, and pursuant to that investigation, two of Sistem's bank accounts, in the name of "Pınara Bishkek Ltd," were frozen following a decision of the "Interrogation Judge of Acute Issues" of Bishkek City Prosecution Office on December 20, 2002.[39]  In the meantime, on December 10, 2002, the Constitutional Court of the Kyrgyz Republic ruled that the bankruptcy of Ak-Keme was unconstitutional and should not be executed.[40]

26.    On December 24, 2002, a further decision of the "Interrogation Judge of Acute Issues" of Bishkek City Prosecution Office annulled the previous decision, dated December 20, 2002, and thus unfroze Sistem's bank accounts.[41]

---

[33]   *Id*. at 2.  The English and Turkish translations refer here and elsewhere to August *2005*, but this is clearly an error: in the Russian original the dates appear as August 2002.

[34]   100 soms is approximately equivalent to USD2.60.

[35]   Case No. B-400/4, Award at 3.

[36]   Request for Arbitration, Sept. 30, 2005, para. 41.

[37]   Decision of the Legislative Assembly of the Republic of Kyrgyzstan, No. 874-II, at 3 (Oct. 7, 2002) (Claimant's Exhibit C-23).

[38]   Letter from Fehim Unice, Chairman of the Board of Directors of Sistem Mühendislik (Oct. 15, 2002) (Claimant's Exhibit C-24).

[39]   Request for Arbitration, para. 43;  Decision on Usurpation of Property (Dec. 20, 2002) (Claimant's Exhibit C-25).

[40]   December 10 is the date given in the freezing order dated December 20, 2002. *Id*. at 1.  The text of the decision of the Constitutional Court which appears as Respondent's Legal Authority LA-5 is dated December 17, 2002.  For the purposes of this decision on jurisdiction, nothing turns on the discrepancy in the dates.

[41]   Decision Regarding the Annulment of Confiscation over the Ownership (Dec. 24, 2002) (Claimant's Exhibit C-26).

27.     The next events that are specifically concerned with the hotel project to which Sistem points occurred in 2005. During the intervening period it appears that Sistem was occupying and operating the hotel. Sistem says that it has run the hotel from 1999 until 2005 and that many official documents of the Kyrgyz Republic recognized it as an investor, so that the Kyrgyz Republic in fact treated it as an investor regardless of the revocation of its investment licence in 1996.[42]

28.     Sistem alleges that on March 25, 2005, Mr. Sarymsakov "invaded the hotel with 50 armed men" and that "[s]ome of the invaders introduced themselves as the Public Prosecutor and the General and police, by showing their identity cards." Sistem sought the assistance of the authorities in ending this incursion into the hotel, and sought to prevent the use without its permission of the stamps, headings and other documentation belonging to the hotel.[43]

29.     On April 6, 2005, the Acting President and Prime Minister of the Kyrgyz Republic, Mr. Kurmanbek Bakiyev, requested the Public Prosecutor, Ministry of Internal Affairs, and National Security Committee to "return the rights of the investor and take urgent measures in order to fulfil the previous commitments of the Government of the Republic of Kyrgyzstan."[44]

30.     On April 8, 2005, the Bishkek Public Prosecutor ordered Ak-Keme and Mr. Sarymsakov to return the hotel to Pınara Bishkek Ltd.[45] The hotel was not returned.

31.     On June 14, 2005, the Bishkek City office of the General Public Prosecutor of the Kyrgyz Republic wrote to Sistem noting *inter alia* that the question of the ownership of the hotel was in issue before the Kyrgyz courts.[46]

32.     On June 30, 2005, Sistem wrote to the Government of the Kyrgyz Republic outlining the dispute and recalling the terms of the Main Agreement and the dispute settlement provisions of the BIT.[47] On July 18, 2005, the Kyrgyz State Estate Fund Administrative Committee wrote to Sistem saying *inter alia* that the dispute lay between Sistem and non-governmental people (R. Sarymsakov and S. A. Jumanaliyeva) and that there was "no dispute between [Sistem] and the Government of the [Kyrgyz Republic]."[48]

---

[42]    Hearing transcripts, May 31, 2007, at 26.
[43]    Request for Arbitration, para. 46–51.
[44]    Letter from K. Bakiyev, Prime Minister of the Kyrgyz Republic, to A. Beknazarov, Public Prosecutor, M. Abdyldayev, Ministry of Internal Affairs, and T. Aytbayev, National Security Committee (April 6, 2005) (Claimant's Exhibit C-34).
[45]    Order No. 11/1-05 on Immediate Ending of Unlawful Actions (Bishkek City Prosecutor's Office, April 8, 2005) (Claimant's Exhibit C-35).
[46]    Letter from R. Majenov, Deputy Public Prosecutor of Bishkek city, to E.V. Babitskaya, Representative of Sistem Mühendislik (June 14, 2005) (Claimant's Exhibit C-40).
[47]    Letters from G. Yencie, Vice President of the Board of Directors of Sistem Mühendislik, to K. Bakiyev, acting President and Prime Minister of the Kyrgyz Republic, to the Minister of Finance of the Kyrgyz Republic, and to the Chairman of the Kyrgyz State Estate Fund (June 30, 2005) (Claimant's Exhibit C-41).
[48]    Letter from A. Madmarov, First Deputy Chairman of the State Estate Fund Administrative Committee, to G. Yenice, Vice President of the Board of Directors of Sistem Mühendislik, at 1 (July 18, 2005) (Claimant's Exhibit C-43).

33.    It is on the basis of alleged facts including those set out above that Sistem claims that the Kyrgyz Republic failed in its obligations, set out in the BIT, in Kyrgyz law and in the Main Agreement, to protect Sistem's investment in the Kyrgyz Republic.[49]

**The Kyrgyz Republic's Account of the Background to the Claim**

34.    The Kyrgyz Republic does not accept the account of the facts given by the Claimant.  In particular, it asserts that Sistem was itself in serious breach of its obligations as an investor in the Kyrgyz Republic.

35.    Specifically, the Respondent says that Sistem failed to make any contribution to the project,[50] and notes that Sistem's investment licence was revoked in 1996 because of its failure to prove that it had made the necessary investment.[51]  It regards Sistem as having been hired by Ak-Keme as contractors, not investors.[52]

36.    According to the Respondent, the hotel was not completed and could not be opened in 1996.[53]  Sistem was essentially absent from the project during the period 1996–1999, during which time Ak-Keme continued the construction of the hotel, at first on its own and then together with a Malaysian partner which paid Ak-Keme's debts in the amount of USD2 million.[54]

37.    The Respondent says that the 1998 declaration of bankruptcy in respect of Ak-Keme was unlawful, pointing to the 2002 decision of the Supreme Court. [55]

38.    The Respondent has also submitted the text of the decision of the Supreme Court of the Kyrgyz Republic in the case No. 6-904, dated November 2, 2005, in which the Supreme Court determined that Ak-Keme was not the owner of the hotel at the time of its bankruptcy, having already transferred it to the joint venture that it had established in January 1997 with the Malaysian investor (the Joint Kyrgyz Malaysian Venture or "**JKMV**").[56]

39.    The Respondent says that "in 1999 Sistem again appears and somehow enters into a contract."[57]  It suggests that the 1999 Main Agreement was procured irregularly:

---

[49]    Request for Arbitration, Sept. 30, 2005, paras. 68, 69.
[50]    Hearing Transcripts, May 31, 2007, at 59, 60, 67.
[51]    *Id.* at 64–65.
[52]    *Id.* at 67.
[53]    *Id.* at 66.
[54]    Hearing Transcripts, June 1, 2007, at 29–30.
[55]    December 10 is the date given in the freezing order dated December 20, 2002  (*see* Decision on Usurpation of Property at 1 (Dec. 20, 2002) (Claimant's Exhibit C-25)).  The text of the decision of the Supreme Court which appears as Respondent's Legal Authority LA-5 is dated December 17, 2002.  For the purposes of this Decision on Jurisdiction, nothing turns on the discrepancy in the dates.
[56]    *See* Case No. 6-904, Decision (Sup. Ct. Kyrg. Rep. Nov. 2, 2005) (Respondent's Exhibit LA-9).
[57]    Hearing Transcripts, June 1, 2007, at 30.

8

Sistem somehow managed to agree with some governmental officials to sign the [M]ain [A]greement, and it claimed it to be the ground for them to operate in the hotel.[58]

40.     It also says that the Main Agreement has the status of an international agreement, and is therefore, as a matter of Kyrgyz law, subject to ratification by the Kyrgyz Government, which was not done.[59]   Further, it says that both the Main Agreement and the Share Purchase Agreement were, in 2002, found to be illegal,[60] and that it was in this context that in 2002 the Legislative Assembly passed the resolution recommending cancellation of the 1999 Agreements.

41.     In its decision in the case No. 6-904, dated November 2, 2005, submitted by the Respondent, the Supreme Court of the Kyrgyz Republic determined that the July 1999 agreements under which Sistem acquired Ak-Keme's interest in the hotel were made on "crushing terms,"[61] in the interests only of Sistem and contrary to public and State interests, and in a manner that did not comply with the requirements of Kyrgyz civil legislation.   The agreements were declared to be void.

42.     The Respondent says that when Sistem was operating the between 1999 and 2005 it was doing so illegally, on the basis of the 1999 Agreements.

43.     Sistem applied to the Bishkek Inter-District Court for an order excluding employees of the JKMV from the hotel.   The application was refused in the Court's decision dated December 19, 2005,[62] which noted the earlier court decisions on the invalidity of the bankruptcy procedure and the 1999 agreements.

44.     By an amicable agreement between (i) the Ministry of Economy and Finances of the Kyrgyz Republic, (ii) the Bankruptcy Affairs Administration under the State Committee of the Kyrgyz Republic on State Property, and (iii) JKMV, dated July 12, 2006,[63] JKMV assumed the liability to pay certain debts in the amount of USD10,261,883.00 and 1,001,150.35 som, owed by Ak-Keme to the Ministry of Economy and Finances of the Kyrgyz Republic.   That amicable agreement was approved by the Bishkek City Court as of July 12, 2006.[64]

45.     In a Default Judgment of the Leninskiy District Court of the City of Bishkek in case No. G.D.-1945\06gb1, dated November 23, 2006, Sistem was ordered to pay JKMV USD5,092,900, being the difference between the amount for which Sistem was paid (around USD8.7 million) for the construction of the hotel under the agreed payment scheme between 10.09.1993 and 05.09.1995, and the amount of services actually rendered by Sistem.[65]

---

[58]     Hearing Transcripts, May 31, 2007, at 84.
[59]     Id. at 68–69.
[60]     Id. at 72.
[61]     Case No. 6-904, Decision at 2,3.
[62]     Case No. ƏD-368/05mbc9, Decision (Bishkek Inter-Dist. Ct. Dec. 19, 2005) (Respondent's Exhibit LA-31).
[63]     Respondent's Counter-Memorial on Jurisdiction at 40–41, 48–49.
[64]     See Case No. G.D.-1945\06gb1, Default Judgment at 1 (Bishkek Leninskiy Dist. Ct. Nov. 23, 2006) (Respondent's Exhibit LA-32).
[65]     Id. at 1,5.

9

## THE PROCEDURAL HISTORY

46.     The case was initiated by the Request for Arbitration dated September 30, 2005, filed by Sistem.  The case was registered by ICSID on April 12, 2006, as case No. ARB/(AF)/06/1, following extensive exchange of communications between Sistem and the Centre.

47.     On June 13, 2006, more than sixty days having elapsed since the registration of the request for arbitration and the parties having not agreed on the number of arbitrators and the method of their appointment, the Claimant invoked Article 9 of the Arbitration (Additional Facility) Rules, under which, the Tribunal is to consist of three arbitrators, one appointed by each side and the third who shall be the presiding arbitrator, appointed by agreement of the parties. Also on June 13, 2006, the Claimant appointed Mr. Paolo Michele Pattocchi, a national of Switzerland, as arbitrator.  The Respondent did not respond to correspondence from ICSID and on July 13, 2006, the Claimant invoked Article 6(4) of the Additional Facility Rules, by which the arbitrators not yet appointed would be appointed by the Chairman of the ICSID Administrative Council upon the request of one of the parties.  The Chairman appointed Judge Nabil Elaraby, a national of Egypt, and Professor Vaughan Lowe, a national of the United Kingdom, as arbitrators in the case, with Professor Lowe being designated as presiding arbitrator.  The Tribunal was constituted on October 26, 2006.

48.     The first session of the Tribunal was held in Geneva on November 30, 2006.  The Claimant was represented by Dr. Ziya Akinci, Dr. Cemile Gokyayla, and Mrs. Karen D. Akinci of the Akinci Law Office, Istanbul.  The Respondent, which had been repeatedly notified by ICSID of the date and location of the session, was not represented.

49.     At the first session the Tribunal decided that it would separate questions of jurisdiction and merits, and first hold a hearing on the question of jurisdiction.

50.     The Claimant filed a **Memorial on Jurisdiction** on January 17, 2007.

51.     The Respondent filed a **Counter-Memorial on Jurisdiction** on May 9, 2007.

52.     At the request of the Tribunal, in order to clarify the issues in dispute as far as possible before the hearing, the Claimant filed a brief response, the **Reply on Jurisdiction,** on May 17, 2007.

53.     At the request of the Tribunal, in order to clarify the issues in dispute as far as possible before the hearing, the Respondent filed a brief response, the **Rejoinder on Jurisdiction,** on May 23, 2007.

54.     The hearing on jurisdiction was held at the World Bank offices in Paris on May 31, 2007, and June 1, 2007.  Dr. Ziya Akinci, Dr. Cemile Gokyayla, and Mrs. Karen D. Akinci of the Akinci Law Office appeared on behalf of the Claimant.  Ms. Indira Satarkulova appeared for the Respondent.  Also attending were Mr. Fehim Yenice, Mr. Gürkan Yenice, and Mr. Gürsel Yenice, of Sistem Muhendislik Insaat Sanayi ve Ticaret A.S.;  Mr. Ishenbay Dushenbievich Kadyrbekov, former peoples' deputy of the Kyrgyz Soviet Socialist Republic and former deputy

10

of the Legislative Assembly of the Jogorku Kenesh-Parliament of the Kyrgyz Republic, Mr. Leonid Nuhimovich Komarover, a former Government official, Mr. Ruslan Sarymsakov, President of the Joint Kyrgyz-Malaysian Venture LLC "Ak Keme" Hotel, LLC, and Mr. Nurdin Sarymsakov, former employee of the "Ak-Keme" Joint Stock Company.

55.   After the hearing the Parties filed comments on the transcript of the hearing and costs, within the time limits set by the Tribunal and adjusted to take account of a delay in the translation of the transcript of the hearing on jurisdiction. The Respondent filed a submission on June 3, 2007, and the Claimant filed a submission on July 6, 2007.

56.   The Tribunal has read the written submissions of the Parties and the transcript of the hearing on jurisdiction, and, after deliberation among its members, has decided as follows.

## JURISDICTION

57.   The Claimant asserts that there are three grounds upon which the Tribunal may base its jurisdiction in this case:

      a.   The BIT, including both
            i.   Article VII ("Settlement of Disputes Between One party and Investors of the Other Party"), and
            ii.   Article II (the MFN provision, under "Promotion and Protection of Investments").
      b.   Article 18 of the Kyrgyz Investment Law, dated March 27, 2003
      c.   Article 12 of the Main Agreement and Article 6 of the Share Purchase Agreement.[66]

58.   Each basis will be addressed in turn. Before doing so the Tribunal will address the question whether the dispute falls within the jurisdiction of the ICSID Additional Facility and certain questions of general significance.

59.   As was noted above,[67] Turkey is a Party to the ICSID Convention, and the Kyrgyz Republic has signed but not ratified the Convention. The claim accordingly falls to be considered within the context of the ICSID Additional Facility. That Facility authorizes the ICSID Secretariat to administer proceedings between a State and a national of another State falling within the following categories:

> (a) conciliation and arbitration proceedings for the settlement of legal disputes arising directly out of an investment which are not within the jurisdiction of the Centre because either the State party to the dispute or the State whose national is a party to the dispute is not a Contracting State;
> (b) conciliation and arbitration proceedings for the settlement of legal disputes which are not within the jurisdiction of the Centre because they do not arise

---

66    Claimant's Memorial on Jurisdiction, para. 5.
67    *See supra* para. 2.

11

directly out of an investment, provided that either the State party to the dispute or the State whose national is a party to the dispute is a Contracting State . . . .

## The Requirements of Nationality

60.     There is no dispute that the requirements of the ICSID Additional Facility relating to nationality are met in the present case, the Claimant being a national of an ICSID Contracting party, Turkey, and the Respondent being another State, the Kyrgyz Republic, which is not an ICSID Party.

## The Requirement That There be a Dispute Arising Out of an Investment

61.     There are two aspects to the question whether there is a dispute arising out of an investment.  The first is the question whether there is an investment, and the second is the question whether the dispute arises out of the investment.

### Is There an Investment?

#### The Positions of the Parties

62.     In this case the Claimant asserts that it has made an investment in the Kyrgyz Republic, *inter alia* by constructing and operating the hotel, buying the shares in the hotel that formerly belonged to Ak-Keme, transferring know-how, and paying Ak-Keme's debts.[68]

63.     The Respondent denies that Sistem made an "investment" in the Kyrgyz Republic.  It concedes that Sistem was issued by the Kyrgyz authorities with an investment licence in 1993, but says that it is not enough for the Claimant to be registered as an investor: it must also be shown that "there were financial operations or financial activity, and contributions attracted or owned by the investor made into the economical development of the State."[69]  It says that Sistem itself made no such contributions of money, time or work to the project.[70]

64.     The Respondent characterizes Sistem's role as that of a contractor, building the hotel for Ak-Keme as the employer, and funded by Ak-Keme using monies deriving ultimately from the Turkish Eximbank funds.[71]  It says further that Sistem failed to fulfil its obligations towards Ak-Keme, and that it was necessary to bring in other (Malaysian) investors in order to complete the hotel.[72]  "Sistem [was] never [in] a position of joint investor," according to the Respondent.[73]

---

[68]   Hearing Transcripts, May 31, 2007, at 19–20;  Hearing Transcripts, June 1, 2007, at 1–4.
[69]   Hearing Transcripts, May 31, 2007, at 52.
[70]   *Id.* at 59, 60, 67.
[71]   *Id.* at 56;  *cf. id.* at 60,
[72]   *Id.* at 62–64.
[73]   *Id.* at 64.

65.   During the hearing on jurisdiction the Respondent gave this account of the position:

> By means of Ak-Keme Joint Stock Company, the hotel was constructed; by means of Kyrgyz-Malaysian company, the hotel was completed.  Sistem invaded the hotel. Sistem somehow managed to agree with some governmental officials to sign the [M]ain [A]greement, and it claimed it to be the ground for them to operate in the hotel, in the Ak-Keme Hotel.  They operated with profits, they took profits from the operation and management of the hotel.[74]

66.   When asked by the Tribunal

> how does the Kyrgyz Republic answer the objection that Sistem has as a matter of fact been carrying on economic activity for several years in the Kyrgyz Republic, to the knowledge of at least some branches of the Kyrgyz Government, without being closed down by the government?

the Respondent replied:

> By referring to the [M]ain [A]greements, Sistem operated the hotel, and it claimed to have property rights and ownership of the hotel.  Because there was no thorough investigation made in this case.[75]

67.   The Respondent considers that Sistem was operating the hotel illegally, having in effect ousted Ak-Keme.[76]   The Respondent also pointed out that the Government of the Kyrgyz Republic could not simply order Sistem to leave the hotel: the matter had to proceed through the State's courts.[77]   Moreover, the Respondent distinguished between the making of an investment and the carrying out of economic activity, suggesting that Sistem merely operated an already-built hotel in order to obtain profit from it, and that this "has nothing to do with the definition of 'investment activity.'"[78]

The Tribunal's Analysis

68.   A key question in the present proceedings is whether the Claimant is an investor which has made an investment in the Kyrgyz Republic.  The question of what constitutes an investment arises in this case under the BIT and the Kyrgyz Investment Law.  The Tribunal notes that it is not necessary for the existence of jurisdiction under the ICSID Additional Facility that the dispute concern an investment.

---

[74]   *Id.* at 84.
[75]   *Id.* at 85.
[76]   *Id.* at 87, 88.
[77]   *Id.* at 85–86.
[78]   *Id.* at 87.

69.     The ICSID Additional Facility does not define the term "investment."

70.     The BIT defines the term "investment" in Article I, as follows:

> 2. The term 'investment', in conformity with the hosting Party's Laws and Regulations, shall include every kind of asset in particular, but not exclusively:
>
> (i)     shares, stocks or any other form of participation in companies,
> (ii)    returns reinvested, claims to money or any other rights to legitimate performance having financial value related to an investment,
> (iii)   moveable and immoveable property, as well as any other rights in rem such as mortgages, liens, pledges and any other similar rights,
> (iv)    copyrights, industrial and intellectual property rights such as patents, licenses, industrial designs, technical processes, as well as trademarks, goodwill, know-how and other similar rights,
> (v)     business concessions conferred by law or by contract, including concessions to search for, cultivate extract or exploit natural resources on the territory of each Party as defined hereafter.
>
> 3. The term 'returns' means the amounts yielded by an investment and includes in particular, though not exclusively, profit, interest, and dividends.[79]

71.     The Kyrgyz Investment Law[80] defines the term "investments" and "investor" in Chapter 1, Article 1, as follows:

> 1. Investments mean tangible and intangible assets, in particular:
> -   money;
> -   moveable and immoveable property;
> -   property rights (mortgages, liens, pledges and others);
> -   stock and other forms of participation in a legal entity;
> -   bonds and other debenture liabilities;
> -   non-property rights (right to intellectual property including goodwill, copyrights, patents, trade marks, industrial designs, technological processes, trade names and know-how);
> -   any right to activity based on a license or in other form given by State agencies;
> -   concessions based on Law, including concessions for search, development, mining or exploitation of natural resources;

---

[79]     BIT at 1–2.
[80]     Law No. 66 of the Kyrgyz Republic on Investments in the Kyrgyz Republic at 1–2 (March 27, 2003) (Claimant's Exhibit C-7;  Respondent's Exhibit LA-27) [hereinafter Law No. 66].

- profit and revenue received from investment and re-invested on the territory of the Kyrgyz Republic;
- other forms of investments that are not forbidden by the legislation of the Kyrgyz Republic.

[. . .]

2. Direct Investments mean the holding, acquisition by an investor of not less than one third percent of stock and stockholders votes in joint stock companies registered or newly created on the territory of the Kyrgyz Republic, or any equivalent of such participation in business entities of other types and all further operations between an investor and a company which is invested to, investment of capital to the fixed assets of branches, representative offices of a legal entity created on the territory of the Kyrgyz Republic.

3. Investor means a subject of investment activity making his own, borrowed or attracted contributions as direct investments.

[. . .]

72.    It is in principle possible that certain economic activity might constitute an "investment" for the purposes of some legal instruments but not others.  In the particular context of this case, however, the Tribunal finds no significant differences in the definitions of an investment under the legal instruments applicable in this case.

73.    The Tribunal considers that the initial intentions of Sistem and Ak-Keme regarding the nature of Sistem's activity in relation to the hotel project are evident from the key agreements concluded in 1992 and 1993.

74.    Article 1 of Special Agreement No. 1 of May 27, 1992, between Sistem and Ak-Keme refers to their agreement to "jointly construct" the hotel.[81]  According to the Respondent, Article 2.1 of the Agreement of May 27, 1992 provides that "Joint Venture is established with the purpose of joint construction and operation of the hotel in Bishkek city."[82]

75.    A third document from 1992, the Charter of the Joint Kyrgyz-Turkish Venture "Ak-Keme-Pınara," signed on October 16, 1992,[83] names Sistem and Ak-Keme as the members of the joint venture ('JV') Ak-Keme-Pınara.  It sets out in Article 2 the aim of the joint venture, which is "joint Hotel construction and running in Bishkek."  It then defines, in 13 sub-paragraphs, the "Venture activity subject," as follows:

2.2.1   Project documents for hotel construction elaboration.

---

[81]     Special Agreement No. 1 for Construction of the "Ak-Keme-Pinara" Hotel in Bishkek City (May 27, 1992) (Respondent's Exhibit E-1).
[82]     Respondent's Post-Hearing Submission at 3.
[83]     Charter, Joint Kyrghyz-Turkish Venture "Ak-Keme-Pinara", Bishkek, Oct. 16, 1992 (Respondent's Exhibit E-3).

2.2.2   Hotel construction in Bishkek.

2.2.3   Goods and raw materials export from Kyrghyzstan Republic.

2.2.4   Goods, machines, equipment, technologies service and materials import for hotel construction needs and venture activity.

2.2.5   Rights on ownership and utilisation of licences, technologies, 'know-how' etc. (acquisition) and other technical information connected with 'JV' acquisition, technical information exchange and technical ties development.

2.2.6   Foreign tourist groups and tourists acception [sic] and service.

2.2.7   Tourist service arrangement in the Republic with routes elaboration and service.

2.2.8   Carrying out commercial operations not contradicting Kyrghyzstan Republic legislation.

2.2.9   Advertisement and sponsor activity.

2.2.10  Tourism instructors and hotel workers training.

2.2.11  Consultations, marketing, brokers service and leasing service.

2.2.12  Investments on countries – 'JV'-members territories with the aim of service and assistance to foreign citizens.

2.2.13  Own souvenirs production and realisation of Participants and other people's production.

76.    These provisions point to an involvement by Sistem that goes beyond the mere construction of the hotel and extends into its operation.

77.    Article 4.4 of the Charter contains a provision which reads as follows:

> . . . 'Sistem Muhendislik' having signed this agreement, not in the capacity of a materials supplier or a Trade Company but in the capacity of a contractor Partner during the construction stage giving services for preparing the project and its related technical supplements and documents and also for constructing the hotel will not be asked in any way to disclose itemized or otherwise the prices of an [sic] material it has to supply (due to local unavailability) for the construction, finishing and equipping the hotel.

78.    This provision (in translation) distinguishes between a mere supplier of materials and a construction Partner. In the view of the Tribunal, the provision is concerned with the process of calculating the resources invested by Ak-Keme and Sistem respectively, and is intended to release Sistem in certain circumstances from any duty to itemise the value of materials that it supplies for the project. Moreover, it relates only to the construction phase and says nothing of the operation phase of the project. Whatever the precise meaning of that provision (and the Tribunal takes no position here on that question), it is plain that the reference to Sistem as a "contractor Partner" was not intended to characterize the nature of the entirety of Sistem's involvement in the hotel project. This provision does not, in the view of the Tribunal, lead to the conclusion that Sistem was merely a hired contractor engaged in the construction of the hotel.

79.    A further indication of the original intentions of Sistem and Ak-Keme regarding the nature of their venture appears in Article 1 of the contract between Sistem and Ak-Keme, dated February 1, 1993 (Contract No. 1) (in which Sistem is referred to as "the Contractors" and Ak-Keme as "the Customers"). It reads as follows:

> 1. Subject of the Contract
> The Contractors will construct as a 'key delivery project' a 4 star 400 beds Hotel in Bishkek on the plot supplied by the Customers and will supply technical and project documentation also a feasibility report, consultancy and assistance, supervision, training of Customers' personnel, Technical Know-How and at completion of the Hotel will be 50% shareholder and will participate in management. [84]

80.    The final words, "and at completion of the Hotel will be 50% shareholder and will participate in management," again indicate an intention that the involvement of Sistem should extend beyond the construction of the hotel.

81.    That reinforces the indications to the same effect in the 1992 documents, quoted above. The Tribunal considers that these documents evidence an intention that Sistem should not only construct the hotel in Bishkek but, having constructed it, should thereafter be a participant in the management and operation of the hotel.

82.    Accordingly, the construction of the hotel by Sistem from November 1992 onwards[85] was itself an activity undertaken in contemplation of Sistem becoming a continuing participant in the management of the hotel.

83.    The Main Agreement and Share Purchase Agreement of July 1, 1999, confirm this view. It is very clear that those two agreements contemplated that Sistem would manage the hotel for some time after the date of those agreements. This is evident from the provisions in Articles 2.2 and 3.3.1 of the Share Purchase Agreement[86] under which the Buyer (Sistem)[87] would remit half of the net profit from the management of the Hotel as payment for the shares purchased according to the terms of that Agreement. That arrangement also makes plain that Sistem was operating the hotel for a variable profit, and not as a contractor receiving a fixed payment. Sistem did indeed manage the hotel, up until the events of 2005.

84.    The Tribunal notes that the Main Agreement of July 1, 1999,[88] made by representatives of Turkey, the Kyrgyz Republic , and Sistem, and the liquidator of Ak-Keme, expressly refers to the hotel project, of which Sistem was about to become the 100% owner, as an "investment." The Main Agreement states in its preamble that "[t]he investments are protected by the Treaty on 'Mutual Protection of Investments and Encouragement of Investments' executed in 1992

---

[84]    Contract for Construction and Management, *supra* note 7.
[85]    *See* Agreement of the State's Approval Committee, *supra* note 26, at 2.
[86]    Share Purchase Agreement, July 1, 1999 (Claimant's Exhibit C-17).
[87]    The term "Buyer" is not defined in the Share Purchase Agreement, but Article 2 of the Main Agreement makes it plain that Sistem is the Buyer. This point is not controversial.
[88]    Main Agreement, July 1, 1999 (Claimant's Exhibit C-8).

between the Republic of Turkey and the Republic of Kyrgyz."[89]   Article 6 of the Main Agreement also states that

> The Government of the Kyrgyz Republic shall take all the necessary measures in order to enable all necessary activities to manage the Hotel. The Government of the Kyrgyz Republic guarantees not to demand any additional request other than applied so far, moreover, in the frame of Kyrgyz laws, the Government of the Kyrgyz Republic guarantees full and sustainable protection of the investment.[90]

85.     The Respondent says that Sistem did not actually transfer its own money or resources into the Kyrgyz Republic to build the hotel, and that there was similarly no transfer of Sistem's own money or resources into the Kyrgyz Republic in order to pay for the purchase of Ak-Keme's 50% shareholding in the hotel venture in accordance with the Share Purchase Agreement.  The Respondent considers that Sistem might have become an investor if it had transferred money or resources into the State, but that it did not do so and is therefore not an investor.

86.     The Tribunal does not share this view.  It considers that Sistem made a contribution at the outset of the project, at least in the form of know-how and work on the construction of the hotel, and that it made a further contribution when it bought Ak-Keme's 50% interest in 1999.

87.     The fact that those actively planning and realising the project may not be relying upon their own financial resources does not prevent them having the status of investors.  It is common for projects to be funded by persons other than those who undertake the actual work of planning and realising a project.  Funding may take the form of bank loans, or loans from passive investors not themselves actively engaged in the running of the project, or from international agencies, or – as here – from domestic or foreign government sources.

88.     In this connection the Tribunal notes that Article 1(3) of the 2003 Kyrgyz Investment Law defines an investor as "a subject of investment activity making his own, borrowed or attracted contributions as direct investments."[91]  "Investment activity" is defined by Article 1(4) as "practical operation of investor in respect of his investments."[92]

89.     Similarly, the fact that the 1999 purchase was to be funded by repayments out of the profits of the hotel operation does not alter the fact that Sistem was paying for the shareholding out of revenues generated by Sistem by the operation of the hotel as a commercial concern.

90.     Sistem was a 50% participant in the Joint Venture established in 1992.  In 1999 it bought Ak-Keme's interest in the project, making it the 100% owner of the hotel.  The Respondent argues that the 1999 Main Agreement and Share Purchase Agreement were found retrospectively to be illegal,[93] and suggests that this is a further reason (in addition to the absence of any real

---

[89]     *Id.* at 1.

[90]     *Id.* at 7.

[91]     Law No. 66, *supra* note 81, at 2.

[92]     *Id.* at 3.

[93]     Hearing Transcripts, May 31, 2007, at 71–72.

18

contribution from Sistem) why the 1999 Agreements cannot support Sistem's claim to be an investor.   The Respondent also considers that the illegality precludes reliance upon the undisputed fact that Sistem was, prior to what it regards as its dispossession in 2005, actually in occupation of the hotel and running it.[94]

91.    The Tribunal does not accept this analysis.  As Judge (now President) Higgins pointed out in her Separate Opinion in the *Oil Platforms* case, at the jurisdiction stage it is necessary to accept *pro tem* the facts as alleged by the applicant and to decide if those facts *could* involve a breach of the relevant treaty.  The equivalent step in the present case is to take the evidence put forward by the Claimant and to consider, in the light of the observations of the Respondent, whether those facts could disclose the existence of an "investment."  Judge Higgins observed that it is not necessary to determine that the facts actually *do* constitute a breach of the treaty when dealing with jurisdiction, and that no such determination could be made without venturing into the merits:

> What is for the merits – and which remains pristine and untouched by this approach to the jurisdictional issue – is to determine what exactly the facts are, whether as finally determined they do sustain a violation of [the treaty]; and if so, whether there is a defence to that violation . . . .  In short, it is at the merits that one sees 'whether there really has been a breach.'[95]

92.    In the present case, there is no suggestion that the 1999 Main Agreement and Share Purchase Agreement are forgeries.  Their effect under Kyrgyz law is disputed, but that dispute is a matter appropriate to be addressed during a consideration of the merits.  So, too, is the character of Sistem's occupation and management of the hotel.  These are matters that go to the heart of the substantive dispute between the Parties.  However, Sistem's characterization of itself as an investor in the Bishkek hotel project prior to the events of 2005 is not based solely upon Sistem's own allegations; Sistem has substantiated this point and relied upon documentary evidence which is sufficient for the Tribunal to determine that it may proceed to consider the merits of the case if there is an instrument that gives jurisdiction over investment disputes arising between Sistem and the Kyrgyz Republic.

93.    The Tribunal appreciates that there may be questions as to the extent to which Sistem fulfilled its obligations to Ak-Keme and to the Kyrgyz Republic in respect of the hotel project. The Tribunal considers, however, that any such failures on the part of Sistem cannot cancel out the fact that Sistem has invested in the Kyrgyz Republic, as has been explained above.  Sistem having made legally binding commitments in respect of its obligations, such failures could have been addressed in the courts of the Kyrgyz Republic.  But in any event, while any such failures on the part of Sistem may be relevant to questions of the value of Sistem's investment and the extent of any loss that it may have suffered, and to questions concerning the merits of Sistem's claim, they do not prevent Sistem qualifying as an "investor."

---

[94]    *Id.* at 84–89.
[95]    *Oil Platforms (Iran v. U.S.)*, 1996 I.C.J. 803, 856 ¶ 34 (Dec. 12, 1996) (Higgins, J., separate opinion) (quoting *The Mavrommatis Palestine Concessions*, Judgment No. 2, 1924, P.C.I.J., Series A, No. 2, at 23).

94.     The Tribunal has considered the position of Sistem in the light of the discussion in the *Bayindir* case[96] of the so-called *Salini* test,[97] which requires (i) that the investor make a contribution to the project, (ii) that the project have a certain duration in time, (iii) that the operational risks be shared, and (iv) that the project contribute to the host State's development. It considers that Sistem's investment satisfies all of those requirements.

95.     The Tribunal also observes in passing that complaints by a State that an investor has failed to fulfil its obligations under the host State law or under contractual arrangements fall clearly within the category of disputes that ICSID tribunals and BITs were intended to address. It would be inconsistent with the basic purposes of international law on the promotion and protection of investments if a tribunal otherwise properly constituted under a BIT were prevented from hearing a claim in respect of cancelled rights whenever a Respondent argued that the cancellation of the rights deprived the Claimant of its status as an investor.

96.     Accordingly, the Tribunal decides that Sistem had made an investment, in the form of its investment of know-how and services in the construction of the hotel, its operation of the hotel, its purchase of Ak-Keme's share of the participation in the project, its payment of Ak-Keme's debts, and its reinvestment of (a share of) its profits from the running of the hotel.

### *Does the Claim Arise Directly Out of the Investment?*

97.     In the view of the Tribunal, there is no room for doubt that the dispute arises directly out of Sistem's investment.

### Jurisdiction Under the ICSID Additional Facility

98.     The Tribunal accordingly concludes that the claim falls within the scope of the ICSID Additional Facility.  The next question is whether there is an instrument that confers jurisdiction on the Tribunal to determine the claim.

### *(a) Jurisdiction Under the BIT*

> Article VII ("Settlement of Disputes Between One Party and Investors of the Other Party")

99.     Article VII of the BIT reads as follows:

> Settlement of Disputes Between One Party and Investors of the Other Party.

---

[96]     *See Bayindir Insaat Turizm Ticaret Ve Sanayi A.S. v. Islamic Republic of Pakistan* (ICSID Case No. ARB/03/29), Decision on Jurisdiction of Nov. 14, 2005.

[97]     *See Salini Costruttori S.p.A. and Italstrade S.p.A. v. Kingdom of Morocco* (ICSID Case No. ARB/00/4), Decision on Jurisdiction of July 23, 2001, [French original] 129 *Journal du droit international* 196 (2002), English translations of French original in 42 *ILM* 609 (2003), 6 *ICSID Rep.* 400 (2004).

1.  Disputes between one of the Parties and one investor of the other Party, in connection with his investment, shall be notified in writing, including a detailed information, by the investor to the recipient Party of the investment.  As far as possible, the investor and the concerned Party shall endeavour to settle these disputes by consultations and negotiations in good faith.

2.  If these disputes cannot be settled in this way within six months following the date of the written notification mentioned in paragraph 1, the dispute can be submitted, as the investor may choose, to:

    (a) the International Centre for the Settlement of Investment Disputes (ICSID) set up by the 'Convention on Settlement of Investment Disputes Between States and Nationals of other States', [in case both Parties become signatories of this Convention.]
    (b) an ad hoc court of arbitration laid down under the Arbitration Rules of Procedure of the United Nations Commission for International Trade Law (UNCITRAL), [in case both parties are members of U.N.]
    (c) the Court of Arbitration of the Paris International Chamber of Commerce,

    provided that, if the investor concerned has brought the dispute before the courts of justice of the Party that is a party to the dispute and a final award has not been rendered within one year.

3.  The arbitration awards shall be final and binding for all parties in dispute. Each Party commits itself to execute the award according to its national law. [98]

*"Disputes between one of the Parties and one investor of the other Party"*

100.  The Claimant's status as a national of "the other Party" to the BIT (i.e., Turkey) is not disputed by the Kyrgyz Republic.

101.  The Respondent has argued that the Government of the Kyrgyz Republic is not a party to the dispute, which it characterises as a private dispute between Sistem and Ak-Keme, to be settled according to the procedures set out in the contracts between Sistem and Ak-Keme. [99]

102.  The Tribunal does not accept this submission.  It is well established in ICSID case law that the fact that a particular action or omission may constitute a breach of contract cannot preclude the possibility that it may also constitute a breach of a BIT provision. [100]  In this case

---

[98]   BIT at 18–19.  The text matches the version of the BIT that appears on the UNCTAD website.
[99]   Respondent's Counter-Memorial on Jurisdiction at 3–9.
[100]  *Bayindir v. Pakistan* (ICSID Case No. ARB/03/29), paras. 148–49.

Sistem is claiming that the Kyrgyz Republic failed in its duty under the BIT to protect Sistem's investment. That clearly makes the Kyrgyz Republic, represented by its Government, a party to this dispute.

> "*in connection with his investment*"

103.   The Tribunal has determined that Sistem made an investment in the Kyrgyz Republic, and that the claim arises directly from it and is therefore certainly a dispute "in connection with" the investment.

> "*shall be notified in writing, including a detailed information, by the investor to the recipient Party of the investment*"

104.   The Tribunal notes the view of the Tribunal in the *Bayindir*[101] and of the Tribunal in *SGS v Pakistan*,[102] that a requirement of notice such as appears in Article VII(1) is "directory but not mandatory and jurisdictional." Sistem had in any event made its complaint very plain to the authorities in the Kyrgyz Republic in the letters dated March 27 and 28, 2005, from Pınara Bishkek Ltd to agencies of the Government of the Kyrgyz Republic.[103]

> "*If these disputes cannot be settled in this way within six months following the date of the written notification mentioned in paragraph 1*"

105.   Six months elapsed between the letters dated March 27 and 28, 2005 from Pınara Bishkek Ltd to agencies of the Government of the Kyrgyz Republic[104] and the Request for Arbitration dated September 30, 2005.

> "*provided that, if the investor concerned has brought the dispute before the courts of justice of the Party that is a party to the dispute and a final award has not been rendered within one year*"

106.   The Respondent takes the view that the words "provided that, if the investor concerned has brought the dispute before the courts of justice of the Party that is a party to the dispute and a final award has not been rendered within one year" in Article VII(2) apply only to Article

---

[101]   *Id.*, para. 99.

[102]   *SGS Société Générale de Surveillance S.A. v. Islamic Republic of Pakistan* (ICSID Case No. ARB/01/13), Decision on Objections to Jurisdiction of Aug. 6, 2003, para. 184, 18 *ICSID Rev.—FILJ* 301 (2003).

[103]   Letter from Gürsel Yenice, Deputy Chairman of Pınara Bishek LTD, to Feliks Kulov, Person In-charge of Law Enforcement Agencies and Defence Forces of the Kyrgyz Republic (Claimant's Exhibit C-28 (where the date is given as "27.05.2005," but is March 27, 2005 in the Russian original)); Yenice's March 28, 2005 letter, *supra* note 27; (Letter from Sistem Mühendislik to Commerce Registrars and to Kyrgyz State Notary (March 28, 2005) (Claimant's Exhibit C-30).

[104]   *Id.*

VII(2)(c).[105]   The Tribunal need take no position on the question because Sistem has not instituted any proceedings in the national courts against the Kyrgyz Republic.

*Jurisdiction Ratione Temporis*

107.   The Respondent argues[106] that the Claimant is attempting to give retroactive effect to the BIT, changing the legal status and consequences of acts that occurred before the BIT entered into force on October 31, 1996.  The Tribunal does not accept this analysis.  Nothing in the BIT limits the scope of its application to investments made after the date of signature or of the entry into force of the BIT; and in so far as the jurisdictional provisions of the BIT are concerned, they do not alter the character of acts that occurred before the BIT enters into force, but only the procedures available in respect of complaints of violations of the BIT.  Furthermore, many of the acts in question in this case occurred after the entry into force of the BIT.  The Tribunal's jurisdiction *ratione temporis* is established.   The question whether particular substantive obligations under the BIT did or did not apply to specific acts is a question appropriate to the merits, and not to this jurisdictional phase.

*The effect of the contractual dispute settlement clause*

108.   The Respondent further argues that the reference in Article 12 of the 1993 Construction Contract[107] to the settlement of disputes by the Arbitration Commission of the Chamber of Commerce of the Kyrgyz Republic precludes a reference of the dispute to ICSID.  It is clear and axiomatic that the dispute settlement provision in the contract between Ak-Keme and Sistem cannot affect the right of Sistem to refer disputes between Sistem and the Kyrgyz Republic, concerning the obligations of the Kyrgyz Republic under the BIT, to the procedures made available under the BIT.

Claims are based on the BIT

109.   The claim refers in general terms to a violation of the obligation to protect Sistem's investment.[108]  Article II of the BIT (entitled "Promotion and Protection of Investments") clearly offers a basis for Sistem's claim.  There is, accordingly, a claim based upon an alleged breach of the BIT and thus within the scope of the BIT.

*"[in case both Parties become signatories of this Convention.]"*

110.   The Tribunal's jurisdiction therefore depends upon Article VII(2)(a), which permits the investor to submit a dispute to ICSID "[in case both Parties become signatories of this Convention.]"[109]

---

[105]   Hearing Transcripts, June 1, 2007, at 42–45;  Respondent's Post-Hearing Submission at 6.
[106]   Respondent's Counter-Memorial on Jurisdiction at 17–19.
[107]   Contract for Construction and Management, *supra* note 7.
[108]   Request for Arbitration, Sept. 30, 2005, para. 69.
[109]   BIT at 5 (brackets in the original).

111.    The drafting of this provision may be thought not to be entirely clear, and the appearance of brackets around the quoted words might be thought to give the text more of the appearance of a draft than of a final text.  Nonetheless, this is the text of a BIT that is now 15 years old, and which has been signed and ratified by both Parties.  The Tribunal must work with the text as it exists.

112.    The text of Article VII(2)(a) indubitably demonstrates the common intention of the Parties to the BIT that it should be possible to refer disputes to ICSID in some circumstances.  The question is, what is the effect of the words "[in case both Parties become signatories of this Convention]"?  The Parties do not dispute that the BIT is to be interpreted in accordance with the rules of international law on treaty interpretation, as reflected in Article 31 of the Vienna Convention on the Law of Treaties.  The Tribunal recalls that Article 31(4) stipulates that "A special meaning shall be given to a term if it is established that the parties so intended."[110]

113.    The Tribunal notes that elsewhere in the BIT there are references to the "ratification" of treaties (Article IX(1)), and to States being "members" of international organizations.  It cannot, therefore, ignore the fact that in Article VII(2)(a) the condition refers not to the *ratification* of the ICSID Convention by both States but to the *signature* of the Convention by both States.  It would be wholly wrong for the Tribunal to re-write the text of the treaty that the Parties have adopted by substituting a reference to the ratification of the ICSID Convention for the reference to its signature.

114.    Reading the text as it is written makes sense.  Turkey was already a Party to the ICSID Convention when the BIT was signed.  The provision accordingly enabled disputes to be referred to ICSID's Additional Facility if the Kyrgyz Republic subsequently signed the ICSID Convention, which it did in 1995.  That is the position here.

115.    Accordingly, the Tribunal considers that it has jurisdiction under Article VII(2)(a) of the BIT over claims based upon alleged violations of obligations arising under the BIT.

Article II ("Promotion and Protection of Investments" / MFN)

116.    The Tribunal has found that it has jurisdiction under the BIT by relying solely upon Article VII.  The Claimant says that the Tribunal may also found its jurisdiction on the MFN clause in Article II of the Kyrgyz Republic's Turkish BIT, which entitles it to rely upon the dispute settlement provisions in the Kyrgyz Republic – U.S. BIT.[111]  The Respondent says that the MFN clause does not allow the submission of contractual disputes to ICSID, and that the MFN clause cannot apply to the present dispute.[112]  It also rejects the argument that the MFN provision can confer procedural rights upon the Claimant, and argues in detail that the case-law cited by the Claimant does not support that argument.[113]  In view of its finding in relation to

---

[110]    Vienna Convention on the Law of Treaties art. 31(4), May 23, 1969, United Nations, *Treaty Series*, vol. 1155, at 331, *available at* http://untreaty.un.org/ilc/texts/instruments/english/conventions/1_1_1969.pdf.
[111]    Claimant's Memorial on Jurisdiction, paras. 8–39.
[112]    Respondent's Counter-Memorial on Jurisdiction at 13–14.
[113]    Respondent's Counter-Memorial on Jurisdiction at 20–37.

24

Article VII, the Tribunal does not need to decide upon the question whether jurisdiction may be established on the basis of the combined effect of the MFN clause in the Kyrgyz Republic-Turkey BIT and the jurisdictional provisions of the Kyrgyz Republic – U.S. BIT.

### (b) Jurisdiction Under the Kyrgyz Investment Law

117.    Article 18 of the 2003 Kyrgyz Investment Law reads as follows:

> 1.    Investment dispute shall be resolved in accordance with any applicable procedure agreed in advance between an investor and authorized state bodies of the Kyrgyz Republic that does not exclude the use of other means of legal defense by an investor in accordance with the legislation of the Kyrgyz Republic.
>
> 2.    If such agreement is not reached the investment dispute between authorized state bodies of the Kyrgyz Republic and investor shall be resolved by conducting consultation between parties. If parties will not agree in 3 month period from the day of first written address for such consultation, the dispute shall be resolved by addressing to a court of the Kyrgyz Republic, unless one of the parties to a dispute between the foreign investor and the state body requests to consider the dispute in accordance with one of the following procedures:
>
>> (a)    by applying to the International Centre for Settlement of Investment Disputes (ICSID) pursuant to the Convention on settlement of investment disputes between states and citizens of other states or the rules regulating the use of additional means for conduct of hearings by the Secretariat of the Centre; or
>>
>> (b)    by applying to arbitrage or an international temporary arbitral tribunal (commercial court) formed in accordance with the arbitration rules of UN Commission on international trade law.
>
> 3.    In the event that an investment dispute is to be resolved through arbitrage as referred to in subpoints 'a' and 'b' of point 2 of this Article, the Kyrgyz Republic shall waive any claim for preliminary application of the internal administrative or judicial procedures prior to referral of the dispute to international arbitration.
>
> 4.    Any investment dispute between the foreign and domestic investors shall be considered by the judicial bodies of the Kyrgyz Republic unless the parties reach an agreement on any other dispute settlement procedure, including national and international arbitration.[114]

---

[114]    Law No. 66, *supra* note 81, at 10–11.

25

118.    An "investment dispute" is defined by Article 1(6) as "any dispute between an investor and governmental bodies, officials of the Kyrgyz Republic and other participants of investment activity, arising in process of investment realization."

119.    Article 18 contemplates the reference of investment disputes to an ICSID arbitral tribunal, without preliminary application to legal procedures in the Kyrgyz Republic. It must, therefore, contemplate that the Kyrgyz Investment Law will be interpreted by an ICSID tribunal. This the Tribunal will do.

120.    The Respondent argues that Article 18 is inapplicable because Sistem made no investment in the Kyrgyz Republic.[115]  The Tribunal has explained above that it considers the Claimant to be an investor which has made an investment in the Kyrgyz Republic. It considers the Claimant to be an investor for the purposes of the Kyrgyz Investment Law.

121.    As far as the three-month consultation procedure is concerned, the Tribunal observes that Sistem had made its complaint clear to the authorities in the Kyrgyz Republic in the letters dated March 27 and 28, 2005 from Pınara Bishkek Ltd to agencies of the Government of the Kyrgyz Republic.[116] Six months elapsed between the letters dated March 27 and 28, 2005 from Pınara Bishkek Ltd to agencies of the Government of the Kyrgyz Republic[117] and the Request for Arbitration dated September 30, 2005. The three-month consultation procedure (which the Tribunal in any event regards as directory but not mandatory and jurisdictional)[118] has been satisfied.

122.    The Respondent argues that Article 18(2)(a) is inapplicable because the Kyrgyz Republic is not a party to the dispute, which it characterises as a dispute between Sistem and Ak-Keme to which Article 18(4) applies.[119]

123.    The Tribunal does not accept this analysis. The claims made by the Claimant are directed against the Kyrgyz Republic, not against Ak-Keme.[120]  The Kyrgyz Investment Law provides substantive legal rights and guarantees for investors.  Those rights arise from obligations imposed upon or accepted by the Kyrgyz Republic and its agencies, such as the obligation in Article 4(4):

> The Kyrgyz Republic in the person of its authorized governmental bodies, officials and self-government bodies shall abstain from any interference with economic activity, rights and legal interests of investors, except as provided by the legislation of the Kyrgyz Republic.[121]

---

[115]    Respondent's Counter-Memorial on Jurisdiction at 39.
[116]    *Supra* note 105.
[117]    *Id.*
[118]    *See supra* para. 104.
[119]    Respondent's Counter-Memorial on Jurisdiction at 41.
[120]    Hearing Transcripts, May 31, 2007, at 30–31.
[121]    Law No. 66, *supra* note 81, at 4.

124.    The claims based on the Kyrgyz Investment Law are distinct from those based upon the BIT. The former necessarily refer to the rights, guarantees and obligations arising under the Kyrgyz Investment Law; the latter refer to the rights and obligations arising under the BIT.

125.    Article 18(2)(a) provides for the possibility of the reference of investment disputes to the ICSID Additional Facility, at the option of the investor.

126.    Accordingly, the Tribunal considers that it has jurisdiction under Article 18(2)(a) of the Kyrgyz Investment Law over claims based upon alleged violations of rights and obligations arising under the Kyrgyz Investment Law.

### (c) Jurisdiction Under the Main Agreement

127.    Article 12 of the Main Agreement dated July 1, 1996 reads as follows:

> All the disputes arising from this Agreement shall be settled through negotiations.  If the dispute can not be settled through negotiations, a committee consisting of the representatives of the Kyrgyz and the Turkish Governments shall resolve the dispute.  If this committee cannot resolve the dispute either, each party shall appoint an arbitrator from their country or from another country.  These arbitrators shall select the third arbitrator from a third country or from a third country that the parties agreed.  The parties undertake to execute the Arbitral Tribunal's award.[122]

128.    Article 6.1 of the Share Purchase Agreement is drafted in identical terms.[123]

129.    It is evident that this Tribunal has not been constituted in accordance with the procedure set out in those provisions.  Its members were appointed in accordance with the ICSID Additional Facility rules.  Accordingly, the Tribunal is not a tribunal constituted under the Main Agreement or the Share Purchase Agreement, and it does not have jurisdiction under Article 12 of the Main Agreement or under Article 6 of the Share Purchase Agreement.

130.    As a result of this determination it is unnecessary for the Tribunal to consider the question of the validity of the Main Agreement and the Share Purchase Agreement at this stage.

131.    The question of whether the Main Agreement and Share Purchase Agreement may be relied upon for substantive rights in proceedings that are within the jurisdiction of the Tribunal as established by the BIT and the Kyrgyz Investment Law is a matter to be addressed at the merits stage.

---

[122]    Main Agreement, July 1, 1999, at 3–4 (Claimant's Exhibit C-16;  Respondent's Exhibit E-7).
[123]    Share Purchase Agreement, July 1, 1999, at 4 (Claimant's Exhibit C-17;  Respondent's Exhibit E-8).

## EFFECT OF THE DECISION ON JURISDICTION

132.   The Tribunal notes the observations of Judge (now President) Higgins in the *Oil Platforms* case in the International Court of Justice where she concluded, after a careful analysis of the matter, that "[w]here the Court has to decide, on the basis of a treaty whose application and interpretation is contested, whether it has jurisdiction, that decision must be definitive."[124] The Tribunal considers that analysis to be applicable here.   Its decision on jurisdiction is definitive, and as *res judicata* is not subject to being reopened at any hearing on the merits.

133.   This decision is limited to the question of jurisdiction.   The result is that the Tribunal finds that it is competent to hear and decide claims based upon alleged violations of the BIT and the Kyrgyz Investment Law.   It remains open to the parties to present at the merits stage arguments concerning the applicability of substantive provisions of the law.

## COSTS

134.   The Tribunal has noted the submissions of the parties concerning costs.   It has decided that it will take no decision as to costs at this stage, but will decide on the matter at the end of the proceedings in this case.

## DECISION

For the reasons set out above herein, the Tribunal decides, unanimously, after having reviewed the Claimant's and Respondent's arguments, both as presented in writing and orally:

1.   that it has jurisdiction under Article VII(2)(a) of the BIT over claims based upon alleged violations of obligations arising under the BIT;

2.   that it has jurisdiction under Article 18(2)(a) of the Kyrgyz Investment Law over claims based upon alleged violations of rights and obligations arising under the Kyrgyz Investment Law;

3.   that it does not have jurisdiction under Article 12 of the Main Agreement or under Article 6 of the Share Purchase Agreement;

4.   that it will take no decision as to costs at this stage, but will decide on the matter at the close of the proceedings in this case.

---

[124]   *Oil Platforms (Iran v. U.S.)*, 1996 I.C.J. 803, 855 ¶ 31 (Dec. 12, 1996) (Higgins, J., separate opinion).

[*signed*]

_____

Vaughan Lowe
President of the Tribunal


[*signed*]                                              [*signed*]

_____          _____

Nabil El Araby                                      Paolo Michele Patocchi
Arbitrator                                              Arbitrator


Date: September 13, 2007

29