BLANK ROME LLP
Attorneys for Plaintiff
W. Cameron Beard
405 Lexington Avenue
The Chrysler Building
New York, NY 10174
(212) 885-5268

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

SISTEM MÜHENDISLIK INSAAT SANAYI VE
TICARET, A.Ş.,

　　　　　　　Plaintiff,

　　　v.

THE KYRGYZ REPUBLIC,

　　　　　　　Defendant.

Civil Action No. 12-cv-4502

**VERIFIED FIRST AMENDED**
**COMPLAINT**



Plaintiff SISTEM MÜHENDISLIK INSAAT SANAYI VE TICARET, A.Ş. ("Plaintiff"

or "Sistem"), by its attorneys Blank Rome LLP, complaining of the above-named Defendant

THE KYRGYZ REPUBLIC ("Kyrgyz Republic" or "Defendant"), alleges upon information and

belief as follows:

　　　　　1.　　　　This is an action for the recognition and enforcement of a foreign arbitral award

issued by the International Centre for Settlement of Investment Disputes ("ICSID") under its

Additional Facility Rules ("AFR"), on or about September 9, 2009, in favor of Plaintiff and

against Defendant (the "Award"). A copy of the Award is attached hereto as Exhibit A. The

Kyrgyz Republic consented to arbitration, *inter alia*, under ICSID in the 1992 *Turkey-Kyrgyz*

*Treaty Concerning the Reciprocal Promotion and Protection of Investments* ("BIT"), and under

ICSID AFR in the *Kyrgyz Law On Investment* (2003) (the "LOI," collectively, the "Rules"). A

copy of the BIT is attached hereto as Exhibit B, and a copy of the LOI is attached as Exhibit C.

## PARTIES AND JURISDICTION

2. Plaintiff is a company incorporated under the laws of the Republic of Turkey. Its head office is located at 1703 Sok, No. 67, Karsiyaka, Izmir, Turkey.

3. Defendant is a foreign state.

4. The Award is of the type governed by 9 U.S.C. § 202.

5. This Court has subject matter jurisdiction over this action to recognize and enforce the Award pursuant to the "1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards" (the "Convention"), 9 U.S.C. § 201.

6. The Court has personal jurisdiction over the Kyrgyz Republic pursuant to 28 U.S.C. § 1330(a), and by virtue of the consent to jurisdiction evidenced by the Kyrgyz Republic's accession to the Convention.

7. Plaintiff will serve the Kyrgyz Republic with a copy of the summons and verified first amended complaint, and such other documents as are required pursuant to 28 U.S.C. § 1608.

## THE UNDERLYING DISPUTE

8. The underlying dispute arose from a 1992 joint venture agreement (the "JV") by and between Sistem and a Kyrgyz company, Ak-Keme Joint Stock Co. ("AK-Keme") to build and operate a 4-star hotel in Bishkek, Kyrgyz Republic (the "Hotel").

9. Pursuant to its Decree 323, the Kyrgyz Republic approved the construction and joint management of the Hotel on July 13, 1992. In 1993 the Republic of Turkey provided, via the Turkish Eximbank, a loan to the Kyrgyz Republic of $75,000,000 of which $6,000,000 was for the construction of the Hotel. This amount was made available to the Joint Venture via the National Bank of Kyrgyzstan.

10.     Sistem bought out AK-Keme's share of the JV in 1999.   After building and operating the Hotel for a number of years Ak-Keme, with the collusion of representatives of the Kyrgyz Republic, ousted Sistem's personnel and physically took control of the Hotel.

11.     Sistem claimed that the Kyrgyz Republic had failed in its duties and obligations under BIT to protect Sistem's investment in the Hotel.   Sistem claimed damages.

## THE ARBITRATION PROCEEDINGS

12.     On October 11, 2005, Sistem commenced arbitration proceedings against the Kyrgyz Republic.

13.     Sistem commenced the arbitration proceedings by way of a request for arbitration dated September 30, 2005.

14.     On October 12, 2005, ICSID acknowledged receipt of the request for arbitration and on October 14, 2005 it transmitted a copy of the request to the Kyrgyz Republic.

15.     The request for arbitration was filed under the AFR and invoked the consent given by the Kyrgyz Republic to ICSID arbitration pursuant to BIT.

16.     Sistem appointed Dr. Paolo Michele Patocchi, a Swiss national, as arbitrator.

17.     On October 26, 2006, the ICSID Administrative Council appointed Judge Nabil Ilaraby, an Egyptian national, and Professor Vaughn Lowe Q.C., a U.K. national, as arbitrators, with Professor Lowe being designated as presiding arbitrator (the "Panel").

18.     The Kyrgyz Republic challenged the jurisdiction of the Panel to adjudicate the dispute between the parties.   A hearing on the issue of jurisdiction was held at the offices of the World Bank in Paris between May 31 and June 1, 2007.   By award dated September 13, 2007, the Panel unanimously dismissed the Kyrgyz Republic's challenge and held that it had jurisdiction over the dispute.

3

19.     The hearing on the merits of the dispute was held at the offices of the World Bank in Paris between October 7-9, 2007.  The Kyrgyz Republic was represented at the hearing by counsel and called witnesses, introduced documentary evidence and cross-examined witnesses called to testify by Sistem.  The parties filed their respective post-hearing briefs on November 14, 2008.

20.     ICSID issued the Award and ordered the Kyrgyz Republic:

(i)     to pay Sistem the sum of $8,500,000 plus interest on that sum at the LIBOR dollar 12 month rate from June 7, 2005 up to the date of payment of the sums owing under the Award;

(ii)    to pay Sistem the sum of $400,000 on account of legal fees plus interest on that sum at the LIBOR Dollar 12 month rate from the date of the Award up to the date of payment; and

(iii)   to reimburse Sistem the sum of $247,410 representing half of $494,820 which is the total of the advance payments that Sistem made to ICSID for the fees and expenses of the Center and the costs of the Panel.

21.     The Kyrgyz Republic has failed to pay to Sistem any of the amounts due under the Award.

22.     The Award is final and binding on the parties. It may not be appealed nor is it subject to any ordinary remedy. Any rights and recourses that the Kyrgyz Republic may have had under the law of France, which was the seat of the arbitration, to annul or set aside the Award have expired without the Kyrgyz Republic having taken any action in this regard.

## COUNT I
## FOR RECOGNITION OF THE AWARD

23.     Plaintiff repeats paragraphs 1 through 22 as if set forth in full here.

24.     9 U.S.C. § 201 governs "Enforcement of Convention" and provides:   "The Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, shall be enforced in United States Courts in accordance with this chapter."

4

25. 9 U.S.C. § 202 is entitled "Agreement or award falling under the Convention" and

provides:

> An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention. An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states. For the purpose of this section a corporation is a citizen of the United States if it is incorporated or has its principal place of business in the United States.

26. In accordance with 9 U.S.C. § 202, the Award falls under the Convention and

may be enforced by this Court.

27. Plaintiff seeks recognition and enforcement of the Award as a money judgment of

this Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the following relief: (1) An order recognizing the

Award as a judgment of this Court in the amounts set forth therein; (2) costs incurred in this

recognition and enforcement proceeding, including reasonable attorneys fees; (3) post-judgment

interest; and (4) such other and further relief as the Court may deem just and proper.

Date:   November 1, 2013
        New York, New York

Respectfully submitted,

**BLANK ROME LLP**

By: _W. Cameron Beard_
W. Cameron Beard
405 Lexington Avenue
New York, NY 10174
(212) 885-5268 (telephone)
(917) 332-3769 (fax)
CBeard@BlankRome.com

*Attorneys for Plaintiff*

6

## **VERIFICATION**

W. Cameron Beard verifies as follows:

1.     I am a member of the bar of this Honorable Court and of the firm of Blank Rome LLP, attorneys for Plaintiff.

2.     I have read the foregoing Verified First Amended Complaint and I believe the contents thereof are true.

3.     The sources of my information and belief are documents provided to me and statements made to me by representatives of Plaintiff.

4.     The reason this Verification is made by deponent and not by Plaintiff is that it is a foreign citizen, not within this jurisdiction.

I verify under penalties of perjury that the foregoing is true and correct.

Executed on November 1, 2013

W. Cameron Beard

# EXHIBIT A

INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

WASHINGTON, D.C.

IN THE PROCEEDING BETWEEN

SİSTEM MÜHENDİSLİK İNŞAAT SANAYİ VE TİCARET A.Ş.

(CLAIMANT)

and

KYRGYZ REPUBLIC

(RESPONDENT)

(ICSID Case No. ARB(AF)/06/1)

AWARD

*Members of the Tribunal:*

Professor Vaughan Lowe, QC, *President*
Judge Nabil Elaraby, *Arbitrator*
Dr. Paolo Michele Patocchi *Arbitrator*

*Secretary of the Tribunal:*

Mr. Ucheora Onwuamaegbu

*Representing the Claimant:*

Dr. Ziya Akıncı
Dr. Cemile Gökyayla
Mrs. Karen D. Akıncı
AKINCI LAW OFFICE
Istanbul, Turkey

*Representing the Respondent:*

Ms. Indira Satarkulova
Monsey, NY, U.S.A.

Date of dispatch to the parties: 9 September 2009

## TABLE OF CONTENTS

PROCEDURAL HISTORY ............................................................................................................................................. 1

THE FACTS AND THEIR LEGAL SIGNIFICANCE ............................................................................................................ 4

    *THE 1999 AGREEMENTS* ..................................................................................................................................... 10
        The 1999 Main Agreement ............................................................................................................. 11
        The 1999 Share Purchase Agreement............................................................................................. 12
        The 1999 [Loan Transfer] "Agreement"........................................................................................... 13

    *EVENTS BETWEEN 1999 AND 2005* ..................................................................................................................... 15
        Developments Building Upon the 1999 Agreements........................................................................ 16
        The Resolution of the Legislative Assembly, October 7, 2002 .......................................................... 16

    *THE 2005 REVOLUTION* ..................................................................................................................................... 21

    *DEVELOPMENTS IN THE SUMMER OF 2005* .......................................................................................................... 23

THE RESPONDENT'S LIABILITY TO MAKE REPARATION ............................................................................................ 26

VALUATION OF THE CLAIMANT'S LOSS .................................................................................................................... 29

    *THE "INCIDENTAL" AND "AGREED" VALUATIONS* ................................................................................................ 29
        The 1993 Contract Value ................................................................................................................ 29
        The 1999 Agreement Value ............................................................................................................ 30
        The 1999 Labrate Report ............................................................................................................... 31
        The January 2002 "Approval" Value ............................................................................................... 31

    *THE PARTIES' VALUATIONS* ................................................................................................................................ 32

    *THE RESPONDENT'S SUBMISSIONS ON VALUATION* .............................................................................................. 32
        The 1999 Labrate Report Valuation ............................................................................................... 32
        The 2005 Inaudit Reports............................................................................................................... 33
        The Respondent's Post-Hearing Submissions on Quantum .............................................................. 33

    *THE CLAIMANT'S SUBMISSIONS ON VALUATION* ................................................................................................. 34
        The Raymond James Reports of 2007 and 2008.............................................................................. 34
        The Claimant's Post-Hearing Submissions on Valuation.................................................................. 35

    *THE TRIBUNAL'S ANALYSIS* ................................................................................................................................ 35
        The Appropriate Method of Valuation ............................................................................................ 36
        The Replacement Value Approach................................................................................................... 36
        The Multiple Deals Approach.......................................................................................................... 37
        The DCF Method ............................................................................................................................ 37
        Increases in Value Since 1999 ........................................................................................................ 39
        The Payments Due Under the 1999 Share Purchase Agreement ...................................................... 40
        The Claim For Lost Profits .............................................................................................................. 43
        The Claim For Interest.................................................................................................................... 44
        Claims Under Other Headings in the BIT.......................................................................................... 45
        The Claim For Costs........................................................................................................................ 46

ORDER................................................................................................................................................................. 47

**PROCEDURAL HISTORY**

1.      On October 11, 2005, the International Centre for Settlement of Investment Disputes ("ICSID" or "the Centre") received from Sistem Mühendislik İnşaat Sanayi ve Ticaret A.Ş. ("Sistem" or "the Claimant") a company registered in Turkey, a request for arbitration (the Request), dated September 30, 2005, against the Kyrgyz Republic (the Respondent).

2.      On October 12, 2005, the Centre acknowledged receipt of the Request and the prescribed lodging fee. On October 14, 2005, after the Claimant provided the Centre with contact details for the Kyrgyz Republic, the Centre transmitted copies of the Request to the Kyrgyz Republic, at the address provided by the Claimant, and to the Embassy of the Kyrgyz Republic in Washington, D.C.

3.      The Request was filed under the Additional Facility Rules and invoked the consent given by the Kyrgyz Republic to arbitration under the ICSID Convention in the 1992 Turkey-Kyrgyz Treaty Concerning the Reciprocal Promotion and Protection of Investments ("the BIT") and the consent given to arbitration under the ICSID Arbitration (Additional Facility) Rules in the 2003 Kyrgyz Law on Investment.

4.      The Request, as supplemented by Sistem's letters of October 14, 2005, October 21, 2005, October 31, 2005, November 25, 2005, December 6, 2005, December 30, 2005, January 23, 2006, and February 13, 2006, was registered by the Centre on April 12, 2006, as ICSID Case No. ARB(AF)/06/1.

5.      On June 13, 2006, more than sixty days having elapsed since the registration of the Request and the parties having not agreed on the number of arbitrators and the method of their appointment, the Claimant invoked Article 9 of the Additional Facility Rules, under which the Tribunal is to consist of three arbitrators, one appointed by each side and the third who shall be the presiding arbitrator, appointed by agreement of the parties. Also on June 13, 2006, the Claimant appointed Dr. Paolo Michele Patocchi, a national of Switzerland, as arbitrator, having on May 10, 2006, proposed Dr. Michael Bühler, a national of Germany, as the President of the Tribunal.

6.      The Respondent did not reply to communications from the Claimant or from the Centre, and on July 13, 2006, the Claimant invoked Article 6(4) of the Additional Facility Rules, by which the arbitrators not yet appointed would be appointed by the Chairman of the ICSID Administrative Council upon the request of one of the parties.

7.      On October 16, 2006, the Centre informed the parties that the Chairman of the ICSID Administrative Council appointed Judge Nabil Elaraby, a national of Egypt, and Professor

1

Vaughan Lowe QC, a national of the United Kingdom, as arbitrators in the case, with Professor Lowe QC being designated as presiding arbitrator.

8.      On October 26, 2006, all three arbitrators having accepted their appointments, the Secretary-General of ICSID informed the parties that, pursuant to Additional Facility Rule 13, the Tribunal was deemed to be constituted and the proceeding to have begun.

9.      The first session of the Tribunal was held in Geneva, on November 30, 2006. At the session, the Claimant was represented by Dr. Ziya Akıncı, Dr. Cemile Gökyayla, and Mrs. Karen D. Akıncı of the Akıncı Law Office, Istanbul. The Respondent, which had been repeatedly notified by the Centre of the date and location of the session, did not appear and was not represented.

10.     At the first session, the Tribunal decided to bifurcate the proceeding, with the issue of jurisdiction to be dealt with first, established a schedule for filing of pleadings on the issue of jurisdiction and reserved April 12−13, 2007, for the hearing on jurisdiction. The Tribunal decided that Paris, France, would be the place of the proceeding.

11.     The Claimant filed its Memorial on Jurisdiction on January 17, 2007, in accordance with the agreed schedule. Having not received a counter-memorial on jurisdiction from the Respondent by the set deadline of March 2, 2007, the Centre sent an inquiry to the Respondent. On March 27, 2007, the Respondent advised that it had appointed a legal representative and requested that the Tribunal postpone the next step in the proceeding by two months in order to allow the Respondent's representative to submit a pleading and prepare for the hearing on jurisdiction. The Respondent also requested to transfer the place of the proceeding to Washington, D.C. On April 2, 2007, the Claimant opposed the Respondent's requests.

12.     On April 4, 2007, the Centre informed the parties of the Tribunal's unanimous decision to (1) extend the deadline for the filing of the Respondent's counter-memorial on jurisdiction until May 10, 2007; (2) permit the Claimant to file a reply on jurisdiction by May 17, 2007; (3) permit the Respondent to file a rejoinder on jurisdiction by May 24, 2007; and (4) re-schedule the hearing on jurisdiction for May 31−June 1, 2007, to be held in Paris.

13.     In accordance with the new schedule, the Respondent filed its Counter-Memorial on Jurisdiction on May 10, 2007. The Claimant filed its Reply on Jurisdiction on May 17, 2007. The Respondent filed its Rejoinder on Jurisdiction, on May 23, 2007.

14.     The Hearing on Jurisdiction was held at the World Bank office in Paris on May 31−June 1, 2007. The Claimant was represented by Dr. Ziya Akıncı, Dr. Cemile Gökyayla, and Mrs. Karen D. Akıncı of the Akıncı Law Office, Istanbul. Also attending from the Claimant's side were Mr. Fehim Yenice, Mr. Gürkan Yenice, and Mr. Gürsel Yenice, of Sistem Mühendislik İnşaat Sanayi

2

ve Ticaret A.Ş. The Respondent was represented by Ms. Indira Satarkulova, a sole practitioner. Also attending from the Respondent's side were Mr. Ishenbay Dushenbievich Kadyrbekov, former peoples' deputy of the Kyrgyz Soviet Socialist Republic and former deputy of the Legislative Assembly of the Jogorku Kenesh-Parliament of the Kyrgyz Republic, Mr. Leonid Nuhimovich Komarover, a former Government official, Mr. Ruslan Sarymsakov, President of the Joint Kyrgyz-Malaysian Venture "Ak Keme" Hotel LLC, and Mr. Nurdin Sarymsakov, former employee of the "Ak-Keme" Joint Stock Company.

15.    As directed by the Tribunal, the Respondent filed a post-hearing submission on June 3, 2007, and the Claimant filed a post-hearing submission on July 6, 2007.

16.    On September 13, 2007, the Tribunal issued a Decision on Jurisdiction, in which it unanimously decided that (1) it had "jurisdiction under Article VII(2)(a) of the BIT over claims based upon alleged violations of obligations arising under the BIT;"[1] (2) it had "jurisdiction under Article 18(2)(a) of the Kyrgyz Investment Law over claims based upon alleged violations of rights and obligations arising under the Kyrgyz Investment Law;"[2] (3) it did "not have jurisdiction under Article 12 of the Main Agreement or under Article 6 of the Share Purchase Agreement;"[3] and (4) it would "take no decision as to costs at this stage, but will decide on the matter at the close of the proceedings in this case."[4] A copy of the Decision on Jurisdiction is annexed hereto.

17.    On October 4, 2007, the Centre informed the parties that pursuant to Additional Facility Rule 45(5), the Tribunal had fixed time limits for further procedures and would like to consult the parties regarding the dates of a hearing on the merits. On November 30, 2007, having heard from the parties, the Tribunal adjusted the schedule for the filing of pleadings on the merits and, on December 13, 2007, it fixed the Hearing on the Merits to be held on October 7–9, 2008, in Paris.

18.    The Claimant filed its Memorial on the Merits on December 19, 2007, and the Respondent filed its Counter-Memorial on the Merits on March 21, 2008. The Claimant filed its Reply on the Merits on May 2, 2008, and the Respondent filed its Rejoinder on the Merits on June 13, 2008.

19.    The Hearing on the Merits was held at the World Bank office in Paris on October 7–9, 2008. The Claimant was represented by Dr. Ziya Akıncı, Dr. Cemile Gökyayla, and Mrs. Karen D. Akıncı of the Akıncı Law Office, Istanbul. Also attending from the Claimant's side were Mr. Fehim Yenice, Mr. Gürkan Yenice, and Mr. Gürsel Yenice, of Sistem Mühendislik İnşaat Sanayi

[1]    *Sistem Mühendislik İnsaat Sanayi ve Ticaret A.S. v. Kyrgyz Republic* (ICSID Case No. ARB(AF)/06/1), Decision on Jurisdiction, Sept. 13, 2007, p. 28.
[2]    *Id.*
[3]    *Id.*
[4]    *Id.*

3

ve Ticaret A.Ş. The Respondent was represented by Ms. Indira Satarkulova, a sole practitioner. Also attending from the Respondent's side were Mr. Belek Sarymsakov and Ms. Valentina Kharlamova, Respondent's representatives.

20. Counsel for the Respondent made an application for the other two persons attending the hearing on behalf of the Respondent, Mrs. Valentina Kharlamova and Mr. Belek Sarymsakov to be allowed to testify as witnesses. Since this was contrary to the agreed procedure on witness examination at the hearing, the Tribunal sought the Claimant's observations. Claimant's counsel objected to Mrs. Kharlamova testifying since a witness statement had not been filed for her and sought some time to revert to the Tribunal on whether Mr. Sarymsakov, for whom a witness statement was already on the record, should be allowed to testify. After the lunch break, counsel for the Claimant announced their wish to cross-examine Mr. Sarymsakov at the allotted time on the second day of the hearing, while reiterating their objection to the proposed testimony of Mrs. Kharlamova.[5]

21. The parties filed their respective post-hearing briefs and post-hearing briefs on quantum on November 14, 2008.

22. The Members of the Tribunal deliberated by various means of communication, including a meeting for deliberations in London on December 16, 2008.

23. The Claimant filed its statement on costs on May 5, 2009, and the Respondent filed its statement on costs on May 6, 2009.

24. On August 12, 2009, the Tribunal declared the proceeding closed pursuant to ICSID Arbitration (Additional Facility) Rule 44(1).

25. The Tribunal has taken into account all pleadings, documents and testimony in this case.


## THE FACTS AND THEIR LEGAL SIGNIFICANCE

26. It is convenient to set out the key facts in narrative form and to explain the Tribunal's view of the facts in the course of this account. The Tribunal has already set out certain details in its Decision on Jurisdiction dated September 13, 2007, and it does not repeat all of those details here.

---

[5]     *Sistem Mühendislik Insaat Sanayi ve Ticaret A.S. v. Kyrgyz Republic* (ICSID Case No. ARB(AF)/06/1), Summary Minutes of the Hearing on the Merits, Oct. 7–9, 2008, p. 2.

4

27. This claim arises from a joint venture initially formed in 1992 by the Claimant, Sistem, and a Kyrgyz company, the Ak-Keme Joint-Stock Company ("Ak-Keme"), for the purpose of building and operating an hotel in Bishkek. The name of the hotel was the "Pınara" or "Ak-Keme Pınara" hotel. Ak-Keme went into bankruptcy in 1998. Sistem says that having fulfilled its obligations under the various agreements that underpinned the project it bought out Ak-Keme's share in the project in 1999, and thereby became the sole owner of the hotel. Sistem says that in March 2005, Ak-Keme ousted Sistem's managers and physically took control of the hotel. Sistem claims that the Respondent failed in its duty under the BIT to protect Sistem's investment. The Respondent says that Sistem was simply a contractor hired to construct the hotel, that it did not fulfil its obligations in relation to the construction of the hotel, that the 1998 bankruptcy procedure and 1999 purchase by Sistem of Ak-Keme's interest were legally invalid, and that Sistem unlawfully occupied the hotel until it was recovered by Ak-Keme in March 2005.

28. In its Decision on Jurisdiction dated September 13, 2007, the Tribunal recorded its determination that Sistem had made an investment in the Kyrgyz Republic.

29. In 1992 Sistem decided to make an hotel investment in the Kyrgyz Republic in collaboration with Ak-Keme. The Respondent has submitted a translation of a short portion of the Special Agreement No. 1 of May 27, 1992, which states that Ak-Keme and Sistem agreed that they "will jointly construct as a 'key delivery project' a 4 star 400-bed world class hotel in Bishkek city."[6] While that wording might seem to refer only to the construction phase of the project, Sistem's involvement in the operation of the hotel is made plain in another document submitted by the Respondent. Article 2.1 of the translation of the "Agreement on establishment and activity of Joint Kyrgyz-Turkish Venture" dated May 27, 1992, which was an agreement made by Ak-Keme and Sistem, stated that a "Joint Venture is established with the purpose of *joint construction and operation of the hotel* in Bishkek city."[7]

30. On July 13, 1992, a Decree of the Kyrgyz Government, No. 323, approved the "construction and joint management" of the hotel Ak-Keme Pınara.[8] The Charter of the Joint Kyrgyz-Turkish Venture "Ak-Keme-Pınara" was signed on October 16, 1992, and referred (in the Respondent's translation) to the aim of "joint Hotel construction and running. . . ."[9]

---

[6] Special Agreement No. 1 for Construction of the "Ak-Keme-Pinara" Hotel in Bishkek city, May 27, 1992 (Resp. Exhibit E-1).

[7] Agreement Concerning Establishment and Activity of the Kyrgyz-Turkish Joint Venture, May 27, 1992 (Resp. Exhibit E-2) (emphasis added).

[8] Decree of the Government of the Kyrgyz Rep. No. 323, July 13, 1992, para. 1 of the Respondent's translation, in Resp. Exhibit RLA 3. The Claimant's translation was submitted as CM3, and refers to "[t]he construction . . . and the development of this Hotel by its constructors . . . ." Another translation submitted by the Respondent refers to the "construction and subsequent joint exploitation" of the hotel, Resp. Exhibits RCM 31, RRJ 73.

[9] Charter, Joint Kyrgyz-Turkish Venture "Ak-Keme-Pinara", Bishkek, Oct. 16, 1992, para. 2.1 (Resp. Exhibit E-3).

5

31.     In 1993 Turkey provided, via Turkish Eximbank, a loan to the Kyrgyz Republic of USD75 million, of which USD6 million was provided for the building of the hotel.  This was made available for the joint venture between Ak-Keme and Sistem via the National Bank of Kyrgyzstan.[10]  Ak-Keme drew on the loan from the Kyrgyz bank, so that the debt was technically owed by Ak-Keme to the Kyrgyz Republic.  It was this debt of Ak-Keme that subsequently became the focus of the arrangements made in July 1999.

32.     On February 1, 1993, Sistem signed a contract with Ak-Keme ("Contract No. 1") for the "Construction and Management" of the hotel.  In that contract Ak-Keme was described as "the Customers" and Sistem as "the Contractors."[11]  Article 2.2 of the Contract provided that the contract value was USD25 million, of which USD6 million was a "creditable sum financed by T[urkish] E[ximbank], USD 6.5 million was to be financed by Ak-Keme, and USD12.5 million was an "amount to be covered by contractors."

33.     On the same date, February 1, 1993, Ak-Keme and Sistem concluded "Special Agreement No. 1", which provided that the parties would "jointly participate in the construction programme and further maintenance at the hotel."[12]  "Special Agreement 2," which accompanied Special Agreement No. 1, stipulated that Ak-Keme would contribute (1) USD2,425,000 in commodities, plus (2) USD3,500,000 in construction materials, plus (3) the equivalent ruble amount of approximately USD500,000 for salaries, plus (4) USD6,000,000 "to be paid as cash or to be received as credit as difference between 50% value of Total Hotel cost and total items 1, 2 and 3 above."[13]

34.     The fact that a substantial part of the cost of constructing the hotel was to be drawn from the Turkish Eximbank does not alter the fact that this was an investment made by the Claimant, in a joint venture with Ak-Keme, or the fact that the value of the hotel project was agreed between Ak-Keme and Sistem in 1993 as USD25 million.

35.     The Tribunal observes that there appears to be, close to the heart of this dispute, a fundamental difference in the understanding and expectations of the parties regarding the nature of an investment. The Claimant clearly considered that it was an investor even though it was recompensed for a substantial part of its work on the construction of the hotel by payments made by Ak-Keme from funds derived from Turkish Eximbank. It may be that the Respondent, and Ak-Keme, had some expectation that a foreign partner such as Sistem would fund its participation in the project entirely from its own monies.[14]  Whether or not that was

---

[10]     Letter from the National Bank of Kyrgyzstan to Sistem, Feb. 3, 1993, Cl. Exhibit CM 5.

[11]     Contract for Construction of a 4 Star 400 Beds Hotel at Bishkek, Respondent's translation, Resp. Exhibit RCM 2, p. 1.

[12]     Special Agreement No. 1 On the construction of "Ak-Keme-Pinara" hotel for 400 persons in Bishkek, Article 3, Resp. Exhibit RCM 2

[13]     Special Agreement 2, Resp. Exhibit RCM 2.  The cash component appears to have been adjusted subsequently. See Witness Statement of Figen Mengi Teker, filed with Cl. Mem., para. 13.

[14]     See, e.g., Case 6-164/4np, Writ, Sup. Arb. Trib. Kyrgyz Rep., March 18, 1998, p. 2, RLA 14, RCM 13.

the case, the Tribunal observes that it is entirely normal for investment projects to be financed by borrowed funds.

36. On May 16, 1994, the Bishkek State Administration made a long-term contract with Ak-Keme for the provision of land for the hotel.[15]

37. Construction work proceeded, and the hotel was built. The parties do not agree upon the amounts that Ak-Keme and Sistem contributed towards the cost of construction. A "Comparison list between the amounts in the agreement and those already realized 25.05.1995," which is said to have been signed by Mr. R. Sarymsakov (for Ak-Keme) and Mr. F. Yenice (for Sistem), is annexed to the Witness Statement of Mr. Fehim Yenice dated May 25, 2007. It indicates that USD19,518,750 had been expended on the project. The Respondent disputes the accuracy of that figure and points to the lack of detailed accounts and of certificates for progress payments[16] that would support the alleged expenditure. Indeed, a commission was established by order of the Kyrgyz Government to consider claims made by Sistem against Ak-Keme relating to the construction of the hotel.

38. The disagreements between Ak-Keme and Sistem continued into 1995. The Tribunal considers that the disagreements between Sistem and Ak-Keme concerning contributions to the hotel project are not material in the context of these proceedings, because of the events that occurred in 1999.[17]

39. There were also disagreements between the Claimant and the Kyrgyz authorities over a range of matters, including the construction standards of the hotel.[18] Again, the Tribunal considers that these disagreements are not material in the context of these proceedings, because of the events that occurred in 1999.

40. At one stage the Claimant refurbished the Kyrgyz President's Guest Residency, which was used to accommodate distinguished guests. The Claimant says that it did so as a good-will gesture, at the request of the Kyrgyz Republic.[19] The Respondent suggests that it was an attempt to bribe the Kyrgyz President.[20]

41. The Tribunal would not have hesitated to attach the appropriate legal consequences to any proven instance of bribery or corruption. There was, however, no such proof. The refurbishment of a public, State facility is plainly not a direct bribe of any individual; nor, in the view of the Tribunal is the refurbishment in this case something beyond the reasonable scope

---

[15] Contract for Use of the Ground Area, May 16, 1994, RCM 23.1.
[16] A "sample" "certificate of the progress payment," dated June 1, 1995, was filed as CM 6.
[17] See infra para. 50 onwards.
[18] See, e.g., Report of the Kyrgyz Fire Protection Dept., Aug. 17, 1995, RCM 35.
[19] Cl Mem., para. 31.
[20] Resp. Counter-Mem., para. 324; Hearing Transcript, Day 1, p. 127, lines 10–18.

of sponsorship or good-will gestures of the sort commonly made by companies. While the Tribunal acknowledges that gestures of this kind are made in order to enhance the reputation of the donor company and encourage its favourable reception and treatment,[21] in a world where corporate sponsorship is not merely tolerated but is an accepted part of the system of funding public events and facilities, it is necessary to have a robust distinction between sponsorship and bribery.

42.    The OECD Convention, to which the Respondent refers,[22] defines bribery as the offer, promising or giving of

> "undue pecuniary or other advantage, whether directly or through intermediaries, to a foreign public official, for that official or for a third party, in order that the official act or refrain from acting in relation to the performance of official duties, in order to obtain or retain business or other improper advantage in the conduct of international business."[23]

The Tribunal regards that as a reasonable and useful definition.

43.    If an agreement is to be nullified, or benefits under a BIT are to be denied, because the transaction is tainted by corruption, the case needs to be clearly made out. In this context, one important element of the concept of bribery or corruption is the link between the advantage bestowed and the improper advantage obtained. In the present case Sistem had made its investment in 1993. The refurbishment occurred in mid-1995. Sistem lost control of the hotel in December 1995. Only in 1999 did it recover control. No plausible explanation was suggested as to how the refurbishment could be linked to any improper advantage. The only suggestion was that "there is no explanation of the [1999] main agreement if there was no bribe involved."[24]

44.    In some circumstances it may happen that regular payments over a period of time effectively "buy" the long-term goodwill of the recipient, so as to make it difficult to establish a causal link between the bribe and the advantage that it procures. But that is not the case here. This was a one-off transaction, from which no individual derived a personal advantage (the refurbishment being of the President's official accommodation); and it is not suggested that the transaction was made surreptitiously.

45.    Many other questions arise concerning the right of a government to raise the bribery of that government as a defence in these circumstances; but it is not necessary to address them,

---

[21]    And, under the company laws of many States, would be *ultra vires* if they did not benefit the company in some way.

[22]    Resp. Counter-Mem., paras. 326–27 (citing OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions (Nov. 1997)).

[23]    OECD Convention on Combating Bribery, Art. 1.

[24]    Hearing Transcript, Day 1, p. 129, lines 14–16.

because no factual basis has been established which might substantiate an allegation of bribery. The Tribunal concludes that no incident of bribery or corruption has been proved in this case.

46.     The hotel was opened by the President of Turkey and the Prime Minister of the Kyrgyz Republic on August 28, 1995. It seems, however, that the relationship between Sistem and Ak-Keme had already broken down by that time. The Respondent records that since July 15, 1995, Ak-Keme had been seeking another international construction company to complete the hotel project.[25]

47.     On December 19, 1995, Ak-Keme purported to terminate its relationship with Sistem, and in particular the contract of May 27, 1992, citing Sistem's non-performance of its obligations.[26] The hotel was taken over by Ak-Keme, and Sistem was effectively excluded from participation in its management. The Kyrgyz Government appears to have bought shares in Ak-Keme around this time.[27]

48.     The period between December 1995 and the end of 1998 was eventful for both Sistem and Ak-Keme. Among other events, Sistem remained excluded from the operation of the hotel. In April 1996, Sistem's foreign investment license was revoked for "non-presentation of documents certifying the facts of investment by Turkish Founder," and the Joint Venture was dissolved.[28] Sistem's construction licence was revoked in September 1996.[29] Ak-Keme formed a Joint Venture, "Hotel 'Ak-Keme,'" with the Malaysian company Business Focus Cdn Bhd, in January 1997.[30] In March 1998, the Kyrgyz Supreme Arbitration Tribunal rejected Sistem's appeal against the revocation of its investment licence.[31]

49.     On December 10, 1998, after earlier proceedings in lower courts, the Supreme Court of Arbitration of the Republic of Kyrgyz decided, finally and without the possibility of appeal, that "'Ak-Keme' company shall be considered bankrupt and the liquidation procedure shall commence."[32]     In the ·same month Mr. Sarymsakov, the chairman of Ak-Keme, was imprisoned.[33]

---

[25]     Resp. Counter-Mem., para. 313.

[26]     *Id.*, para. 8; RCM 11.

[27]     *See* Judgment of Bishkek Interdistrict Court, June 17, 2005, RCM 47.

[28]     Decision No. 04/338 of the General Directorate of the State Commission of the Kyrgyz Rep., RLA 11.

[29]     Decision No. 335 on Termination of License, Ministry of Architecture and Construction of the Kyrgyz Rep., Sept. 24, 1996, RLA 13, RCM 15.

[30]     Foundation Agreement on Creation and Activity of Joint Kyrgyz-Malaysian Company Hotel "Ak-Keme," Jan. 24, 1997, RCM 20.

[31]     Case 6-164/4np, Writ, Sup. Arb. Tribunal Kyrgyz Rep., March 18, 1998, RLA 14, RCM 13.

[32]     Case No. 6-400/4, Judgment, Sup. Ct. Arb. Kyrgyz Rep., Dec. 10, 1998, p. 8, Request for Arb., Exhibit 15.

[33]     Request for Arb., para. 24.

50.     All of these events are essentially no more than the background to what the Tribunal regards as the definitive legal basis of the relationship between the parties for the purposes of this case. That basis is found in the Agreements of July 1999.

51.     In June 1999, the President of the Kyrgyz Republic visited Turkey and met the Turkish President. The Kyrgyz and Turkish delegations discussed the problems of the Sistem-Ak-Keme Joint Venture. The Claimant says that

> "The Kyrgyz delegation said that Sistem's local partner, Ak-Keme was bankrupted and had left significant debts to the Government and third parties. The Kyrgyz delegation also said that they would like to invite Sistem to resume its investment in Kyrgyz. Mr. Fehim Yenice was invited for negotiations. During the meetings, the Ministers and bureaucrats representing the Republic of Turkey and the Republic of Kyrgyz were present. Sistem and the liquidator of the bankrupt Ak-Keme also participated in the meeting."[34]

52.     Whatever uncertainty there may be about what happened beforehand, it is certain that on July 1 and 2, 1999 three agreements of critical importance in this case were signed. These will be referred to collectively as "the 1999 Agreements."[35]

### THE 1999 AGREEMENTS

53.     The three agreements signed in July 1999 were (i) the Main Agreement, (ii) the Share Purchase Agreement, and (iii) a third instrument titled "the Agreement" and also known as the Loan Transfer Agreement. The main features of arrangement established by these three agreements were as follows.

54.     The Liquidator of Ak-Keme set up a new company, the "Hotel Ak-Keme De Luks" Limited Company, to which the whole of Ak-Keme's interest in the hotel (but not Ak-Keme's debts and liabilities)[36] was transferred.   Sistem agreed to buy 100% of the shares, valued at USD12,700,000, in the "Hotel Ak-Keme De Luks" Limited Company, and to pay for them by handing over 50% of the profits from the operation of the hotel until such time as the USD12,700,000 debt was repaid. The Kyrgyz Government transferred its own claims against Ak-Keme (which included the claim for repayment of the sums made available by Turkish Eximbank) for USD10,985,799 and 19,571,000 Kyrgyz Som to Sistem. In short, in return for

---

[34]     Cl. Mem., para. 49.

[35]     All of the 1999 Agreements appear in Cl. Exhibit CM14.

[36]     Main Agreement, Art. 1.

future payments of 50% of its profits up to a total of USD12.7 million, Sistem took over Ak-Keme's entire interest in the hotel and became the sole owner of the hotel.

55.     Some provisions of these three agreements call for further comment.

### The 1999 Main Agreement

56.     The Main Agreement[37] was signed in Ankara, Turkey, on July 1, 1999 by (i) Professor Çay, Minister of State, representing the Republic of Turkey, (ii) Mr. Mederov, Chairman of the Government Estate Fund, "acting in accordance with the instruction of the Government of the Republic of Kyrgyz dated 30.06.1999, numbered 271-P", representing the Kyrgyz Republic; (iii) Mr. Kenesev, the liquidator of Ak-Keme, "acting in accordance with the award dated June 30, 1999 of the Bishkek Court of Arbitration and in consistence with the Law of Bankruptcy of the Republic of Kyrgyz" and (iv) Mr. Fehim Yenice, representing Sistem.

57.     Article 2 of the Main Agreement contained the following provision:

> "The Liquidator of 'Ak-Keme AO' Company and the Government of the Republic of Kyrgyz guarantee that
> - There is no sale, pledge, dispute, mortgage or seizure on the asset of the new limited company,
> - All the creditors in the first and second ranks were wholly satisfied.
> - The interest of the other creditors shall not be damaged."

58.     Article 8 of the Main Agreement stipulated that

> "The Agreement hereby enters into force by the signature of the parties and is liable for the parties and their legal successor."

59.     Article 11 of the Main Agreement stipulated that

> "The execution of the Agreement is hereby guaranteed by the Governments of the Turkish and Kyrgyz Republics."

60.     The list of signatories and the provisions of Articles 2, 8 and 11 are significant. They explicitly and emphatically make clear that the Respondent was committed and legally bound to guarantee the execution of the arrangement set out in the Agreement, and that it explicitly affirmed that there was no dispute concerning the ownership of Ak-Keme's share (or, by implication, Sistem's share) in the hotel. On this there is no room for any doubt.

---

[37]     Exhibit CM 14 and exhibit RE 7.

11

61.    The preamble to the Main Agreement records that the four signatories

> "have agreed on the below mentioned issues:
>
> • By the decision of the Supreme Arbitration Court of the Republic of Kyrgyz it was held and declared that Ak-Keme Company went into bankruptcy and the liquidation is in progress.
>
> •According to Kyrgyz Bankruptcy law, the liquidator is the sole legal representative of the Ak-Keme Company and has all authority for any kind of transactions regarding the assets of the debtor.
>
> •The Economy Development Fund instituted under the Kyrgyz Ministry of Finance is the main creditor of Ak-Keme AO.
>
> •The investments are protected by the Treaty on 'Mutual Protection of Investments and Encouragement of Investments' executed in 1992 between the Republic of Turkey and the Republic of Kyrgyz.
>
> •Sistem Mühendislik Insaat Sanayi ve Ticaret A.S. (Turkey) owns 50% of the shares according to the agreement made on February 1, 1993 and also according to the Turkish Protocol dated September 13, 1996."[38]

62.    The Respondent submitted the same translation as Exhibit RE 7, but later disputed the translation of the final sub-paragraph. It argued that the provision does not say that Sistem "owns" 50% of the shares but that Sistem "has the right towards 50% of the shares of the hotel."[39] The Tribunal does not consider it necessary to decide this issue, because the purpose and effect of the 1999 Agreements was to transfer to Sistem all the rights in the hotel that were held by Ak-Keme. As Ak-Keme and Sistem were the only parties with any legal interest in the hotel, it is plain that whatever Sistem's legal interest in the hotel before July 1999, Sistem became the sole owner of the hotel as a result of the 1999 Agreements.

#### The 1999 Share Purchase Agreement

63.    The Share Purchase Agreement,[40] to which Sistem and the Liquidator of Ak-Keme were the only two parties, was also dated July 1, 1999. It set out the financial basis of the arrangement. It recorded that Ak-Keme had been declared bankrupt by the Supreme Arbitration Court of the Republic of Kyrgyz, on December 10, 1998, and that in accordance with a decision of the Bishkek Arbitration Court dated December 23, 1998 the Liquidator of Ak-Keme had established the "Hotel Ak-Keme De Luks" Limited Company, which had taken over the assets of Ak-Keme. Further, Ak-Keme had decided to sell 100% of the shares of the "Hotel Ak-Keme De Luks" Limited Company. Those shares were "appraised . . . by the parties" as having a

---

[38]    CM 14; "The Turkish Protocol" (Protocol of the Meeting of the Joint Turkish-Kyrgyz Technical Committee), dated Sept. 13, 1996, appears as Exhibits CM 10 and CM 52.

[39]    Resp. Rejoinder, para. 84.1.

[40]    Share Purchase Agreement, CM 14.

value of USD12,700,000.[41] That agreement was reached against the background of a valuation report on the hotel made by a Moscow-based firm, Labrate, in May 1999, which estimated the value of the hotel as USD10.57 million.[42]

64.     Article 3.2 of the Share Purchase Agreement sets out the "Seller's Guarantees", and provided that

> "The assets and ownership of Hotel Ak-Keme De Luks are not subject to sale, pledge, dispute, mortgage or seizure which may somehow restrict the asset and ownership of Ak-Keme De Luks Limited Company."

65.     Article 2.2 of the Share Purchase Agreement Payment stipulated that the payment for the shares would be made "with the remittance of 50% of the profit to be gained from the operation of the Hotel until the amount deemed by this Agreement is wholly covered." The payments were to be made to "the Seller's bank account,"[43] the Seller being the liquidator of Ak-Keme.[44] The third Agreement (the "Loan Transfer Agreement," described below) made further provision for the modalities of payment. The conditions for repayment were modified in 2003.[45]

### The 1999 [Loan Transfer] "Agreement"

66.     The third agreement, simply headed "Agreement" but also known as the Loan Transfer Agreement, was dated July 2, 1999. Its parties were (i) the Kyrgyz Government, represented by the Chairman of the Government Estate Fund, acting in accordance with Kyrgyz Government decision 271-P of June 30, 1999; (ii) Sistem, represented by Mr. Fehim Yenice, and (iii) Mr. Kenesev, the Liquidator of Ak-Keme, appointed by a decision of the Bishkek Court of Arbitration dated June 30, 1999.

67.     This Agreement sets out provisions concerning the manner in which the indebtedness of Ak-Keme was to be treated. In effect, it transferred the Eximbank funding that Ak-Keme had borrowed via a loan from the Kyrgyz Government, to Sistem. The key provisions of the Loan Transfer Agreement are contained in Articles 3 and 4, which read as follows:

> "3. The liquidator of 'Ak-Keme AO' Company affirmed that 'Ak-Keme AO' Company owes 10,985,799 USD and 19,571,000 [Kyrgyz] Som to the Government of the Republic of Kyrgyz.

---

41      *Id.*, Article 2.1
42      *See infra* para. 144.
43      Share Purchase Agreement, Art 2.2
44      *Id.*, Preamble.
45      *See infra* para. 93.

13

> 4. . . . the Government of the Republic of Kyrgyz shall transfer its credit amounting to 10,985,799 USD (including 8,700,000 USD and 2,285,799 paid by the Government of the Republic of Kyrgyz to Turk Eximbank) and 19,571,000 Som to Sistem Muhendislik Sanayi ve Ticaret A.S. The Republic of Kyrgyz shall not demand any additional interest, punishment or interest cost from Sistem Muhendislik Sanayi ve Ticaret A.S. other than 12,700,000 USD."

In addition, under Article 5, Sistem undertook to pay USD1,249,881 to the liquidator, for the payment of Ak-Keme's debtors other than Turkish Eximbank.[46] Article 12 of the Agreement stated that "[t]his Agreement represents all the conditions of the agreement regarding the issues determined and declares the understanding of the parties."

68.     Sistem thus took over both Ak-Keme's entire interest in the hotel and Ak-Keme's payment obligations on the Eximbank loan and its debts to other creditors for USD12.7 million payable under the Main Agreement and the Share Purchase Agreement. Sistem operated the hotel through Pınara Bishkek Ltd, as "Hotel Ak-Keme De Luks" Limited Company (in which Sistem held 100% of the shares) was renamed on July 7, 1999.[47]

69.     The three agreements of July 1999 initiated a new phase in Sistem's investment in Kyrgyzstan. Whatever rights Sistem may or may not have had prior to July 1999, and whatever claims or complaints the Kyrgyz Government might have had against Sistem prior to 1999, the July 1999 Agreements were an explicit and unequivocal recognition by the Kyrgyz Government that Sistem was thenceforth the sole and undisputed owner of the hotel.

70.     The terms may appear to have been remarkably generous to Sistem, which was not obliged immediately to pay any monies out of its own resources but would repay the debt by sharing its future profits with the liquidator of Ak-Keme and the Kyrgyz Government.[48] The fact that payments were to be spread over a period of some years after 1999 (and indeed, the 1999 Loan Transfer Agreement provided, in Article 5, that repayments on the Eximbank loan need not begin until January 1, 2002) meant that the 1999 value of those future payments was significantly lower than the nominal value.

71.     On the other hand, the arrangement resulted in discharge of Ak-Keme's local debts, and the operation of a four-star hotel in Bishkek which had been largely funded by Turkish Eximbank. It is not for the Tribunal to judge whether this was on balance a good or a bad deal for Kyrgyzstan. There is no evidence to suggest that the July 1999 Agreements were anything

---

46      Cf., Claimant's Post-Hearing Brief on Quantum, paras. 10–11.

47      See Case No. 6-904, Decision, Sup. Ct. Kyrgyz Rep., Nov. 2, 2005, RLA 9.

48      Loan Transfer Agreement, para. 5. The amount of the Eximbank loan was to be repaid to the Kyrgyz Government, in so far as Turkey did not waive its claim against Kyrgyzstan (Loan Transfer Agreement, paragraph 6). A separate sum, representing Ak-Keme's non-Eximbank debt, was to be paid to the liquidator. Both sums were payable out of future profits.

14

other than a negotiated arrangement freely entered into, with the knowledge and participation of the Kyrgyz and Turkish Governments, which guaranteed the execution of the arrangement.

72.    The Respondent alleges that the 1999 Agreements were void because they were procured by bribery.[49] As was explained above,[50] the Tribunal does not accept this submission. Similarly, as is explained below, the Tribunal does not accept that the Agreements were invalid because they had the status of a treaty and required ratification by the Kyrgyz Legislative Assembly.[51]

73.    The Respondent also submitted that the 1999 Agreements were invalid because of Sistem's failure to provide evidence of its payment obligations.[52] The Tribunal observes that a failure to perform a contractual obligation may breach the contract but it does not render the contract void *ab initio*. If it were otherwise, no party in breach could ever be held liable for the breach of contract. Moreover, the Agreements were implicitly affirmed in 2003, when a further agreement was made revising the schedule of payments due from Sistem.[53]

74.    The Tribunal concludes that the 1999 Agreements were valid and legally binding, and created for the Claimant legal rights which can be the subject of protection under the BIT.[54]

75.    The Respondent also submitted that the dispute settlement clauses in the Main Agreement and the Share Purchase Agreement "excluded any jurisdiction of the ICSID Tribunal."[55]  Questions of jurisdiction were addressed in the earlier Decision of this Tribunal; but it is appropriate to note at this point that the dispute settlement provisions in the 1999 Agreements related to disputes arising from those Agreements. The present proceedings, in contrast, are based not upon claims of breaches of the 1999 Agreements but upon claims of breaches of the BIT. The dispute settlement provisions in the 1999 Agreements cannot deprive this Tribunal of jurisdiction over those BIT claims.

### *EVENTS BETWEEN 1999 AND 2005*

76.    Between July 1999 and March 2005 Sistem remained in control of the hotel. While Sistem's situation was relatively calm, this period was not wholly uneventful.

---

[49]    Hearing Transcript Day 1, p. 132.
[50]    *Supra* paras. 40–45.
[51]    *Infra* paras. 83–85.
[52]    Hearing Transcript Day 1, p. 134, lines 18–21.
[53]    *See infra* para. 93 ff.
[54]    Certain other objections to the validity of the Agreements are considered in *infra* paras. 80–91.
[55]    Hearing Transcript Day 1, p. 133, lines 12–16.

15

**Developments Building Upon the 1999 Agreements**

77. At first, developments appeared to confirm and build upon the arrangements that had been made in the 1999 Agreements. In January 2000, two reports were made criticising the construction of the hotel.[56] In January 2002, however, the Kyrgyz State Approval Committee confirmed that all requirements had been met and that the hotel was ready to be opened to the public.[57] That step was approved by an Order of the Kyrgyz Government.[58]

78. In April 2001, the "Turkish-Kyrgyz Intergovernmental Mixed Economic 2nd Term Meeting Commission Protocol," signed "on behalf of the Republic of Turkey" by Minister of State Abdulhak Mehmet Çay and "on behalf of the Republic of Kyrgyz" by Minister of Finance Temirbek Akmataliev, stated that

> "The parties have affirmed their determination to fulfil the main agreement signed on July 1, 1999, in Ankara, under the guarantee of the Governments of the Turkish and Kyrgyz Republics, concerning Pınara Bishkek Hotel located in Bishkek."[59]

79. On August 2, 2002, a Kyrgyz court decided that Ak-Keme's bankruptcy process was complete, that liquidation proceedings had been finalized, and that Ak-Keme was liquidated.[60]

**The Resolution of the Legislative Assembly, October 7, 2002**

80. In October 2002, a different policy began to emerge. On October 7, 2002 the Kyrgyz National (Legislative) Assembly issued a resolution "Regarding the governmental loss amounting to a few million USD as a result of the unheard of Agreement which is against the demands of the public and state."[61] That resolution asserted that the Kyrgyz party (Ak-Keme) in the hotel project had contributed its 50% share of the capital but that the Turkish party (Sistem) had not fulfilled its obligations. The resolution also asserted that the 1999 "Main Agreement which is considered as an International Treaty has not been ratified by the Parliament of the Republic of Kyrgyzstan and is legally not valid."[62] It went on to list various complaints against Sistem.

81. The resolution of October 7, 2002 concluded by recording that the Legislative Assembly

---

56. Engineering Reports, State Architecture and Construction Inspectorship, CM 16, CM 17.
57. CM 18.
58. CM 19.
59. CM 15. The Protocol is dated April 13, 2001.
60. Case No. Б-400/4, Decision, Bishkek Ct. Arb. Aug. 2, 2002, CM 20.
61. Decision of the Legislative Assembly of the Republic of Kyrgyzstan, No. 874-II, Oct. 7, 2002, CM 21.
62. Id., p. 2.

16

"agreed . . . [that the] Government of the Republic of Kyrgyzstan:

- Shall cancel the Main Agreement and other Agreements which were regulated on July 1ˢᵗ, 1999 in Ankara (Turkey) between the Republic of Turkey and 'Sistem Muhendislik' Turkish Company; and, the Government of Kyrgyzstan and the Liquidator of 'Ak-Keme' Joint Stock Company because it has not been ratified by the Parliament of the Republic of Kyrgyzstan and it is against the demands of the public and state;
- Shall compel 'Sistem Muhendislik' Turkish Company [to pay debts totalling USD 6,292,900 and 7000,000 soms;]
- A new legal entity shall be established within 10 days and direction of the 'Pınara Bishkek' Hotel shall be transferred to the said entity. Following, for the assurance of the management, contribution of the Republic of Kyrgyzstan Government, 'Ak-Keme' Joint Stock Company and the Malaysian Company 'Biznes Fokus Sdn. Bhd.' To the hotel construction shall establish. [sic] . . . ."[63]

The resolution noted that the Assembly also agreed that the Kyrgyz General Prosecutor would investigate Sistem, and that "Parliament examination shall take place on hotels including 'Pınara Bishkek' hotel constructed with contributions of foreign investors."[64]

82.   The Tribunal does not consider that the October 7, 2002 resolution of the Legislative Assembly invalidated or cancelled the 1999 Agreements. In the view of the Tribunal, no matter how unpalatable the arrangements may have been to some observers, it has not been established that the 1999 Agreements were invalid when they were concluded, even as a matter of Kyrgyz law. The presumption that they were indeed valid is reinforced by the affirmation of the Main Agreement by both the Turkish and Kyrgyz Governments in April 2001.[65]

83.   The argument that the 1999 Main Agreement was a treaty which required ratification by the Kyrgyz Parliament cannot be accepted. First, it is not established that the Main Agreement was a treaty. The references to it as an agreement guaranteed by the Governments of Turkey and Kyrgyz indicates that it was essentially an agreement between Sistem and the Liquidator of Ak-Keme, with the two Governments acting as guarantors, rather than an international treaty between the two Governments.

84.   The Tribunal notes, moreover, that even if the Agreement had been a treaty, far from indicating that the Agreement was a treaty which required ratification, Article 8 of the Main Agreement stipulated that "[t]he Agreement hereby enters into force by the signature of the parties . . . ." The Tribunal notes that this is consistent with the Constitution of the Kyrgyz

---

[63]   Id., p. 3.
[64]   Id., p. 4.
[65]   See supra para. 78; CM 15.

17

Republic, Article 48 of which appears to permit the delegation by the President of the power to ratify treaties,[66] and Article 58 (I) of which excepts from the Legislative Assembly's power of ratification "cases envisaged in Article 48."

85. The Tribunal further recalls that Article 27 of the Vienna Convention on the Law of Treaties, which it considers to be an accurate reflection of customary international law, asserts that "A party may not invoke the provisions of its internal law as justification for its failure to perform a treaty," subject to the provisions of Article 46 of that Convention. Article 46 reads as follows:

> "*Article 46*
> 
> *Provisions of internal law regarding competence to conclude treaties*
> 
> 1. A State may not invoke the fact that its consent to be bound by a treaty has been expressed in violation of a provision of its internal law regarding competence to conclude treaties as invalidating its consent unless that violation was manifest and concerned a rule of its internal law of fundamental importance.
> 
> 2. A violation is manifest if it would be objectively evident to any State conducting itself in the matter in accordance with normal practice and in good faith."

The Tribunal does not consider that the conditions for the application of Article 46 would be met even if the 1999 Main Agreement were properly to be regarded as a treaty; and it concludes that whatever the position in Kyrgyz law, the validity of the Main Agreement cannot be impugned as a matter of international law on the basis of any alleged failure to conform to procedures set out in the Kyrgyz Constitution.

86. The resolution of October 7, 2002 was followed by two developments within the Kyrgyz Republic.

87. First, later in October 2002 a case was instituted by Mr. Ruslan Sarymsakov and others in the Kyrgyz courts. The result was a decision, which was final and not subject to appeals, from the Constitutional Court on December 17, 2002.[67] In that decision the Constitutional Court held that the High Commercial Court of the Kyrgyz Republic had exceeded its authority under the

---

[66] Article 48: "The President of the Kyrgyz Republic has the right to transfer powers specified in subpoint 2 of point 3 of Article 46 of the Constitution to the Prime Minister, members of the Pravitel'stvo, and other officials; and also has the right to ratify international financial contracts and credit agreements signed by them."

[67] Decision, Const. Ct. Kyrgyz Rep., Dec. 17, 2002, RLA 5.

18

Kyrgyz Constitution when, on December 10, 1998, it had decided to reverse[68] the decision of the Commercial Court of Bishkek City and held that Ak-Keme was bankrupt.

88.     The decision of the Constitutional Court stated that the earlier decision "is not subject to execution;" but gave no other indication of the consequences which would flow from it. There was, moreover, no consideration by the Constitutional Court of the factual position and no finding that Ak-Keme was not insolvent.

89.     It appears that the Kyrgyz Supreme Arbitration Court then examined the question of the bankruptcy of Ak-Keme and, in a decision of January 15, 2003, directed that it should be reconsidered.  It was later reported by a Kyrgyz court that "[u]nder new consideration on 16.01.2003 'Ak-Keme' CJSC had been repeatedly recognized bankrupt."[69]

90.     Second, on December 20, 2002 the Prosecutor of Bishkek City froze two bank accounts belonging to Pınara Bishkek Ltd (and hence to Sistem).  The Prosecutor did so in order to protect the property of Pınara Bishkek Ltd, in the light of the Constitutional Court's decision of December 17, 2002 which indicated that the bankruptcy of Ak-Keme was unconstitutional and should not be given effect.[70]  The freeze was, however, lifted by the Prosecutor four days later, because "there remains no reason to confiscate 'Pınara Bishkek' Ltd's accounts rights."[71]  No further explanation was given.

91.     The legal position at the end of 2002 was, accordingly, unclear.  The bankruptcy of Ak-Keme, which had been definitively established by the Kyrgyz commercial courts, was the basis for the 1999 Agreements guaranteed by the Turkish and Kyrgyz Governments.  The final court ruling on that bankruptcy was declared unconstitutional in December 2002, but without either finding that Ak-Keme was not bankrupt or indicating what legal consequences flowed from the unconstitutionality of the decision.

92.     The factual position at the end of 2002, in contrast, was clear.  Sistem was in control of the hotel, which it was operating commercially; and it remained in that position until March 2005.

93.     It is obvious that the authorities in the Kyrgyz Republic were aware that Sistem remained in control of the hotel.  A full year after the decision of the Constitutional Court on the bankruptcy of Ak-Keme, on December 26, 2003, Sistem and the Kyrgyz Government agreed to revise the terms of the payment due under the 1999 Agreements.  Instead of Sistem paying

---

[68]     See supra para. 49, where the "High Commercial Court of the Kyrgyz Republic" is referred to as the "Supreme Court of Arbitration of the Republic of Kyrgyz". See CM 12 for the decision of Dec. 10, 1998.
[69]     Case No. B-400/4, Judgment, Bishkek Interdistrict Ct., June 17, 2005, RCM 47. See infra para. 105ff.
[70]     Decision on Usurpation of Property, Bishkek City Prosecution Office, Dec. 20, 2002, CM 23.
[71]     Decision Regarding the Annulment of Confiscation Over the Ownership, Bishkek City Prosecution Office, Dec. 24, 2002, CM 24.

19

50% of its profits until such time as it had made full payment, a schedule of payments was agreed.[72] That schedule provided for the payment of the sum of 19,571,000 Soms in four six-monthly instalments of specified amounts between November 2003 and May 2005, and for the payment of USD10,985,799 in 35 six-monthly instalments of specified amounts between November 2005 and May 2023.

94.    The Repayment Schedule, signed by representatives of Sistem and of the Kyrgyz Government, was submitted by the Respondent as an exhibit (no. 57) appended to its Counter-Memorial. Both parties accepted it is an accurate and valid document, although the Tribunal was not provided with the text of the remainder of the "Collateral Agreement" to which the Schedule was Appendix No. 1. It was later reported by the Kyrgyz Ministry of Finance that "Pınara Bishkek" Ltd (the Sistem affiliate) had paid 17,428,517.57 som under the 1999 contract.[73]

95.    This repayment schedule enabled Sistem to pay the 1999 contract price, interest-free, over a period ending almost 24 years after the making of the 1999 Agreements. On the other hand, the Kyrgyz Government had the benefit of knowing what sums would be paid and on what dates. The Claimant says that

> "According to the 1999 Agreements, there was no time-limit for our
> payments as they were related to the profit margin of the Hotel. The
> Ministry however asked for us to complete the payment in 20 years because
> the Turkish Eximbank had postponed Kyrgyz's loan payments for 20 years.
> Accordingly, we were asked to complete our payments within 20 years.
> Because of this, we prepared an agreement changing our payment Schedule.
> This agreement was signed by the Kyrgyz Vice-Minister of Finance and
> [Sistem]."[74]

Again, it is not for the Tribunal, which has no knowledge of the circumstances surrounding the renegotiation of the payment terms, to judge whether the rescheduling was or was not a balanced and beneficial arrangement. What the 2003 Repayment Schedule does make clear, however, is that at the end of 2003 the Kyrgyz Government adhered to the 1999 Agreements and recognized Sistem's title to the hotel.

---

[72]    Repayment Schedule of Sistem Mühendislik Sanayi ve Ticaret A.Ş.'s debt to the Government of the Kyrgyz Republic, RCM 57.

[73]    Letter from Kyrgyz Ministry of Finance to Sistem, July 12, 2005. CM 48.

[74]    Witness Statement of Fehim Yenice, para. 65.

20

*THE 2005 REVOLUTION*

96.     That situation appears to have subsisted until the events that gave rise to Sistem's claim in this case. In March 2005 the Kyrgyz Republic underwent a revolution. On March 24, President Akayev left the Kyrgyz Republic. On March 25, first Mr. Kadyrbekov, and later Mr. Bakiyev, assumed the office of acting President. Mr. Bakiyev was subsequently confirmed as President after Presidential elections in July 2005.

97.     There was much unrest at this time. The Claimant says that the security officers at the hotel unsuccessfully sought police protection for the hotel on March 23 and 24, 2005.[75] On 25 March, according to the Claimant, Mr. Sarymsakov, the former chairman of Ak-Keme, invaded the hotel with a group of around 50 armed men, seized control of the hotel, and expelled the Turkish personnel.[76] It was also alleged that State officials colluded with and participated in the seizure.[77] The Respondent denies that the hotel was invaded. Professor Belek Sarymsakov says in his witness statement that a group of people occupied the hotel in order to protect it from marauders, and advised the Turkish personnel to leave for their own safety.[78]

98.     On March 27 and 28, and April 2, 2005 the Claimant wrote a number of letters to the Kyrgyz Government, including letters to the Ministry of Defence, the General Public Prosecutor, the Ministry of Internal Affairs, the Prime Minister, and the acting President, complaining that the hotel had been seized and seeking its restoration.[79]

99.     On April 1, 2005 the Kyrgyz State Estate Fund replied to the Claimant's letter and confirmed that according to State Registration, the owner of the Hotel was Pınara Bishkek Ltd, the affiliate of Sistem.[80] On April 4, 2005 the Kyrgyz Deputy Minister of Finance wrote to the Kyrgyz Prime Minister and Deputy President. The letter briefly summarized the position, stating that under the 1999 Agreements the hotel was currently owned by Sistem, which in turn was indebted to the Ministry of Finance, and that Sistem had said that the hotel had been seized by Mr. Sarymsakov. The letter continued:

> "The Minister of Finance conveys its concerns over the matter, since the aforementioned situation, in line with the Articles of Association signed on July 01, 1999, prevented 'Sistem Mühendislik' company to effect necessary payments concerning the debt and tax and insurance payments."

---

[75]     Cl. Mem., paras. 120–29.

[76]     *Id.*; Witness Statement of Gürsel Yenice, paras. 26–55; Hearing Transcript Day 2, pp. 44–64.

[77]     Cl. Memorial, paras. 93–95, 239.

[78]     Witness Statement of Belek Sarymsakov, parags. 78–92; Hearing Transcript Day 2, pp. 91–97.

[79]     *See* CM 25.

[80]     CM 26.

> Moreover; the depropriation of the property of Turkish citizens might have a negative impact on mutual efforts initiated under the framework of the Paris Club with regard to the dispensation of Kyrgyz Republic debts to Turkish Republic. . . . [T]he Minister of Finance demands the investigation of the situation and related institutions to be directed to inspect whether the acts of Sarimsakov R. are consistent with the law."[81]

100.    On April 6, 2005 the Kyrgyz Prime Minister wrote to the Kyrgyz Public Prosecutor, the Ministry of Internal Affairs and the National Security Committee. The note read as follows:

> "1. I kindly request you to return the rights of the investor and take urgent measures in order to fulfil the previous commitments of the Government of the Republic of Kyrgyzstan.
> 2. An investigation shall take place for those state security organs who participated in the usurpation of Pınara Hotel.
> A report regarding the measures is requested within 3 days."[82]

That, or a similar letter, was also sent to the Ministry of Foreign Affairs and to the Turkish Embassy in Kyrgyzstan.[83]

101.    On the same day the Prime Minister (and Acting President), at a meeting with representatives of the international donor community,

> "assured the donor community that he will take all mentioned concerns into account and specifically responded that some of the raised issues are already being addressed, for example:
> -   *Pinara Hotel, Bitel* – he gave appropriate instructions and these cases will be resolved according to law."[84]

102.    On April 8, 2005 the Assistant Prosecutor of Bishkek issued an "Order on immediate ending of unlawful actions" to Mr. R. Sarymsakov, stating that

> "You have usurped the 'Pınara Bishkek' Hotel premises on March 25, 2005 by claiming that ZAO 'Ak-Keme', administrated by yourself, was unlawfully bankrupted and that the transfer of the premises to the Turkish company was unlawful, and you are still holding the premises. . . .

[81]    CM 27.
[82]    CM 28.
[83]    *See* Letter from the Turkish Embassy to Sistem, April 13, 2005, CM 32.
[84]    Draft Minutes of the Donor Community's Meeting with Prime Minister, Acting President of the Kyrgyz Republic Kurmanbek Bakiyev, Bishkek, April 6, 2005, CM 45.

22

> According to article 19/2 of the Constitution of the Republic of Kyrgyz (KC GK 222, 281), property rights can not be violated; property owners rights cannot be violated by a third party's decision; and a property can only be seized against its owners will by a Court decision.
>
> Besides, according to article 183 of the Civil Code of the Republic of Kyrgyz, the Share Purchase Agreement signed between ZAO 'Ak-Keme''s liquidator and 'Sistem Muhendislik Insaat Sanayi ve Ticaret AS' on July 1, 1999 can be annulled only by a Court decision. . . .

#### ORDER

> You are obliged to return 'Pınara Bishkek' Hotel's premises which were usurped unlawfully, in order to cure the injustice regarding 'Pınara Bishkek' LTD's property rights."[85]

103. Had this Order been implemented, no case could have been made out that the Respondent had violated its duties under the BIT. True, the Claimant had been ousted from the hotel; but the documentary record shows that the Respondent had taken steps to restore the hotel to the Claimants, to investigate the legal position, and to investigate allegations of the involvement of State officials in the events of March 25.

#### DEVELOPMENTS IN THE SUMMER OF 2005

104. In fact, the Order was not implemented. In May 2005, Sistem wrote again to the authorities requesting that the necessary steps be taken to restore the hotel to Sistem.[86] It appears from a letter sent by the Kyrgyz General Public Prosecutor to Sistem, dated June 16, 2005, that Mr. Sarymsakov then appealed against the order to quit the hotel, and took the question of the ownership of the hotel to the Kyrgyz courts.[87]

105. On the following day, June 17, 2005, the Bishkek Interdistrict Court issued a judgment in which it refused the claim that the Kyrgyz Department on Bankruptcy had filed on May 14, 1997 seeking recognition of the bankruptcy of Ak-Keme, and ordered that the parties be brought to their "initial position" and that the Kyrgyz Department of Bankruptcy "transfer (return) movable, real estate, turnaround and money resources and others [sic] commodity-material assets of 'Ak-Keme' CJSC."[88]

---

[85]   CM 29.

[86]   CM 25.

[87]   RE 13.

[88]   Case No. B-400/4, Judgment, Bishkek Interdistrict Ct., June 17, 2005, RCM 47. This court decision appears in a certified copy dated June 27, 2005.

106.   The Court's reversal of the determination of Ak-Keme's bankruptcy was based upon findings that though payment documents had been submitted by the Kyrgyz Department on Bankruptcy they "cannot serve as the proof, and the court considers these payment documents false." It noted the "absence of any documents" and of data in relation to the movement of the funds provided by Turkish Eximbank. And it said that

> "[f]rom the text of a brief information as of 4.12.1998 addressed to the President of the Kyrgyz Republic, made by Department of Economic Policy of Administration of the President of the Kyrgyz Republic, it follows that 'Ak-Keme' CJSC is solvent, profitable, had no debts on payments to the budget (book 11, pages 160-163 of the case)."[89]

107.   A further court decision, dated June 27, 2005, reached the same conclusion, and found that the 1999 Share Purchase Contract was void.[90] That decision, in a hearing in which the Kyrgyz Government, though notified, was not represented, cancelled the Claimant's rights under the 1999 Agreements.

108.   On June 21, 2005, Mr. R. Sarymsakov and others were notified by the Public Prosecutor that the criminal charges instituted against them had been dropped.[91]

109.   On June 29 and 30, 2005, Sistem wrote to the Kyrgyz authorities requesting the establishment of a joint Kyrgyz-Turkish commission to consider the dispute, as provided for in Article 12 of the July 1999 Main Agreement, and raising the prospect of recourse to ICSID under the BIT.[92]

110.   A letter dated July 5, 2005, from the First Deputy Chief of the Prime-Minister to Sistem said that Sistem's claim to the hotel must be pursued through the courts, to whom the claim had been forwarded, and was not a matter for the Executive.[93] On July 7, the Public Prosecutor informed Sistem that in the light of the court decisions declaring Ak-Keme not to be bankrupt and the 1999 Share Purchase Agreement to be void, it would not be intervening on Sistem's behalf.[94]

111.   As has been noted, on July 12, 2005 the Kyrgyz Ministry of Finance wrote in response to a letter from Sistem and "Pınara Bishkek" Ltd to confirm that "Pınara Bishkek" Ltd had paid 17,428,517.57 som under the 1999 contract.[95] On July 18, 2005 the Kyrgyz State Estate Fund

---

[89]   *Id.*
[90]   Decision, Leninskiy District Ct. of the City of Bishkek, June 27, 2005, RCM 48.
[91]   RLA 33.
[92]   CM 31, CM 33.
[93]   RE 12.
[94]   RE 14.
[95]   CM 48.

24

wrote to Sistem to say that its dispute with Mr. Sarymsakov and others was a private matter and that there is no dispute between Sistem and the Kyrgyz Government.[96]

112.    The judicial board of the Bishkek City Court heard an appeal by Sistem against the court decision of June 27, 2005, and on August 30, 2005 it ruled that the decision should stand.[97]  A further appeal by Sistem, to the Kyrgyz Supreme Court, was rejected on November 2, 2005.[98]  A further attempt by Sistem to regain the hotel by legal action was rejected by a Kyrgyz court on December 19, 2005.[99]

113.    In the final weeks of 2005 there were moves towards an amicable settlement of the dispute.  At one such meeting, held on November 23 and attended by (among others) the Chairman of the Kyrgyz Supreme Court, the Deputy Chairman of the Kyrgyz Republic National Bank, representatives of the Kyrgyz Ministries of Economy and of Foreign Affairs and the State Committee of State Property and the Prime Minister's office, and Mr. Sarymsakov (but no representative from Sistem), it was resolved that

> "The Ministry of economy and finances of the Kyrgyz Republic together with the Kyrgyz Republic State Committee on state debt management, and Joint Kyrgyz and Malaysian enterprise 'Hotel Ak-Keme' (R. Sarymsakov) and the Turkish Company 'Sistem Muhendislik' till December 5, 2005 shall conclude the amicable agreement on settlement disputes and differences, arising in connection with the activity of 'Ak-Keme- Pınara' Hotel."[100]

It was further resolved that the Kyrgyz Ministry of Foreign Affairs would assist the participation of the representative of Sistem, and the Turkish Ambassador, in the negotiations. These moves did not produce an amicable settlement.

114.    The events after 2005 do not affect the scope or character of the present dispute, which had by then already crystallized, the Request for Arbitration dated September 30, 2005 having been filed with ICSID in October 2005 and registered by ICSID in April 2006. The Tribunal has, however, noted that proceedings were instituted in the Kyrgyz courts against Mr. Fehim Yenice personally and against Sistem,[101] and wishes to make clear that its present award does not affect those proceedings or any other claims that the Kyrgyz Republic or private persons may have against Sistem.

---

96      CM 34.

97      Appeal Proceedings #A.S-000430/05-ГД, Decision, Judicial Board on Civil Cases of the Bishkek City Ct., Aug. 3, 2005, RCM 49.

98      Case No. 6-904, Decision, Sup. Ct. Kyrgyz Rep., Nov. 2, 2005, RLA 9.

99      Case No. ЗД-368/05мбс9, Decision, Bishkek Inter-Dist. Ct., Dec. 19, 2005, RLA 31, RCM 24.

100     See RRJ 74; RRJ 75.

101     RLA 37; RCM 28; RCM 39; RCM 42.

115. The Tribunal has also noted Respondent's exhibit 23, submitted with its Counter-Memorial. This is an "Amicable Agreement" dated July 12, 2006 between the Kyrgyz Ministry of Finance, the Bankruptcy Department of the Kyrgyz State Committee on State Property Management, and the Ak-Keme Hotel JKMV (the Joint Kyrgyz-Malaysian Venture, represented by Mr. R. Sarymsakov, which took over the running of the hotel in 2005). That document recorded the agreement that the Ak-Keme Hotel JKMV would pay the Ministry of Finance USD10,261,883.00 "in consideration of interests accrued in the amount of 2.75 percent per annum" and 1,001,150.35 som, in accordance with a payment schedule that ran from September 2006 until November 2016.[102] That Amicable Agreement does not affect the substance of the claim in this case, but it does cast some light on the value of the hotel at that time.

116. While the Tribunal has read and considered the other documents, including witness statements, and the oral submissions of the parties in the present case, it does not consider it necessary to set them out at any greater length than has been done above. It turns next to its analysis of the question of liability.

## THE RESPONDENT'S LIABILITY TO MAKE REPARATION

117. The Tribunal has found that in 1999 the Claimant became the sole owner of the hotel, and that the Claimant's ownership rights in the hotel were abrogated by the decision of the Leninskiy District Court of the City of Bishkek dated June 27, 2005, which was upheld by the decision of the Bishkek City Court dated August 30, 2005 and the decision of the Kyrgyz Supreme Court dated November 2, 2005, invalidating the July 1999 Share Purchase Agreement. The effect of those decisions was supported by the decision of the Bishkek Interdistrict Court dated June 17, 2005, annulling the bankruptcy of Ak-Keme.

118. That abrogation was effected by an organ of the Kyrgyz State, for which the Kyrgyz Republic is responsible.[103] It is well established that the abrogation of contractual rights by a State, in the circumstances which obtained in this case, is tantamount to an expropriation of property by that State.[104] The Court decision deprived the Claimant of its property rights in the hotel just as surely as if the State had expropriated it by decree. If the Claimant has been

---

[102] RCM 23. The payment schedule shows that Ak-Keme Hotel JKMV would repay USD10,261,883.00, plus USD1,481,559.36 (total, USD11,743,442.36) by November 1, 2016.

[103] See Article 4 of the International Law Commission's Articles on State Responsibility, reprinted in J. Crawford, *The International Law Commission's Articles on State Responsibility*, (2002), p. 94.

[104] See, e.g., Siemens A.G. v. Argentine Republic (ICSID Case No. ARB/02/8), Award of Feb. 6, 2007, paras. 267–72.

26

deprived of its property rights by an act of the State, it is irrelevant whether the State itself took possession of those rights or otherwise benefited from the taking.[105]

119. That abrogation of the Claimant's property rights amounts to a breach of the Article III of the Turkey-Kyrgyz BIT, which forbids the expropriation of property unless it is done for a public purpose, in a non-discriminatory manner, and upon payment of prompt, adequate and effective compensation. Those conditions are not satisfied in this case: in particular, no compensation has been paid. The Respondent is accordingly obliged to make reparation for that breach of the BIT.

120. That is not a matter between the Claimant and Mr. Sarymsakov or the present operators of the hotel. It is a matter between the Claimant and the Respondent, because the claim is based on the Claimant's losses as a result of the Respondent's duties owed to the Claimant under the BIT.

121. The Claimant was deprived of all of its rights in the hotel, and the appropriate form of reparation is compensation for the value of the hotel. Article III (2) of the Turkey-Kyrgyz BIT stipulates that in cases of expropriation compensation "shall be equivalent to the real value of the expropriated investment before the expropriatory action was taken or became known."

122. The history of the investment in the Kyrgyz courts is convoluted. Two things are, however, clear beyond doubt. First, the Claimant operated the hotel and was treated by the Kyrgyz authorities as owner of the hotel from 1999 to March 2005 – and indeed, for some time afterwards, when the Kyrgyz authorities appeared disposed to take steps to restore control of the hotel to Sistem. Second, in March 2005, the Claimant lost control of the hotel as a matter of fact and, by virtue of the decision of the Kyrgyz court on June 27, 2005, the Claimant was deprived of all of the rights in the hotel which it had obtained under the 1999 Agreements.[106]

123. As a matter of strict logic it might be said that the Claimant was deprived as a matter of law only of that part of its interest in the hotel which it gained as a result of the 1999 share purchase agreement which was invalidated by the Kyrgyz courts in 2005. In theory, the Claimant lost only the 50% interest in the hotel which, even on its own view of its legal position, it did not own prior to 1999, and which it bought from the liquidator of Ak-Keme in July 1999.

124. On the other hand, it appears that by April 2005 the former owners of Ak-Keme had formed a new joint venture to run the hotel together with a Malaysian company,[107] and that by

---

[105]     See, e.g., CME Czech Republic B.V. (The Netherlands) v. The Czech Republic (UNCITRAL Arb. Proc.), Partial Award of Sept. 13, 2001, paras. 591–609, *available at* http://ita.law.uvic.ca/documents/CME-2001PartialAward.pdf.

[106]     As was explained above, the decision was subsequently affirmed on appeal. It was upheld finally and without the possibility of further appeal by the Supreme Court on November 2, 2005.

[107]     RCM 53.

27

June 2005 the Kyrgyz Ministry of Economy and Finance had recognized that this joint Kyrgyz-Malaysian enterprise was the operator of the hotel.

125.    In June 2005 a Reconciliation Report was signed by (1) A. Zhaparov of the Ministry of Economy and Finance of the Kyrgyz Republic, (2) M. Temirbekov, the Director of the Central Treasury of the Ministry of Economy and Finance of the Kyrgyz Republic, (3) R. Sarymsakov, for the Ak-Keme Hotel Joint Kyrgyz Malaysian Enterprise, and (4) V. Harlamova, the Financial Coordinator of Ak-Keme Hotel Joint Kyrgyz Malaysian Enterprise. The translation of the Report submitted by the Respondent as exhibit 30 to its Counter-Memorial is headed "Reconciliation report of share repayments by the Ak-Keme Hotel Joint Kyrgyz Malaysian Enterprise[108] to the Ministry of Economy and Finance of the Kyrgyz Republic according to the Agreement between Ak-Keme Joint-Stock Company and Affairs Management Department of the President's Administration and Kyrgyz Republic Government Office as consistent with the Kyrgyz Republic Government Decree #85-P dated 05/04/1995."

126.    The Report appears to detail "repayments" by the Ak-Keme Hotel Joint Kyrgyz Malaysian Enterprise between May 6, 2005 and June 20, 2005 of shares bought by the Ministry of Economy and Finance in November and December 1996, totalling USD45,000.00.    The significance of the Report is that it makes plain that by late June 2005 the Ak-Keme Hotel Joint Kyrgyz Malaysian Enterprise was acting as the owner of the hotel. That is further confirmed by the conclusion of the "Amicable Agreement" of July 12, 2006.[109]

127.    There is no suggestion that in the discussions between the Claimant and the Respondent that have taken place since the decision of the Kyrgyz Supreme Court dated November 2, 2005, either the Claimant or the Respondent has taken the position that at the present time the Claimant retains a half-share in the hotel. Indeed, there is no indication in the evidence submitted to the Tribunal that either Ak-Keme or the Ak-Keme Hotel Joint Kyrgyz Malaysian Enterprise considers that Sistem retains any legal interest in the hotel.

128.    In the circumstances of this case the Tribunal considers that as a matter of fact the Claimant lost control of the hotel on March 25, 2005. As a matter of law it must be regarded as having lost its legal interest in the hotel as of June 27, 2005. Any chance of the restoration of that interest was removed by the decision of the Kyrgyz Supreme Court dated November 2, 2005. The Tribunal has accordingly decided that the Claimant's investment in the hotel was expropriated as of June 27, 2005.    This, in the Tribunal's view, is the only realistic characterisation of the position.

129.    Nonetheless, in order to remove any doubt on this matter the Tribunal emphasises that its award of compensation is made explicitly on the basis that the Claimant no longer has any legal interest in the hotel.

---

108     I.e., the Ak-Keme Hotel JKMV.
109     See supra para. 115.

**VALUATION OF THE CLAIMANT'S LOSS**

130.    It is necessary for the Tribunal to determine the value of the investment of which the Claimant was deprived. Both parties were asked to submit post-hearing briefs on questions of quantum including the question, what would be the proper approach to the determination, on the basis of the documentary exhibits that are included in the documentary record already filed in this case, of the value of the Claimant's legal interest in the hotel on (a) March 24, 2005 and, if different, (b) November 1, 2005.[110]

131.    The submissions made by the parties do not indicate a valuation upon which they are currently agreed for this purpose. The Tribunal has, therefore, to determine the compensation payable as best as it can on the basis of the documents before it.

*THE "INCIDENTAL" AND "AGREED" VALUATIONS*

132.    Certain documents contain references to the "value" of the hotel. Some of these documents are incidental to transactions in which both parties were involved, and might be said to have been accepted, at least for some purposes, both by the Claimant and the Respondent. Thus, in 1993 the initial contract referred to a value of USD25 million; the 1999 Share Purchase Agreement valued the re-organized Ak-Keme company shares, representing Ak-Keme's half-interest in the hotel, at USD12.70 million; and the 2002 "Approval" of the hotel by the Kyrgyz authorities valued it at USD21.6 million.

**The 1993 Contract Value**

133.    The 1993 "contract value" was an agreed sum reflecting the contributions that each party would in future make to the project to build the hotel. It was fixed at **USD25 million**. The Tribunal does not consider that it is a reliable guide to the value in 2005 of the hotel as it was actually built. The limited usefulness of the 1993 contract value is underscored by the fact that the Claimant produced no detailed records of its actual expenditure on the project. While the Tribunal accepts that the Claimant was under no contractual duty to Ak-Keme to produce detailed records and accounts, that fact does not relieve the Claimant of the burden of establishing its case, including the amount of its losses, before the Tribunal. It is a matter of regret that no such records and accounts were forthcoming.

---

[110]    The first and last dates in 2005 on which, on the facts, it might be argued that an expropriation had occurred.

29

**The 1999 Agreement Value**

134.    The 1999 Share Purchase Agreement price might appear to be a more secure basis for valuation, since it is an agreed contract price. The repayment terms of that agreement cannot, however, be ignored. Article 2.2 of the Share Purchase Agreement provided that "The payment in exchange of the purchased shares shall be provided with the remittance of 50% of the profit to be gained from the operation of the Hotel until the amount deemed by this Agreement is wholly covered." In other words, Ak-Keme's share in the hotel (in the form of shares in Hotel Ak-Keme De Luks) was to be handed over to the Claimant, but the Claimant had no immediate obligation to pay anything. The Claimant would pay one-half of the profits of the hotel, which it now wholly owned, until such time as it had handed over USD12.7 million to the liquidator of Ak-Keme.

135.    In addition, Article 3 of the Main Agreement dated July 2, 1999 provided for the right of the Republic of Kyrgyz to payments of USD10,985,799 and 19,571,000 Som to be transferred from the original debtor Ak-Keme to the Claimant.[111] In addition, USD1,249,881 had to be paid to the Ak-Keme liquidator, to pay off the non-Eximbank creditors. In other words, Sistem took on Ak-Keme's debt. Article 4 of the Loan Transfer Agreement of the same date stipulated that "The Republic of Kyrgyz shall not demand any additional interest, punishment or interest cost from [Sistem] other than 12,700,000 USD."[112]

136.    The repayment schedule agreed on December 26, 2003, provided for interest-free repayments of the sums due over a period extending to May 15, 2023.[113] The sums due in future can be discounted in order to give their value in present-day terms. For example, the Claimant estimates that USD200,000 due in November 2015 was worth USD67,747 in December 2007.[114]

137.    The Claimant estimated in the First Raymond James Report[115] that the December 2007 value of the repayments of USD10,985,799 plus about 2.14 million Kyrgyz Soms (around USD53,000) which remained unpaid as of December 2007 was around USD3.6 million. According to the Claimant's view, therefore, the contract price of Ak-Keme's 50% share of the hotel, discounted back to 1999 values, would have been very much less than the USD12.7 million which was the "value of the transferred shares" according to the Share Purchase Agreement. The 1999 contracts appear to have transferred to the Claimant shares nominally valued at USD12.7 million in return for a schedule of payments whose overall value in 2005 terms was less than one-third of that amount. The Claimant would, of course, have had to

---

[111]    See supra para. 31.
[112]    CM 14.
[113]    RCM 57.
[114]    Hotel Pinara, Bishkek, Valuation Report, Raymond James Turkey, Dec. 2007 [hereinafter First Raymond James Report], p. 45.
[115]    Id.

30

continue with its investment and actually operate the hotel in order to generate the profits from which the 1999 contract price was to be paid: but so would any other buyer of all or part of the legal interest in the hotel.

138.    The Tribunal is aware that it is by no means uncommon for governments to sell existing businesses to new investors for very low sums, in the hope that the new owners will generate jobs, taxes and income which will over time make the arrangement worthwhile for both the government and the new investor. It is not for the Tribunal to second-guess those who agreed to the 1999 Agreements on behalf of the then-insolvent Ak-Keme and the Kyrgyz Republic and take a view on the desirability of those Agreements.

139.    The value of Ak-Keme's one-half share in the hotel as implied by the terms of the 1999 Agreements thus falls in a range running from around USD3.6 million to over USD12 million, implying a 1999 value for the hotel in the approximate range of **USD7 million – USD24 million**, (if it can be supposed that the value of the hotel was double the value of Ak-Keme's half share, which is by no means clear).

### The 1999 Labrate Report

140.    Prior to the conclusion of the 1999 Agreements a valuation report was produced by the Moscow-based firm, Labrate. That report is discussed below;[116] but it is right to note here that the valuation that it contains is referred to in a report submitted by the Claimant as "agreed," and that the Respondent also appears to have accepted that valuation.

### The January 2002 "Approval" Value

141.    The "Agreement of the State's Approval Committee" for the commission of the hotel,[117] approved by the Government of Kyrgyzstan on January 15, 2002, valued the hotel at USD21,670,000, being USD15,850.000 for construction and USD5,827,000 for equipment [sic].[118]

142.    That document does not record the details of the information upon which the valuation was based, or the valuation method. Nonetheless, the decision of the State's Approval Committee, which decision was itself "'approved' [w]ith the Order of the Government of Kyrgyzstan dated January 15, 2002,"[119] points to a valuation of the order of **USD21.6 million**, broadly in line with the initial 1993 contract value.

---

[116]    *See infra* paras. 144ff, 165ff.
[117]    CM 18.
[118]    The USD7,000 discrepancy appears in the original document.
[119]    CM 18.

*THE PARTIES' VALUATIONS*

143.   In addition to these valuations, which were incidental to other transactions in which the parties were involved, each Party has submitted its own valuations of the hotel.  The Respondent has submitted the 1999 Labrate Report and a Report from Inaudit dated September 12, 2005, supplemented by a further Inaudit Report dated December 13, 2005.  The Claimant has submitted two reports by Raymond James Turkey.  It is convenient first to consider the Respondent's valuations, which are earlier in date and to which the Claimant's valuations are in part a response.

*THE RESPONDENT'S SUBMISSIONS ON VALUATION*

### The 1999 Labrate Report Valuation

144.   The Respondent submitted a very detailed and closely-argued report dated May 28, 1999, compiled by Labrate, a valuation company based in Moscow.  The valuation was an "[a]ppraisal of market value for the purpose [of] the possible purchase and sale of the object of appraisal and/or for the purpose of investors attraction."[120]  It adopted the international valuation standard of a willing buyer and willing seller.[121]  The Report estimated the value of the hotel on the basis of a number of approaches to valuation, all based on the assumption that "existing sub quality work" would be eliminated and that the hotel (then incomplete) would be completed.[122]

145.   On the basis of a cost approach, assuming that a willing buyer would pay no more for the property than it would cost to build an equivalent, the Labrate Report estimated a value of USD14,020,000 as at May 1, 1999.[123]  On the basis of a "profits" approach,[124] in which the present value of expected future profits is calculated, it estimated the value as USD9,300,000 as at May 1, 1999.[125]  That approach has the merit of focusing upon the value of the asset as a functioning business, rather than the cost of constructing it.  The Labrate Report then

---

[120]   Report, *Market Value Estimation for "Ak-Keme" Hotel*, Investment Laboratory LABRATE, Moscow, May 28, 1999, [hereinafter Labrate Report], p. 5 ("Short Description of Existing Actual Information").

[121]   *Id.*, Section 6, p. 62 (quoting "International standards of appraisal, the Standard 1, Clause 3.1", which appears to be International Valuation Standard 1, Clause 3.1.

[122]   *Id.*, Sections 6, 7.

[123]   *Id.*, Section 8, para. 8.7.

[124]   Similar to the discounted cash flow (DCF) method.

[125]   Labrate Report, Section 10; para. 10.5.6.

proceeded to apply a hierarchical analysis procedure in order to arrive at an estimated market value of **USD10.57 million** as at 1 May 1999.[126]

### The 2005 Inaudit Reports

146. In June 2005, the Office of the Public Prosecutor of Bishkek City instructed the Kyrgyz-English Joint Venture, Inaudit, to undertake an audit of the financial and economic activity of the Pınara-Bishkek Limited Company for the period July 1, 1999 to March 24, 2005.[127] The Pınara-Bishkek Limited Company (i.e., Sistem)[128] held the land rights for the hotel complex and operated the hotel.

147. The Inaudit reports noted that Labrate did not have documentation for the construction of the hotel, so that its USD10.57 million valuation was only an approximate market value. They further stated that the valuation in the "Approval" decision of January 2002 "should not be considered as correct," it being alleged that the value had been intentionally increased in order to reduce the liability of the Pınara-Bishkek Limited Company to profits tax.[129] They also alleged that the accounts of the company for the years 1999-2004 had been manipulated in order to show losses and enable the Pınara-Bishkek Limited Company to avoid paying taxes.[130]

148. The Inaudit reports do not cast doubt upon the Labrate estimate of **USD10.57 million** as an approximation to the market value of the hotel, but question only its precision. They do, on the other hand, indicate that the 2002 "Approval" value is fundamentally unreliable.

### The Respondent's Post-Hearing Submissions on Quantum

149. The Respondent's post-hearing submissions on quantum takes the position that the Labrate report was an independent appraisal, and that the Claimant has not proved any increase in the value of the hotel beyond Labrate's estimate of **USD10.57 million**.[131] Moreover, the Respondent does not accept that the Claimant would be entitled even to that amount, as in its view certain sums would have to be deducted from the value of the hotel.

---

[126] *Id.,* Section 11. Paragraph 11.2.

[127] Inaudit Reports, Bishkek, Sept. 12, 2005 and Dec. 13, 2005, RCM 38.

[128] *See supra* para. 68 and the reference to the resolution of the Municipality of Bishkek dated April 10, 2001 in the Testimonial Letter B-000262 on the Right of Temporary Usage of the Land, CM 50.

[129] Inaudit Report, Sept. 12, 2005, p. 4.

[130] *Id.,* pp. 5-9.

[131] Resp. Post-Hearing Brief on Quantum, pp. 7, 10.

### The Raymond James Reports of 2007 and 2008

150.    The Claimant has submitted two short reports by Raymond James Turkey (a subsidiary of Raymond James Inc., a diversified financial services holding company with subsidiaries engaged primarily in investment and financial planning, in addition to investment banking and asset management), dated December 2007 and April 2008. The first report applied three valuation methods: discounted cash flow (DCF) analysis; multiples analysis (also known as the peer comparison method); and replacement value analysis. The report stated that Sistem's accounting records concerning the hotel are held at the hotel and inaccessible to Sistem, and that it had used management accounts provided by Sistem for the three years 2002, 2003 and 2004 as "the only available accurate, organized, and reliable data" for determining the fair asset value of the hotel.[132]

151.    On that basis the first Raymond James report estimated the value of the hotel at the end of 2007, on a DCF analysis, as USD23,5S8,817.[133] Using a Deal Multiple Analysis, comparing the hotel with other hotels world-wide, the estimated value was USD23,293,S29.[134]   The estimated value based on a replacement value calculation was USD24,897,SS0.[135]

152.    The second Raymond James report addresses the valuation in the Labrate report, which it considers to be outdated in view of changes such as improvements in the hotel and macroeconomic developments in the Kyrgyz Republic between 1999 and 2005. It also states that the hotel should be considered as a "business" rather than as "stand-alone real estate."[136] The report then offers estimates of the value of the hotel extrapolating from the Labrate valuation using (a) the "risk-free" index of the growth rate in US Treasury bills and (b) LIBOR + 6%. Those calculations yield year-end values of respectively (a) USD13.79 million in 2004 and USD14.38 million in 2005, and (b) USD17.61 million in 2004 and USD19.39 million in 2005.[137] The second report states that the growth of the value of the hotel, as a profitable and growing business, was projected to exceed both of those growth rates, thus proving the accuracy and fairness of the valuations in the first Raymond James report.[138]

---

[132]    First Raymond James Report, p. 32, para. 4.2.
[133]    Id., p. 40.
[134]    Id., p. 43.
[135]    Id., p. 44.
[136]    Hotel Pinara, Bishkek, Follow-up Report, Raymond James Turkey, April 2008 [hereinafter Second Raymond James Report], p. 4.
[137]    Id., p. 5.
[138]    Id., p. 6.

34

### The Claimant's Post-Hearing Submissions on Valuation

153. The Claimant's post-hearing submissions on quantum adopt broadly the same approach as did its earlier submissions. The value of the hotel as of March 25, 2005 is estimated at USD19,943,486 using the DCF method, and USD24,758,861 using the replacement cost method.[139] The value of the hotel on November 1, 2005 is estimated at USD20,710,423 using the DCF method, and USD24,758,861 using the replacement cost method.[140]

### THE TRIBUNAL'S ANALYSIS

154. The Tribunal is conscious of the desirability for conceptual clarity in valuing assets for the purposes of calculating compensation payable; and it is conscious of the criticism of "triangulation" methods, which select a figure that lies somewhere in the middle ground of estimates put forward by the parties.

155. The Tribunal is also aware of the fact that all valuations in the absence of an actual sale are estimates, and is mindful of the fact that the Tribunal has a legal duty to render an award under a process which the Respondent has freely agreed to establish and the Claimant has freely chosen to pursue, and to do so on the basis of the material that the parties have decided to put before it. That is, necessarily, an exercise in the art of the possible; and the Tribunal has sought to arrive at a rational and fair estimate, in accordance with the BIT, of the loss sustained by the Claimant rather than to engage in a search for the chimera of a sum that is a uniquely and indisputably correct determination of the value of what the Claimant lost. The Tribunal derives some comfort from Immanuel Kant's observation that "Out of the crooked timber of humanity no straight thing was ever made."

156. The Tribunal is obliged by the BIT to determine the "real value of the expropriated investment." It has approached this task by asking first, which valuation method most closely corresponds to that standard of compensation, and second, whether there is adequate evidence to generate a valuation according to that method. If there is not adequate evidence to support a valuation based on the appropriate method, the Tribunal will have to proceed to a third stage and ask what rational and reasonable valuations can be derived from the available evidence.

---

[139]   Cl. Post-Hearing Brief on Quantum, p. 19.
[140]   *Id.*, p. 32.

35

**The Appropriate Method of Valuation**

157.    In deciding between available methods of valuation, the Tribunal is in the first place conscious of the distinction between cost-based valuations that focus on the value of what the investor has invested and lost, and profit-based approaches that focus on the value of the asset and the expected profits that the investor has lost – that is, the distinction between what the asset cost and what it was worth.

158.    Whatever might be the position in relation to breaches of duties of Fair and Equitable Treatment or Non-Discrimination or Full Protection and Security, in cases where the breach takes the form of an expropriation compensation will generally be assessed by reference to the value of the property or rights of which the Claimant was wrongly deprived: that is what the property was worth. The oft-repeated *Chorzów Factory* formula refers to

> "the obligation to restore the undertaking and, if this be not possible, to pay its value at the time of the indemnification, which value is designed to take the place of restitution which has become impossible. To this obligation, in virtue of the general principles of international law, must be added that of compensating loss sustained as a result of the seizure."[141]

It is questionable whether an arbitral tribunal has the power to order a State to restore expropriated property to its original owner. In any event, restoration of expropriated property is plainly no longer the primary judicial remedy in cases of expropriation, if it ever was. Monetary compensation is the normal remedy, and its role is precisely "to take the place of restitution."

159.    Monetary compensation will "take the place of restitution" if the investor's periodical receipts are the same as they would have been if the investor had remained in possession and control of the property. If investors are given compensation which represents a net income stream that is the same as that which the investor could rationally and reasonably have expected, at the time of the taking, to derive from the expropriated investment, and which also reflects the residual value of the investment that would have generated that income stream, then that compensation will ordinarily discharge the liability of the State.

**The Replacement Value Approach**

160.    The "replacement value" approach to valuation looks to what the investor has put in, not what the investor could expect to derive from the investment – at what the investment cost rather than at what it was worth.   But there is no necessary relationship between cost and

---

[141]    Case Concerning the Factory at Chorzów (Claim for Indemnity) (Germany v. Poland), 1928 P.C.I.J. (ser. A) No. 17 (13 Sept.), p. 48.

value.[142] It may take some years before an investment builds up a reputation and turnover which raises its value above the amount that was needed to create it. Indeed, it may never rise to that value; and if that is so, it is not the role of a BIT to turn a bad investment into a good one. The investment was worth what it was worth, regardless of how much it cost.

161.    In the context of expropriation, replacement cost is therefore less helpful than a valuation based upon expected profits. (The application of a costs approach in this case would, moreover, be impeded by the surprising inability of the Claimant to produce detailed records of the costs incurred in the hotel project.) In contrast, because buyers of businesses can be expected to value them according to the profit that they will generate, rather than the cost of creating them, the "multiple deals" approach to valuation, and the DCF method, appears more appropriate in this context than the "replacement value" approach. The Tribunal considers the replacement value approach inappropriate in the circumstances of this case.

### The Multiple Deals Approach

162.    In this case the Tribunal is not persuaded that there is an adequate basis for the application of the "multiple deals" approach. Conditions in the Kyrgyz hotel sector in the period in question are not so obviously comparable with the comparators in Ireland, Sweden, the UK, the USA, and the other States to which the first Raymond James report makes reference[143] as to persuade the Tribunal, without more, that these comparators offer a sound basis for comparison and extrapolation. The fact that the Raymond James report states that "there are almost no completed transactions in the Central Asian region with accurate transaction data" and that "[i]n addition, 30% discount is applied on the deal multiples to normalize the multiple for the Kyrgyzstan market"[144] reinforces the view that the valuation based on this approach involves a large measure of speculation.

163.    Accordingly, while the "multiples" approach would in principle be an appropriate approach to valuation in the circumstances of this case, there is inadequate information to which that approach could be applied.

### The DCF Method

164.    The Tribunal considers it clear that the DCF or "profits" approach is appropriate in the circumstances of this case. Many tribunals have observed that it is appropriate to follow the World Bank's approach to valuation in the circumstances of expropriation, assessing the

---

[142]    As the Second Raymond James Report points out (pp. 10–11; para. 20).
[143]    First Raymond James Report, p. 42.
[144]    Id., p. 43.

> "amount that a willing buyer would normally pay to a willing seller after
> taking into account the nature of the investment, the circumstances in which
> it would operate in the future and its specific characteristics, including the
> period in which it would operate in the future and its specific characteristics,
> including the period in which it has been in existence, the proportion of
> tangible assets in the total investment and other relevant factors pertinent to
> the specific circumstances of each case."[145]

While the available data is sparse, both parties appear to have considered that the data
is sufficient for the DCF approach to be applied and to yield a reasonable estimate of the value
of the hotel and of the compensation due.

165.    The Claimant used the DCF approach to generate an estimated value of the hotel on
November 1, 2005 of USD 20,710,423.[146] The Respondent's Labrate Report used a "profits"
approach to generate an initial estimated value of USD9,300,000, but adjusted that to produce
an estimated market value of USD10.57 million, as at May 1, 1999.

166.    The Labrate analysis appears thorough and clear as to its assumptions and reasoning. It
is true that the Labrate estimate cannot be regarded as a perfect basis from which to derive an
estimate of the value of the hotel in 2005. The most obvious difficulties in relying upon the
Labrate report for that purpose are that the hotel had not been completed in 1999, and that
the Labrate "profits" calculation did not have the benefit of actual operating turnover figures
from which to work.    Nonetheless, the Labrate report appears to have been carefully
calculated.

167.    The Raymond James Turkey reports are also produced by a skilled professional team.
Their projections are based on variables such as growth in GDP (estimated at 6.60% for 2008),
growth in the share of GDP taken by tourism (from 3.5% in 2005 to 10% in 2017) and inflation
(expected to remain within the 6%-8% range until 2017). They yield significantly higher DCF
valuations than does the Labrate report, although that difference is greatly reduced when the
eight year difference in valuation dates is taken into account.

168.    Given the conflicting nature of the available data, the Tribunal has preferred to work
from the basis of the Labrate figure of USD10.57 million as of May 1999. While it relates to an
earlier time, it appears to have a firmer base for its calculations than the Raymond James
figures, where assumptions concerning future variables indicate the possibility of a significant
margin of error. Most importantly, the Tribunal notes that in the second Raymond James
Report, submitted by the Claimant, it is said that

---

[145]    World Bank Guidelines on the Treatment of Foreign Direct Investment, 1992. Guideline IV.
[146]    Cl. Post-Hearing Brief on Quantum, p. 32.

38

"The share purchase agreement was signed by Sistem Muhendislik in 1999 based on the value of the hotel at that time, which was agreed as USD10,570,000."[147]

169.   The same figure is also accepted by the Respondent as a broadly accurate valuation as of 1999. Thus, the Labrate figure is the most recent to have been accepted by both parties. Given the conflicting evidence on who paid for and effected the post-1999 improvements in the hotel, the Tribunal considers that the Labrate valuation of USD10.57 million provides the most secure evidential basis from which to begin work on the determination of compensation.

### Increases in Value Since 1999

170.   The value of the hotel being thus fixed at USD10.57 million on May 1, 1999, the next question is whether the hotel has been shown to have been worth more than USD10.57 million six years later, in June 2005.

171.   There is no reason to suppose that the hotel declined in value between 1999 and 2005. On the contrary, there is no doubt that the fabric of the hotel was improved and that the hotel began to operate successfully. There is, however, a great shortage of reliable and compelling evidence of the financial position of the hotel.

172.   As far as the evidence submitted by the Claimant is concerned, the Raymond James Turkey reports used management accounts for 2002-2004 and, adopting the DCF approach, produced a value which the Claimant has recalculated to a November 2005 value for the hotel of USD20,710,423. The Respondent submits that there is no evidence that in 2005 the hotel was worth more than the 1999 value of USD10.57 million.

173.   The Tribunal has considered what evidence there is of an increase in the value of the hotel between 1999 and 2005. The first Raymond James Report[148] was based on only three years' figures and shows a mixed picture as far as the growth of the hotel was concerned. Room occupancy fluctuated: in 2002 it was 63.65%; in 2003, 60.64%; in 2004, 61.49%. Average room revenue increased over the period, from USD55.04 to USD61.48. Some costs fell, but others increased; and the same is true of the various sources of revenue. Similarly, the figures in the Inaudit report show an unsettled picture of profits and losses during this period. The 2002 "Approval" valuation of USD21,670,000, in contrast, was a cost-based estimate, and not a profits-based estimate, and is for that reason unreliable as an indication of market value. While these figures certainly do not indicate that the hotel was failing to establish itself in the Kyrgyz market, the Tribunal does not consider that it is possible to draw a robust inference from them concerning the market value of the hotel as at June 2005.

---

[147]   Second Raymond James Report, para. 13.

[148]   First Raymond James Report, p. 32.

39

174.    The Tribunal has therefore decided that the most reliable way to estimate the 2005 market value of the hotel is to go back to the "agreed" 1999 market value of USD10.57 million and to adjust it to a June 2005 value by reference to an objective measure of increased value. The Tribunal considers that there can be no real doubt that in June 2005 the hotel was worth at least an amount corresponding to the 1999 "agreed" value of USD10.57 million as that sum had increased in line with the rate at which risk-free investments denominated in the same currency would have increased in value.

175.    The Claimant itself has made such a computation, by recalculating the 1999 "agreed" sum of USD10.57 million using the "risk-free" rate of interest on US Treasury Bills.[149]  It calculated estimated values of USD13.79 million at the end of 2004 and USD14.38 million at the end of 2005. Assuming a steady growth in value during the year 2005, the value of the hotel at the end of June 2005 (an adequate approximation for the value as at June 24, 2005) would have been approximately USD14.08 million. That represents an increase in the value of the hotel of a little over 30% during the period May 1, 1999 – June 30, 2005. **The Tribunal is satisfied that the hotel was worth not less than USD14.08 million in June 2005.** It adopts that figure as the basis for its further calculations.

#### The Payments Due Under the 1999 Share Purchase Agreement

176.    In order to acquire the whole of the interest in the hotel the Claimant would have been obliged to fulfil its obligations under the July 1999 Share Purchase Agreement (as amended in 2003) to pay the liquidator of Ak-Keme. According to Article 3.4 of the Share Purchase Agreement, only upon fulfilment of the obligations under that Agreement (which included the obligation to pay USD12.7 million for the shares: Article 2) was the buyer, Sistem, entitled to transfer the purchased share capital of Hotel Ak-Keme De Luks "wholly or partially to third persons."

177.    Those sums were initially due not to the Respondent but to the liquidator; but the three-sided agreements in 1999, between Ak-Keme (through its liquidator), Sistem, and the Government of the Kyrgyz Republic, restructured the debts. In any event, it is evident that Sistem's true loss must take account of its obligation to pay for the acquisition of Ak-Keme's 50% interest in the hotel in accordance with the 1999 Agreements, and evident also that it is the Government of the Kyrgyz Republic that must pay compensation because it is the Kyrgyz Republic that has been found to have caused the injury to the Claimant as a result of the breach of the obligations of the Kyrgyz Republic under the BIT.

178.    It is necessary that the repayment obligation be evaluated as a single sum, estimated as at June 27, 2005. The sum ought, in principle, to be that which Sistem would have had to pay to the liquidator or the Kyrgyz Government in order to obtain release from its obligations to

---

[149]    Second Raymond James Report, p. 5.

make a full and prompt set of payments by instalments in accordance with the December 2003 schedule of payments.

179. That sum would in principle be no more than the total of any amounts already due in accordance with the schedule of payments from the Claimant to the Respondent on June 27, 2005, plus an amount which, if invested by the Claimant at reasonable commercial rates on June 27, 2005, would have been expected to generate a sum corresponding to each of the payment instalments on the dates on which that instalment fell due. Since practically all of the payments were due in US dollars, the rates should be those applicable to transactions in US dollars.

180. The first Raymond James Report offers one estimate (as of December 2007), of **USD3,632,659.**[150] The Tribunal considers, however, that the Claimant has not demonstrated that the 14% interest rate applied there to discount the value of the future sums payable by Sistem is appropriate – particularly in the light of recent trends in interest rates – or that such a rate is in line with the calculations that an investor would have made in June 2005.

181. Furthermore, it cannot be assumed that the entire sum would in fact have been payable by Sistem. Article 6 of the 1999 Loan Transfer Agreement stipulated that

> "[i]n case the Republic of Turkey immunizes the Republic of Kyrgyz from the guarantor obligations to be fulfilled regarding the provided credits [sc., the Eximbank loan], the Government of the Republic of Kyrgyz shall immunize 'Sistem Muhendislik Sanayi ve Ticaret A.S' Firm from the payment of the credit transfer fee amounting to 8,700,000 (eight million seven hundred thousand) USD."[151]

This appears to mean that if Turkey waives its right to repayment of the loan by the Kyrgyz Republic, the Kyrgyz Government would waive its right to repayment by Sistem. Sistem might, therefore, have ended up paying as little as USD2.2 million, if the payments in respect of the full USD8.7 million credit were waived.

182. In these circumstances it is particularly difficult to determine what a realistic discounted value for the scheduled payments would have been, which the Liquidator or the Kyrgyz Government might have accepted in return for releasing Sistem from its payment obligations. The Prayer for Relief in the Claimant's Memorial asks the Tribunal to award compensation in the range of USD19.57 million – USD21.27 million "or such sum as the Tribunal may decide is reasonable and properly due to the Claimant in respect of the asset value of the Hotel."[152] The Tribunal considers that this authorizes a robust approach to the question of the valuation of

---

[150] First Raymond James Report, p. 45.
[151] CM 14.
[152] Cl. Memorial, para. 305.1.

41

Sistem's debt under the 1999 Agreement – principally,[153] the USD10,985,799 payable as the dollar-denominated component.

183.    The Tribunal considers that a reasonable approximation can be obtained by asking what sum would have generated the USD10,985,799 payable by Sistem at the end of the 18 year period starting in November 2005 within which the dollar amounts were repayable under the 2003 payment schedule.[154]   That simple approach would, hypothetically, give the Kyrgyz Government less than the payment schedule, because it does not take account of the value of having part-payments of the sum due at six-monthly intervals during the repayment period. On the other hand, it would, hypothetically, give the Kyrgyz Government more than they would have been paid if the Turkish Government had waived repayment rights at some stage before the final payment was due.[155]

184.    The key question is, what discount rate should be applied? Attempts to identify rates that might actually have been used in the calculation of the price of buying out Sistem's scheduled payment obligations founder on the fact that interest rates available to a private enterprise such as Sistem are not the same as those available to a sovereign State such as the Kyrgyz Republic. Borrowing rates are higher for private enterprises. The applicable rate would therefore depend upon whether one looks at the cost to Sistem of funding the payment stream or the cost to the Government of borrowing a similar sum. For example, on June 27, 2005 the LIBOR USD rate was 3.83%.[156]   Commercial rates were, of course, higher.   On the other hand the Kyrgyz Republic had in March 2005 succeeded in rescheduling its Paris Club debt on concessional terms.

185.    The Tribunal has decided that for the purposes of discounting the value of the scheduled payments back to June 2005 levels, in the absence of evidence clearly indicating that another standard should be used, it is reasonable to use the LIBOR USD rate. This is an objective standard.   It has been used by the Claimant;[157] and it is used in Article 6(3) of the Kyrgyz Investment Law as the standard for interest payable in cases of expropriation.

186.    The Tribunal has therefore arrived at a June 2005 value of the sums due from the Claimant to the Kyrgyz Government under the schedule of payments of USD5.58 million, a sum which would, over 18 years of compound interest at 3.83%, have yielded USD10.98 million.

---

[153]    Sistem had in fact paid only 17,428,517.57 Soms of the 19,571,000 Soms payable under the 2003 schedule. The difference – equivalent to around USD50,000 – is within the margin of error in the approach that the Tribunal has adopted.
[154]    Under that schedule only the Som – denominated debt was repayable in the first two years of the 20 year schedule.
[155]    There is no indication in the Share Purchase Agreement that the Kyrgyz Government would repay any sums to Sistem if Turkey waived its right to repayment after Sistem had, in effect, paid off the whole or part of the debt in respect of the Eximbank loan. The Tribunal accordingly disregards that possibility.
[156]    See, e.g., http://www.bba.org.uk/bba/jsp/polopoly.jsp?d=141&a=11945.
[157]    E.g., Cl. Post-Hearing Brief on Quantum, p. 10.

187.    Accordingly, the Tribunal determines that the value of the hotel in June 2005 was USD14.08 million minus USD5.58 million, which equals **USD8.5 million**. That sum will, of course, be augmented by the interest due upon it, as is explained below.

### The Claim For Lost Profits

188.    The Claimant seeks an award in respect of lost profits from March 2005 onwards. [158] The Tribunal accepts that the function of financial reparation is to wipe out, as far as possible, all of the losses caused to the Claimant by the Respondent's breach of its legal duties owed to the Claimant. In broad terms, the successful Claimant is to be put in the same financial position as he would have been in if his rights had not been violated. Account must be taken of the fact that the Claimant lost not only the hotel, but also the profits which the hotel would have generated if the Claimant had retained ownership and possession of it. It is, however, important not to double-count that element of the Claimant's loss.

189.    In the present case, compensation for the loss of the hotel takes the form of the award of a lump sum payment. The calculation of that lump sum starts by awarding an amount equivalent to the value of the hotel *at the time of the time of the expropriation* (i.e., June 27, 2005). The hypothetical willing buyer's expectations regarding future profits and losses would, of course, have a significant influence upon the price that would have been paid, and thus upon the value of the hotel at that date. Indeed, as one study has observed, "where the fair market value is established by using the DCF method, it directly represents the net present value of future (in relation to the date of valuation) cash flows that the investment is expected to generate." [159] Actual profits and losses, which might vary greatly from those anticipated at the time of the loss or hypothetical "willing buyer – willing seller" sale, would have been unknown and could have had no influence.

190.    The Tribunal's valuation of the hotel as at the time of the taking in 2005 was an extrapolation from a DCF valuation of the hotel as of 1999. [160] Accordingly, the DCF element in the valuation has already taken some account of the profits that the hotel was expected to generate. It is, however, not enough to award the Claimant the sum which the Tribunal has determined the hotel was worth in June 2005. Had the hotel not been taken, the Claimant would have generated profits from the hotel. Had the Claimant sold it to a willing buyer, at a price reflecting the buyer's expectations of the hotel's profits, the Claimant would have received a cash sum in June 2005 which the Claimant could then have invested, earning interest on the cash sum. The interest is, in a sense, therefore the counterpart of the profits which the Claimant would have continued to earn from its investment in the hotel. It follows that on the Claimant is entitled not only to a sum equivalent to the value of the hotel but also to interest on

---

[158]    Cl. Memorial, para. 305.2.

[159]    SERGEI RIPINSKY WITH KEVIN WILLIAMS, DAMAGES IN INTERNATIONAL INVESTMENT LAW, p. 289 (British Institute of International & Comparative Law, 2008).

[160]    *See supra* paras. 165–175.

43

that sum, from the date of the taking up to the date on which the compensation is paid. In this way the profits lost by the Claimant will be compensated. But the Claimant could not both have retained the hotel and also held the lump sum and invested it as an income-producing asset: if it had retained the hotel it would not have had the lump sum, and *vice versa*. That is why the Claimant cannot also recover lost profits for the period after the taking. If there were to be an award of lost profits as well as an award of interest, the Claimant would in effect be compensated twice for the same loss.

191. The Tribunal has considered whether compensation for lost profits might be due for the period between March 25, 2005 and June 27, 2005, on the basis of a failure by the Respondent to protect the investment in accordance with its obligations under the BIT, assuming that such an obligation existed.[161] There is, however, evidence that during the early part of that period the Kyrgyz Republic was attempting to restore the hotel to Sistem, so that there is no clear evidence to support a date prior to June 27, 2005 on which the Respondent's liability for breach of the BIT might be said to have begun. Furthermore, this was a short period which saw much political turmoil; and any estimate of the profits (if any) of the hotel during this period would be speculative. In these circumstances, the Tribunal has decided not to make any award in respect of lost profits.

### The Claim For Interest

192. The Claimant has also claimed interest on the monetary award.[162]

193. The Tribunal has estimated the amount that would have represented the market value of the hotel if it had been paid to the Claimant on June 27, 2005. As has been noted, the Claimant is entitled to interest on that sum, from the date of the taking up to the date on which the compensation is paid. The Claimant is thus entitled to interest on the sum of USD8.5 million, from June 27, 2005 up to the date on which the sum awarded is paid.

194. The proper role of the payment of interest is to fulfil the duty to compensate the Claimant for the whole of its loss. One cannot know what a Claimant would have done had it been paid USD8.5 million in June 2005. It might have made spectacularly good, or disastrously bad decisions on the investment of such a sum. The cautious approach is to assume, in the absence of evidence to the contrary, that its loss would have been at least that of the principal sum plus interest gained from risk-free investments. It is plain that had that sum been invested it would have generated compound interest, and full compensation of the Claimant's loss therefore demands that the award of interest be similarly compounded.

---

[161] As to which, *see infra* para. 197.

[162] Cl. Memorial, para. 305.3.

195. Unlike the estimate of the market value of the hotel on June 27, 2005, the calculation of the interest payable can properly take account of facts that have occurred since June 27, 2005. In particular, it can be calculated having regard to the actual interest rates that have obtained during this period.

196. On that basis the Tribunal determines that the interest payable is that resulting from the LIBOR USD twelve-month rate. Interest is payable from the date of the taking (June 27, 2005) up to the date of the payment of the sums owing under this award.

### Claims Under Other Headings in the BIT

197. The Tribunal has determined that the Respondent was in breach of its BIT obligations concerning expropriation. The Claimant also argued that although the Kyrgyz-Turkey BIT does not itself set out obligations of Fair and Equitable Treatment and Full Protection and Security in its operative paragraphs, such obligations were owed by the Respondent to the Claimant by virtue of the MFN provision in Article I of the Kyrgyz-Turkey BIT. The Tribunal does not consider it necessary to decide this point, or the question whether there was a breach of the Article II duty to accord "national" treatment to investors, because the sum awarded by the Tribunal represents the full loss which the Tribunal has determined was suffered by the Claimant. Nor has the Tribunal found it necessary to consider the precise position under Kyrgyz investment law, because any losses sustained as a result of any such breach arising from the facts in this case would already be fully compensated by the award that the Tribunal has made in respect of the BIT breaches.

198. Accordingly, the sum awarded by the Tribunal represents the full loss which was suffered by the Claimant, and no further sums are due under the claims in this case.

199. The Claimant also sought additional relief, in the form of an order that the Kyrgyz Republic must not make any other decisions in relation to the hotel, and that any payment awarded or to be awarded by the Kyrgyz courts against Sistem or its shareholders "will be added in favour of Sistem and will not be off-set." The Tribunal considers that it is unable to make an order in such wide terms, and it declines to do so.

200. The Respondent has referred to various sums said to be owing by the Claimant to the Kyrgyz Republic. These sums were not made the subject of a counter-claim in these proceedings; nor were there any detailed pleadings addressed to them. The Tribunal lacks jurisdiction to rule upon those claims. Those claims are not affected in any way by the present award, and the Respondent may pursue them through other procedures if it so wishes.

45

**The Claim For Costs**

201. Both parties submitted summary accounts of the costs that they had incurred in conducting the case and sought an order to recover them from the other Party. The Claimant's costs amounted to just over USD686,392, plus advance payments to ICSID of approximately USD429,000. The Respondent's costs amounted to just over USD230,000. The Tribunal is required by Article 58 of the Additional Facility Rules to determine how and by whom the costs of the arbitration shall be borne.

202. The Tribunal considers that the reasonable costs of a successful Claimant incurred in pursuing a successful claim for compensation are, in principle, a part of the loss suffered as a result of the violation of the Claimant's rights, and accordingly recoverable from the Respondent.

203. It also accepts that in some cases disputes arise not from obvious breaches of legal obligations but from different conceptions, held in good faith, of the legal position. In such cases the costs of the resolution of the dispute through agreed procedures might be regarded as an extension of the costs incurred by each Party in making the initial agreement. Indeed, in some circumstances the parties may choose to leave to an arbitral tribunal the determination of their precise rights and duties, rather than themselves continue negotiations and increasingly detailed drafting of agreements. In such cases it seems more appropriate to regard the costs of arbitration as a cost of establishing the initial relationship between them, which in the absence of indications to the contrary is to be shared equally between them.

204. In many, perhaps most, cases it will not be possible to place the case at one or other of these extreme positions. In such circumstances the Tribunal must exercise its discretion and arrive at an apportionment of costs which it considers to be fair in the light of all the circumstances that gave rise to the dispute and in the light also of the manner in which the parties conducted the arbitral proceedings.

205. There are no settled principles concerning the apportionment of costs in ICSID proceedings and ICSID Additional Facility Proceedings. Studies have suggested that the most common solution is for ICSID fees and the costs of the Tribunal to be shared equally and for each Party to bear its own legal costs.[163] In some cases, however, the "loser pays" principle has been applied.[164]

206. In the present case the Tribunal notes that the Respondent did not appear in the first procedural meeting and that the Respondent unsuccessfully challenged the jurisdiction of the

---

[163] *See, e.g.,* CHRISTOPH H. SCHREUER, THE ICSID CONVENTION: A COMMENTARY (2001), p. 1229. *Cf.* CAMPBELL MCLACHLAN QC, LAURENCE SHORE, MATTHEW WEINIGER, LOUKAS MISTELIS, INTERNATIONAL INVESTMENT ARBITRATION: SUBSTANTIVE PRINCIPLES, pp. 346–349 (Oxford 2007)..

[164] MCLACHLAN QC, *supra* note 163, pp. 346–349.

46

Tribunal in 2007. The Tribunal notes also that the opacity of the Claimant's financial arrangements contributed to the difficulty of determining the amount of its loss, and may also have been a factor contributing towards the development of the dispute. Once proceedings were under way, neither Party obstructed the progress of the proceedings.

207.    In these circumstances the Tribunal considers it fair that the parties should each pay an equal share of the ICSID fees and the costs of the Tribunal, and that the Respondent should make a contribution to the legal fees incurred by the Claimant. The Tribunal has therefore decided:

> i.  that the Respondent should pay to the Claimant the sum of USD400,000 as a contribution towards the Claimant's legal fees. Interest is payable on that amount from the date that the payment is due: i.e., the date of this award.

> ii. that the Respondent should reimburse the Claimant USD247,410 representing half of USD494,820, which is the total advance payments that the Claimant has paid to ICSID for the fees and expenses of the Centre and the costs of the Tribunal;

## ORDER

208.    In view of the above, the Tribunal hereby orders:

> i.  That the Respondent shall pay the Claimant the sum of USD8.5 million, plus interest on that sum at the LIBOR USD twelve-month rate for the period from the date of the taking (June 27, 2005) up to the date of the payment of the sums owing under this award.

> ii. That the Respondent shall pay to the Claimant the sum of USD400,000 as a contribution towards the Claimant's legal fees, plus interest on that sum at the LIBOR USD twelve-month rate for the period from the date of this award up to the date of the payment.

> iii. That the Respondent shall reimburse the Claimant USD247,410 representing half of USD494,820, which is the total advance payments that the Claimant has paid to ICSID for the fees and expenses of the Centre and the costs of the Tribunal.

> iv. That all other claims are hereby dismissed.

47

[*signed*]  20.08.09

Vaughan Lowe, QC
*President of the Tribunal*

[*signed*]  24.08.09                              [*signed*]  14.08.09

Nabil Elaraby                              Paolo Michele Patocchi
*Arbitrator*                                  *Arbitrator*

48

# EXHIBIT B

## AGREEMENT BETWEEN

### THE REPUBLIC OF KYRGYZSTAN

#### AND

### THE REPUBLIC OF TURKEY

CONCERNING THE RECIPROCAL PROMOTION AND PROTECTION OF INVESTMENTS

The   Republic   of   Kyrgyzstan   and   The   Republic   of   Turkey, hereinafter called the Parties.

Desiring  to promote greater economic cooperation between  them, particularly  with  respect to investment by  investors  of  one Party in the territory of the other Party.

Recognizing  that  agreement upon the treatment to  be  accorded such   investment   will   stimulate   the   flow   of   capital   and technology and the economic developments of the Parties.

Agreeing  that  fair and equitable treatment  of  investment  is desirable in order to maintain a stable framework for investment and maximum effective utilization-of-economic resources, and

Having   resolved   to   conclude   an   agreement   concerning   the encouragement and reciprocal protection of investmens.

Hereby agree as follows:

## ARTICLE I

### Definitions

For the purpose of this Agreement;

1. The term "investor" means:

   (a) natural persons deriving their status as nationals of
       either Party according to its applicable law.

Text provided by Embassy of the Kyrgyz Republic, Washington, D.C.

1

(b) corporations, firms or business associations incorporated or constituted under the law in force of either of the Parties and having their headquarters in the territory of that Party.

2. The term "investment", in conformity with the hosting Party's Laws and Regulations, shall include every kind of asset in particular, but not exclusively:

   (i) shares, stocks or any other form of participation in companies,

   (ii) returns reinvested, claims to money or any other rights to legitimate performance having financial value related to an investment.

   (iii) movable and immovable property, as well as any other rights in rem such as mortgages, liens, pledges and any other similar rights.

   (iv) copyrights, industrial and intellectual property rights such as patents, licenses, industrial designs, technical processes, as well as trademarks, goodwill, know-how and other similar rights,

   (v) business concessions conferred by law or by contract, including concessions to search for, cultivate extract or exploit natural resources on the territory of each Party as defined hereafter.

3. The term "returns" means the amounts yielded by an investment and includes in particular, though not exclusively, profit, interest, and dividends.

4. The term "territory" includes the land boundaries, maritime areas and the continental shelf delimited by mutual agreement between the parties concerned over which the Party hosting the investment has sovereign rights or jurisdiction in accordance with international law.

### ARTICLE II

#### Promotion and Protection of Investments

1. Each Party shall permit in its territory investments, and activities associated therewith, on a basis no less favourable than that accorded in similar situations to investments of investors of any third country, within the framework of its laws and regulations.

2

2.   Each Party shall accord to these investments, once established, treatment no less favourable than that accorded in similar situations to investments of its investors or to investmenst of investors of any thir country, whichever is the most favourable.

3.   Subject to the laws and regulations of the parties relating to the entry, sojourn and employment of aliens;

   (a) nationals of either Party shall be permitted to enter and remain in the territory of the other Party for purposes of establishing, developing, administering or advising on the operation of an investment to which they, or an investor of the first Party that employs them, have committed or are in the process of committing a substantial amount of capital or other resources,

   (b) companies which are legally constituted under the applicable laws and regulations of one Party, and which are investments of investors of other Party, shall be permitted to engage managerial and technical personnel of their choice, regardless of nationality.

4.   The provisions of this Article shall have no effect in relation to following agreements entered into by either of the Parties.

   (a) relating to any existing or future customs unions, regional economic organization or similar international agreements,

   (b) relating wholly or mainly to taxation.

## ARTICLE III

### Expropriation and Compensation

1. Investmens shall not be expropriated, nationalized or subject directly or indirectly, to measures of similar effect except for a public purpose, in a non-discriminatory manner, upon payment of prompt, adequate and effective compensation, and in accordance with due process of law and the general principles of treatment provided for in Article II of this Agreement.

2.   Compensation shall be equivalent to the real value of the expropriated investment before the expropriatory action was taken or became known Compensation shall be paid without delay and be freely transferable as described in para. 2 Article 4.

3

3. Investors of either Party whose investmens suffer losses in the territory of the other Party owing to war, insurrection, civil disturbance or other similar events shall be accorded by such other Party treatment not less favourable than that accorded to its own investors or the investors of and third country, whichever is the most favourable treatment, as regards any measures it adopts in relation to such losses.

## ARTICLE IV

## Repatriation and Transfer

1. Each Party shall permit in good faith all transfers related to an investment to be made freely and without unreasonable delay into and out of its territory. such transfers include:

   (a) returns,

   (b) proceeds from the sale or liquidation of all or any part of an investment.

   (c) compensation pursuant to Article III,

   (d) reimbursements and interest payments deriving from loans in connection with investmens.

   (e) salaries, wages and other remunerations received by the nationals of one Party who have obtained in the territory of the other Party the corresponding work permits relative to an investment.

   (f) payments arising from an investment dispute,

2. Transfer shall be made in the convertible currency in which the investment has been made or in any convertible currency at the rate of exchange in force at the date of transfer, unless otherwise agreed by the investor and the hosting Party.

## ARTICLE V

## Subrogation

1. If the investment of an investor of one Party is insured against non-commercial risks under a system established by law, any subrogation of the insurer which stems from the terms of the insurance agreement shall be recognized by the other Party.

2. The insurer shall not be entitled to exercise any rights other than the rights which the investor would have been entitled to exercise.

4

3. Disputes between a Party and an insurer shall be settled accordance with the provisions of Article VII of this Agreemen

## ARTICLE VI

## Derogation

This agreement shall not derogate from:

(a) laws and regulations, administrative practices or procedures or administrative or adjudicatory decisions of either Party,

(b) international legal obligations, or

(c) obligations assumed by either Party, including those contained in an investment agreement or an investment authorization,

that entitle investments or associated activities to treatment more favourable than that accorded by this Agreement in like situations.

## ARTICLE VII

### Settlement of Disputes Between One Party and Investors of the Other Party

1. Disputes between one of the Parties and one investor of the other Party, in connection with his investment, shall be notified in writing, including a detailed information, by the investor to the recipient Party of the investment. As far as possible, the investor and the concerned Party shall endeavour to settle these disputes by consultations and negotiations in good faith.

2. If these disputes cannot be settled in this way within six months following the date of the written notification mentioned in paragraph 1, the dispute can be submitted, as the investor may choose, to:

(a) the International Center for Settlement of Investment Disputes (ICSID) set up by the "Convention on Settlement of Investment Disputes Between States and Nationals of other States", [in case both Parties become signatories of this Convention.]

5

(b) an ad hoc court of arbitration laid down under the Arbitration Rules of Procedure of the United Nations Commission for International Trade Law (UNCITRAL), [in case both parties are members of U.N.]

(c) the Court of Arbitration of the Paris International Chamber of Commerce,

provided that, if the investor concerned has brought the dispute before the courts of justice of the Party that is a party to the dispute and a final award has not been rendered within one year.

3. The arbitration awards shall be final and binding for all parties in dispute. Each Party commits itself to execute the award according to its national law.

## ARTICLE VIII

### Settlement of Disputes Between the Parties

1. The Parties shall seek in good faith and a spirit of cooperaiton a rapid and equitable solution to any dispute between them concerning the interpretation or application of this Agreement. In this regard, the Parties agree to engage in direct and meaningful negotiations to arrive at such solutions. If the Parties cannot·reach an agreement within six months after the beginning of dispute between themselves through the foregoing procedure, the dispute may be submitted, upon the request of either Party, to an arbitral tribunal of three members.

2. Within two months of receipt of a request, each Party shall appoint an arbitrator. The two arbitrators shall select a third arbitrator as Chairman, who is a national of a third State. In the event either Party fails to appoint an arbitrator within the specified time, the other Party may request the President of the International Court of Justice to make the appointment.

3. If both arbitrators cannot reach an agreement about the choice of the Chairman within two months after their appointment, the Chairman shall be appointed upon the request of either Party by the President of the International Court of Justice.

4. If, in the cases specified under paragraphs (2) and (3) of this Article, the President of the International Court of Justice is prevented from carrying out the said function or if he is a national of either Party, the appointment shall be made by the Vice-President, and if the Vice-President is prevented from carrying out the said function or if he is a national of either Party, the appointment shall be made by the most senior member of the Court who is not a national of either Party.

6

5. The tribunal shall have three months from the date of t
selection of the Chairman to agree upon rules of procedu
consistent with the other provisions of this agreement. In t
absence of such agreement, the tribunal shall request t
President of the International Court of Justice to designa
rules of procedure, taking into account generally recogniz
rules of international arbitral procedure.

6. Unless otherwise agreed, all submissions shall be made at
all hearings shall be completed within eight months of the da
of selection of the third arbitrator, and the tribunal sha'
render its decision within two months after tehe date of tl
final submissions or the date of the closing of the hearing:
whichever is later. The arbitral tribunal shall reach it
decisions, which shall be final and binding, by a majority c
votes.

7. Expenses incurred by the Chairman, the other arbitrators
and other costs of the proceedings shall be paid for equally b
the Parties. The tribunal may, however, at its discretion
decide that a higher proportion of the costs be paid by one o
the Parties.

8. A dispute shall not be submitted to an internationa
arbitration court under the provisions of this Article, if the
same dispute has been brought before another internationa
arbitration court under the provisions of Article X and is stil
before the court. This will not impair the engagement in direct
and meaningful negotiations between both Parties.

## ARTICLE IX

### Entering into Force

1. This Agreement shall enter into force on the date on which
the exchange of instruments of ratification has been completed.
It shall remain in force for a period of the years and shall
continue in force unless terminated in accordance with paragraph
2 of this Article. It shall apply to investments existing at the
time of entry into force as well as to investments made or
acquired thereafter.

2. Either Party may, by giving one year's written notice to the
other Party, terminate this Agreement at the end of the initial
ten year period or at any time thereafter.

3. This Agreement may be amended by written agreement between
the Parties. Any amendment shall enter into force when each
Party has notified the other that it has completed all internal
requirements for entry into force of such amendment.

4. With respect to investments made or acquired prior to the
date of termination of this Agreement and to which this

7

Agreement otherwise applies, the provisions of all of the of Articles of this Agreement shall thereafter continue to be effective for a further period of the years from such date termination.

IN WITNESS WHEREOF, the respective plenipotentiaries have signed this Agreement.

DONE at_____on the day of_____in two authentic copies in English.


FOR THE GOVERNMENT OF
THE REPUBLIC OF KYRGYZSTAN

W. Loic Reeed,-

FOR THE GOVERNMENT OF
THE REPUBLIC OF TURKEY

S. Demiul


8

**EXHIBIT C**

ON INVESTMENTS IN THE KR

Written by Administrator
Friday, 22 July 2005

Bishkek March 27, 2003, # 66

## THE LAW OF THE KYRGYZ REPUBLIC

### On Investments in the Kyrgyz Republic

CHAPTER 1. GENERAL PROVISIONS
CHAPTER 2. LEGAL GUARANTEES FOR INVESTORS
CHAPTER 3. STATE SUPPORT OF INVESTORS AND INVESTMENTS
CHAPTER 4. INSTRUCTIONS OF THE LABOR LEGISLATION FOR INVESTORS
CHAPTER 5. FINAL PROVISIONS

This Law regulates the main principles of the state investment policy aimed at developing favorable investment climate in the republic and attracting and stimulating domestic and foreign investments by means of providing a fair legal regime to investors and quarranties for protection of investments made by investors to the economy of the Kyrgyz Republic.

## CHAPTER I
## GENERAL PROVISIONS

Article 1. Basic concepts and terms used in this Law

I. Investments mean tangible and intangible assets, in particular:

- money;
- movable and immovable property;
- property rights (mortgages, liens, pledges and others);
- stock and other forms of participation in a legal entity;
- bonds and other debenture liabilities;
- non-property rights (right to intellectual property including goodwill, copy rights, patents, trade marks, industrial designs, technological processes, trade names and know-how);
- any right to activity based on a license or in other form given by State agencies;
- concessions based on Law including concessions for search, development, mining or exploitation of natural resources;
- profit and revenue received from investment and re-invested on the territory of the Kyrgyz Republic;
- other forms of investments that are not forbidden by the legislation of the Kyrgyz Republic.

A form in which property is invested, or any change in this form shall not influence the nature of investments.

2. Direct Investments mean the holding, acquisition by an investor of not less than one third percent of stock and stockholders votes in joint stock companies registered or newly created on the territory of the Kyrgyz Republic, or any equivalent of such participation in business entities of other types and all further operations between an investor and a company which is invested to, investment of capital to the fixed assets of branches, representative offices of a legal entity created on the territory of the Kyrgyz Republic.

3. Investor means a subject of investment activity making his own, borrowed or attracted contributions as direct investments.

Domestic investor means a legal entity or natural person of the Kyrgyz Republic, a foreign citizen and person without citizenship having status of resident in Kyrgyz Republic and engaged in investment activity on the territory of the Kyrgyz Republic.

Foreign investor means any natural person or legal entity which is not a domestic investor making contributions to the economy of the Kyrgyz Republic, including:

1) a natural person who is a foreign citizen or person without citizenship, permanently living outside the Kyrgyz Republic;

2) a legal entity which is either:

- founded and registered in accordance with the legislation of a foreign State; or
- founded with foreign participation but established in compliance with the legislation of the Kyrgyz Republic: entirely belonged to one or more foreign natural, legal persons; or

controlled and managed by one or more foreign natural, legal persons on the basis of a written contract, the right to exercise the majority of shares, the right to appoint the majority of members to its executive or supervisory bodies, or

not less than one third percent of stock and stockholders voices of which are held by foreign citizens. people without citizenship permanently living outside the Kyrgyz Republic or legal entities as referred to in this Article;

3) a legal entity created by inter-governmental treaty of the Kyrgyz Republic;

4) foreign organization which is not a legal entity;

5) international organization.

4. Investment Activity means practical operation of investor in respect of his investments.

5. Reinvestment means investment in the objects of entrepreneurial activity on the territory of the Kyrgyz Republic for the account of proceeds and profits of investors received from their investments made in Kyrgyz Republic.

6. An Investment dispute means any dispute between an investor and governmental bodies, officials of the Kyrgyz Republic and other participants of investment activity, arising in process of investment realization.

7. An Authorised governmental body means a body of state administration, authorized by the Government of the Kyrgyz Republic to promote investments and coordinate investment activity in the Kyrgyz Republic. The regulation on the authorized governmental body is approved by the Government of the Kyrgyz Republic.

Article 2. Legislation of the Kyrgyz Republic on Investments

1. Legislation regulating the investment regime is comprised of the Constitution of Kyrgyz Republic, this Law. other laws and regulatory legal acts of the Kyrgyz Republic.

2. If any amendments are made to the investment legislation of Kyrgyz Republic except for the Constitution of Kyrgyz Republlic, tax legislation and legislation regarding state security, public health and environmental protection, investors shall have the right to opt for more favourable conditions within ten years from the date of approval of such amendments.

3. In case of contradictions in provisions of this Law and the interstate agreements to which the Kyrgyz Republic is a signatory, the provisions of the interstate agreements shall apply.

Article 3. Scope of the present Law

1. Direct investment relationships in the Kyrgyz Republic shall be regulated by this Law and other regulatory legal acts of the Kyrgyz Republic adopted in in accordance with this Law.

2. Investments to credit or insurance organizations shall be regulated by specific regulatory legal acts of the Kyrgyz Republic.

## CHAPTER 2
## LEGAL GUARANTEES FOR INVESTORS

Article 4. Guarantees of Investment and investors Protection

1. The Kyrgyz Republic shall provide foreign investors, making investments on the territory of Kyrgyz Republic, with the national regime of economic activity applicable in respect of legal entities and natural

perons of the Kyrgyz Republic.

2. Foreign investors, their representatives and foreign employees living in the Kyrgyz Republic in connection with their investment activity have the right for free travel on the territory of the Kyrgyz Republic, except for territories where they may stay on the terms and pursuant to the procedure as defined by respective legislation of the Kyrgyz Republic.

3. The Kyrgyz Republic in the person of its authorized governmental bodies shall not permit discrimination in respect of investors on the basis of their citizenship, nationality, language, sex, race, religion, place of their economic activity and country of origion of investors or investments.

4. The Kyrgyz Republic in the person of its authorized governmental bodies, officials and self-government bodies shall abstain from any interference with economic activity, rights and legal interests of investors, except as provided by the legislation of Kyrgyz Republic.

5. Officials of the Kyrgyz Republic violating the provisions of this Law shall bear a responsibility pursuant to Kyrgyz law.

6. Restoration of violated rights and interests of investors guaranteed by the laws of the Kyrgyz Republic shall be regulated by the legislation and international agreements of the Kyrgyz Republic.

7. Investors, making investments in the priority economic and social sectors and in certain areas of the Republic, in accordance with the state development programs (projects), may be granted investment benefits in compliance with the Kyrgyz law.

8. Investments may be made in any form to the objects and types of activity not prohibited by Kyrgyz law, including into the licenseable types of activity pursuant to the Law of the Kyrgyz Republic "On licensing".

Article 5. Guarantees of export or repatriation of investments, property and information outside the Kyrgyz Republic

1. An nvestor shall have right for free export or repatriation of compensation in freely convertible currency provided by Article 6 of this Law, and proceeds received from investments on the territory of the Kyrgyz Republic, including but not limited to the following:

a) profit from investments received as dividends, interest and other forms of proceeds;

b) resources received by investors upon partial or full termination of investment activity in Kyrgyz Republic or alienation of investments, property and property rights, without prejudice to the investor's obligations to Kyrgyz Republic or any other lenders.

2. An investor, who initially imported to Kyrgyz Republic property and information in a documentary or electronic form as investments, shall have right for repatriation (without being subject to quota, licensing and any other measures of nontariff regulation of foreign trade) of the aforesaid property and information outside the Kyrgyz Republic.

Article 6. Guarantees for Protection from Expropriation of Investments and Compensation of Losses to Investors

1. Investments shall not be subject to expropriation (nationalization, requisition, or other equivalent measures, including actions or ommissions by the state bodies of the Kyrgyz Republic which have resulted in forced withdrawal of investors' funds or in their deprivation of an opportunity to gain on the investments' results), except as provided by the legislation of the Kyrgyz Republic when such expropriation is effectuated in public interests on the basis of nondiscrimination, in observance of a proper legal order and is carried out with timely, appropriate and real compensation of damages, including lost profit.

2. The compensation shall be equivalent to the fair market price of the expropriated investment or its part, including lost profit, fixed on the date of decision on expropriation. The fair market price must not reflect any change in the value as a result of knowing beforehand that the expropriation will take place.

3. The compensation shall be realizable, paid in a freely convertible currency within the terms agreed by parties. Compensation shall include interest at the London interbank rate of LIBOR in US Dollars corresponding to the period for which compensation is charged. If such period is more than one year, a

twelve-month rate shall be used.

4. The proper legal order provides for the investors right for an expedient consideration of a case if the claim on expropriation was filed, including evaluation of his investment and payment of compensation, in accordance with provisions of this Article, by a judicial body or any other competent state body of the Kyrgyz Republic without violation of a procedure for compensation of losses to investors pursuant to Article 18 of this Law.

5. The investors which suffered damage to their investments in the Kyrgyz Republic as a result of the war or any other armed conflict, revolution, state of emergency, civil collisions or other similar circumstances, shall be granted the legal status and conditions as favorable as such are applied to legal and physical persons of the Kyrgyz Republic.

Article 7. Guarantees for the Use of Proceeds

1. Foreign investors shall have the right to use and dispose their investments and proceeds and profit received from investment activities for any purposes, not prohibited by the legislation of the Kyrgyz Republic, freely and in their own discretion.

2. In order to maintain and utilize proceeds and other resources, investors shall have the right to open accounts in the national and foreign currency in accordance with the legislation of the Kyrgyz Republic in the territory of the Kyrgyz Republic.

Article 8. Freedom of Currency Transactions

1. Currency transactions shall be carried out by investors in accordance with the Law of the Kyrgyz Republic "On Foreign Currency Transactions" and other regulatory legal acts of the Kyrgyz Republic on currency controls.

2. With respect to all payments relating to investments in the Kyrgyz Republic investors shall have the right to convert freely the national currency of the Kyrgyz Republic into any other currency.

3. Money transfers in foreign currency related to investments shall be carried out freely to and from the Kyrgyz Republic in conformity with a procedure established by Kyrgyz law.

4. If Kyrgyz legislation is amended to the extent restricting foreign currency transfers to and from the Kyrgyz Republic, such amendments shall not apply to foreign investors. Such restrictions for foreign investors may be enforced only on the basis of the law to prevent money laundry operations.

Article 9. Free Access to Open Information

1. All regulatory legal acts of Kyrgyz Republic and court decisions which affect in any manner interests of investors must be accessible to them, and must be published as directly provided for by the legislation of the Kyrgyz Republic.

2. State bodies and officials of Kyrgyz Republic shall provide investors at their request with accessible information they are interested in according to the procedure provided for by the legislation of the Kyrgyz Republic.

Article 10. Investors' Economic Independence and Recognition of their Rights

1. Investors can freely choose the amount, composition and structure of the capital of a newly created legal entity unless otherwise provided by Kyrgyz law.

2. Investors shall have right to conduct economic activity necessary for realization of investment activity with legal and natural persons, including foreign persons in compliance with Kyrgyz law.

3. Investors may create subsidiaries, branches and representative officers on the territory of the Kyrgyz Republic subject to Kyrgyz legislation. Branches and representative officers shall operate pursuant to the regulations approved by a parent company and shall carry out their activity on behalf of the parent company. The parent company shall bear responsibility for activities of branches and representative officers.

4. By virtue of agreement, investors may transfer their rights (assign claims) and duties (assign debts) in accordance with Kyrgyz legislation.

5. Investors may voluntarily form associations and other unions on the territory of Kyrgyz Republic in accordance with Kyrgyz legislation.

6. Investors may attract to the Kyrgyz Republic monetary funds as credits, securities and other loans. The investor's assets and various property and nonproperty rights may be used as a security for such investor's obligations.

7. Investors may participate in privatization of the state and communal property by acquiring the ownership rights to the state and communal property or its shares in the charter capital of the privatized enterprise on the terms and in conformity with a procedure established by Kyrgyz legislation.

8. Investors may acquire the government notes, stock and other securities of legal entities registered in the Kyrgyz Republic in accordance with Kyrgyz legislation.

9. The Kyrgyz Republic and its officials shall recognize all rights of investors with respect to their intellectual property objects and pertaining to the foreign investments.

10. During the transfer of property rights on buildings and constructions the right to use lands is transferred along with these objects in order and conditions established by the legislation of the Kyrgyz Republic.

11. The tenant right of land can be acquired by investors in conformity with a procedure established by the legislation of the Kyrgyz Republic.

Article 11. Concession contracts

1. Provision to foreign investors of concession on exploration, development and exploitation of natural resources and depths, other economic activity is carried out on the basis of concession contracts signed by foreign investors with authorized state bodies of the Kyrgyz Republic in order determined by the legislation of the Kyrgyz Republic.

2. Concessions are allowed in all spheres and types of activity if they are not forbidden by the legislation of the Kyrgyz Republic and comply with the purposes of signed concession contracts.

Article 12. Investments in Special Economic Zones

The provisions of Kyrgyz legislation governing the special economic zones shall apply to the making of investments into the special economic zones.

## CHAPTER 3
## STATE SUPPORT OF INVESTORS AND INVESTMENTS

Article 13. Purposes of State Support of Investors and Investments

1. The purpose of state support and protection of investors and investments is to create a favorable investment climate and attract direct investments into the country's economy.

2. State support and protection of investments, promotion of investments shall be carried out by an authorized state body.

Article 14. Authorized State Body Effectuating Support and Protection of Investors and Promotion of Investments

1. For the state support and protection of investors, promotion of investments in the Kyrgyz Republic, the authorized state body, in accordance with the Regulation approved by the Government of the Kyrgyz Republic, shall perform the following functions:

   - ensuring connection between state bodies and investors;

   - preparing and distributing information about investment opportunities and conditions in the Kyrgyz Republic

10/31/13
Case 1:12-cv-04502-ALC-RLE Document 27 Filed 11/05/13 Page 74 of 76
INVESTMENT.KG :: On Investments in the KR

- advising potential investors on legal, economic and other issues regarding a specific activity;

- providing investors with the necessary information related to the procedure of permissibility to implement activities and provides necessary assistance;

- providing assistance in resolving problems of the existing and potential investors, including assistance and protection if they become faced with illegal actions or hindrances caused by the state and other bodies;

- developing proposals for all agencies of the Kyrgyz Republic concerning improvement of the investment climate in the Kyrgyz Republic;

- within its competence, representing the Kyrgyz Republic or participating on behalf of the Kyrgyz Republic in international negotiations or consultations on foreign investments;

- taking measures aimed on liability fulfillment of the Kyrgyz Republic coming out from international contracts, conducting actions on international cooperation, organizing learning and use of international experience in these spheres;

- advising any agencies and officials on the existing policy or a policy being planned in the area of investments;

- organizing and conducting competition of investment projects and programs jointly with interested ministries and bodies;

- performing other functions directed to the promotion of investments, maintenance and protection of investors in the Kyrgyz Republic.

2. Investors shall, on equal basis, have the right but not be obliged to use the services for development and protection of their interests which are provided by the authorized state body effectuating the promotion of investments.

## CHAPTER 4
## INSTRUCTIONS OF THE LABOR LEGISLATION FOR INVESTORS

Article 15. Labor Relations between the investors and the citizens of the Kyrgyz Republic

Relations between investors and employees which are the citizens of the Kyrgyz Republic shall be subject to the labor legislation of the Kyrgyz Republic.

Article 16. Attraction of Foreign Workers

1. Foreign citizens may be hired as workers by investors in accordance with Kyrgyz legislation. Such workers may enter the administration of a legal entity.

2. Salary, compensation and other types of reimbursement and income paid by the investor to the worker may be freely transferred outside the Kyrgyz Republic in order established by the legislation of the Kyrgyz Republic.

3. The authorized state bodies shall provide assistance with entrance, departure and stay of foreign citizens for their employment term within the bounds of the investment activity in the Kyrgyz Republic.

Article 17. Social Insurance and Provision

1. Investors shall be obliged to pay for its employees, who are the citizens of the Kyrgyz Republic, individuals without citizenship, the deductions on social insurance and provision established by the Law of the Kyrgyz Republic.

2. Foreign investor shall have the right to transfer payment on social insurance and provision for foreign employee to the respective funds of the foreign state unless otherwise provided by the international agreements of the Kyrgyz Republic.

## CHAPTER 5
## FINAL PROVISIONS

Article 18. Settlement of Investment Disputes

1. Investment dispute shall be resovled in accordance with any applicable procedure agreed in advance between an investor and authorized state bodies of the Kyrgyz Republic that does not exclude the use of other means of legal defense by an investor in accordance with the legislation of the Kyrgyz Republic.

2. If such agreement is not reached the investment dispute between authorized state bodies of the Kyrgyz Republic and investor shall be resolved by conducting consultation between parties. If parties will not agree in 3 month period from the day of first written address for such consultation, the dispute shall be resolved by addressing to a court of the Kyrgyz Republic, unless one of the parties to a dispute between the foreign investor and the state body requests to consider the dispute in accordance with one of the following procedures:

    à) by applying to the International Center for Settlement of Investment Disputes (ICSID) pursuant to the Convention on settlement of investment disputes between states and citizens of other states or the rules regulating the use of additional means for conduct of hearings by the Secretariat of the Center; or

    b) by applying to arbitrage or an international temporary arbitral tribunal (commercial court) formed in accordance with the arbitration rules of UN Commission on international trade law.

3. In the event that an investment dispute is to be resolved through arbitrage as referred to in subpoints "a" and "b" of point 2 of this Article, the Kyrgyz Republic shall waive any claim for preliminary application of the internal administrative or judicial procedures prior to referral of the dispute to international arbitration.

4. Any investment dispute between the foreign and domestic investors shall be considered by the judicial bodies of the Kyrgyz Republic unless the parties reach an agreement on any other dispute settlement procedure, including national and international arbitration.

5. Disputes between foreign investors and physical and legal entities of the Kyrgyz Republic may be resolved under agreement of parties by an arbitral tribunal of the Kyrgyz Republic as well as a foreign arbitral tribunal. In case if such agreement is not reached the disputes will be resolved in conformity with a procedure provided by the legislation of the Kyrgyz Republic.

Article 19. Liabilities of the Kyrgyz Republic on Investments

The Kyrgyz Republic shall not be liable for liabilities of the residents and nonresidents of the Kyrgyz Republic, attracting foreign and/or domestic investments, except when these liabilities are guaranteed by the state in conformity with a procedure established by the legislation of the Kyrgyz Republic.

Article 20. Observance by Investors of Legislation of the Kyrgyz Republic

1. Investors shall observe the legislation of the Kyrgyz Republic in carrying out their economic activity on the territory of the Kyrgyz Republic.

2. In the event of breach of Kyrgyz legislation, the investor shall be imposed liability in accordance with Kyrgyz legislation.

Article 21. Specifics of State Registration of Legal Entities with Foreign Participation

The state registration, re-registration and liquidation of legal entities with foreign participation as well as their branches and representative offices shall be carried out in accordance with the Civil Code of the Kyrgyz Republic and the Law of the Kyrgyz Republic "On the State Registration of Legal Entities".

The foreign investor shall additionally provide the following documents:

    - for foreign legal entity as a founder: a legalized extract from the trade register to verify that the foreign investor (founder) is a legal entity in accordance with the legislation of the country where this legal entity has been registered, with a notarized translation into the state or official language. No legalization is required for legal entities registered in the CIS countries;

    - for foreign natural person as a founder: a copy of passport or any other ID (stating the term of visa), with a notarized translation into the state or official language.

Article 22. Insurance of Investments

1. Insurance of investments and risks of investors shall be voluntary. Unless required by Kyrgyz legislation, the investments and risks may be insured both in and outside the Kyrgyz Republic.

2. Kyrgyz Republic is not liable for obligations of insurance organizations.

Article 23. Application of Law on Foreign Investment made before its adoption

Foreign investors registered in the Kyrgyz Republic before the enforcement of this Law are allowed for privileges, provided by part one of Article 20 and Article 23 of Law on Foreign Investments in the Kyrgyz Republic (Vedomosti of Supreme Soviet of the Kyrgyz Republic, 1991, #13, page/Article 449) with changes and addenda as of 7 May 1993 and 28 July 1995 (Vedomosti of Jogorku Kenesh of the Kyrgyz Republic, 1993, #9, page/article 181; 1995, #10, page/article 390) until the expiry date.

Article 24. Publicity in the activity related to the investment project realization

The authorized state body shall publish all legal acts of the Kyrgyz Republic related to the investment project realization in mass media.

Article 25. Enactment Procedure for this Law

1. This law shall come into effect as of its publication.

2. To consider invalid the Law of the Kyrgyz Republic "On Foreign Investments in the Republic of Kyrgyzstan" (Vedomosti of the Supreme Soviet of the Republic of Kyrgyzstan, 1997, No 10, page 475).

3. The Government of the Kyrgyz Republic within a three month period shall:

   - prepare and submit to Jogorky Kenesh of the Kyrgyz Republic proposals on bringing legislative acts in compliance with this law;

   - bring its own decisions in compliance with this law.

President of the Kyrgyz Republic A. Akaev

Adopted by the Legislative Assembly
of Jogorku Kenesh of Kyrgyz Republic February 7, 2003
Last Updated ( Friday, 28 April 2006 )

**Close Window**